## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## NEW BERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **CHAPTER 11** |
| **JSMITH CIVIL LLC** | ) | |
| | ) | **CASE NO. 23-02734-5-JNC** |
| **DEBTOR.** | ) | |

## OBJECTION TO CONFIRMATION OF
## THE DEBTOR'S PLAN OF REORGANIZATION

COMES NOW, Westfield Insurance Company (the "Westfield"), by and through its undersigned counsel, and respectfully files this *Objection to Confirmation of the Debtor's Plan of Reorganization* (the "Objection"). In support of this Objection, Westfield respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    Westfield comes in opposition to the proposed Plan of Reorganization as the entity that expended millions of dollars prior to the filing of this case to preserve and financially support the Debtor's operations, fund the payroll of Debtor's pre-petition employees, pay the Debtor's pre-petition obligations (thereby significantly limiting the number of unsecured creditors), and complete or arrange to complete many of the Debtor's bonded construction contracts (thereby avoiding significant hardship and resulting claims from the counter-parties to contracts). Now, having essentially cleaned up all of Debtor's bonded construction contracts (which was the vast majority of its business operations) at the cost of over $35 million and standing as the largest creditor of the Debtor, by far, Westfield is faced with a plan that not only makes no effort to protect Westfield's interests, but, in fact, harms Westfield. It should be noted that the Plan was proposed

without even the sharing of a draft or any discussion with Westfield. The result of the Plan would be for Jeremy Smith (the Debtor's sole member, manager, and president) to largely shed the debt and obligations related to the Debtor's largest creditor, Westfield, and continue to operate his company with minimal impact and to the severe prejudice of Westfield, the other creditors, and the Debtor. This Plan is not in the interest of the creditors, does not further the interest of the Bankruptcy Code, and allows the owner of the Debtor to continue operating the post-petition Debtor while also taking assets, claims, and property that should be held for the sole benefit of the creditors. The only beneficiary of this Plan is Jeremy Smith, and that flies in the face of the Bankruptcy Code and its intent.

2.      Two policies undergird chapter 11 of the Bankruptcy Code: (a) preserving the going concern value of the debtor and (b) maximizing returns for the debtor's creditors. *See In re Patel*, case no. 20-30455 (JCW), 2022 WL 1420045, at *4 (Bankr. W.D.N.C. May 4, 2022) (citing *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 435 (1999)). In this case, however, the above-captioned Debtor has no going concern value to preserve nor has the Debtor proposed a plan that maximizes, or even attempts to maximize, returns for its creditors, with a specific emphasis with respect to Westfield. In fact, despite Westfield, as a surety to the Debtor, taking on an outsized role prepetition in protecting the Debtor's going concern value (as discussed below), the Debtor has proposed a Plan (as defined below) that by all appearances is designed to minimize any return to Westfield. To add insult to injury, the Debtor has drafted the Plan in a way that allows the Debtor, post-confirmation and post-reorganization, to receive all the benefits of certain prepetition claims and causes of action while further burdening Westfield as the ultimate target of those claims and causes of action. Further, while Westfield asserts these claims and causes of action are either clearly baseless or not even the Debtor's property, the Plan as

drafted could be interpreted to enjoin Westfield from defending itself either in its own name or as equitable subrogee. These perversions of the two purposes of the chapter 11 process cannot stand and should not be countenanced or encouraged. The Plan, therefore, should not be confirmed.

3. More specifically, the Debtor, through its Plan, has trapped itself in a "Catch-22" with respect to satisfaction of the absolute priority rule codified in section 1129(b)(2)(B) and the feasibility standard found in section 1129(a)(11) of the Bankruptcy Code. The Debtor's owner, sole member, and manager, Jeremy Smith ("Mr. Smith") seeks to provide "new value" in exchange for retention of his equity interest in the Debtor. However, (a) it is not clear that doing so is actually allowed by the Fourth Circuit, (b) even if it is allowed, doing so is not "fair and equitable" in the broad sense, and (c) the alleged "new value" is neither new nor valuable and is insufficient to satisfy the absolute priority rule. The "Catch-22" arises in that, if, *arguendo*, the alleged "new value" is sufficient, then the Debtor necessarily has no equity or going concern value to reorganize around. And confirmation of the Plan must be denied on grounds of feasibility. Other grounds for denial of confirmation based on feasibility also exist (as discussed further below).

4. Further, the Plan lacks any evidentiary support. For instance, there has been no evidence offered to support the Debtor's valuations, and the Liquidation Analysis (as defined below) attached to the Disclosure Statement (as defined below) is mathematically inaccurate and, therefore, does not (a) support lien stripping with respect to Westfield or (b) establish that the best interest of creditors test from section 1129(a)(7) of the Bankruptcy Code has been satisfied.

5. More generally, the issues outlined above and discussed below all indicate the Debtor has not proposed the Plan in good faith as required by section 1129(a)(3) of the Bankruptcy Code.

6.     The Debtor here, as the Plan proponent, bears the burden, by a preponderance of the evidence, of establishing all the elements and requirements of section 1129 of the Code, whether under subsection (a) or (b).  *See In re Platinum Corral, LLC*, case no. 21-00833-5-JNC, 2022 WL 127431, at *10 (Bankr. E.D.N.C. January 13, 2022).  This, the Debtor cannot do for all the reasons outlined above and discussed below, and this Court must, therefore, deny confirmation of the proposed Plan.

## II.     JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

7.     The United States Bankruptcy Court for the Eastern District of North Carolina (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and standing order 84-PLR-4 titled *Referral of Bankruptcy Matters to Bankruptcy Judges*, dated August 3, 1984, issued by the United States District Court for the Eastern District of North Carolina.

8.     Westfield leaves to the determination of this Court whether this, and all issues raised herein, constitute core or non-core proceeding pursuant to 28 U.S.C. § 157.

9.     Venue properly rests before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     Westfield only consents to the entry of a final order or judgment with respect to this Objection to the extent that such final order or judgment is consistent with Article III of the United States Constitution and 28 U.S.C. §§ 157 and 1334.

## III.     PROCEDURAL AND CASE BACKGROUND

11.     On September 19, 2023 (the "Petition Date"), the Debtor commenced the above-captioned Case by filing a voluntary petition [Doc. No. 1] for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in this Court.

12.     On the same day as the Petition Date, the Debtor also filed an *Emergency Motion for Authorization to Use Cash Collateral* [Doc. No. 10] (the "Cash Collateral Motion"). Westfield filed its *Limited Objection to Entry of a Subsequent Interim or Final Order on the Debtor's Emergency Motion for Authorization to Use Cash Collateral* [Doc. No. 38] (the "Westfield Cash Collateral Objection"] on September 28, 2023. Through agreed language between Westfield, the Debtor, and other parties in interest resolving the Westfield Cash Collateral Objection and other formal or informal responses, the Cash Collateral Motion has been granted on an interim basis eight times to date [Doc. Nos. 28, 56, 92, 160, 221, 249, 279, and 312].

13.     The Debtor filed its original schedules and statements on October 17, 2023 [Doc. No. 68], and it filed an amended *Summary of Assets and Liabilities for Non-Individuals* and an amended *Schedule A/B: Assets – Real and Personal Property* ten days later on October 27, 2023 [Doc. No. 96] (Doc. Nos. 68 and 96, collectively, the "Schedules and Statements").

14.     Since the Petition Date, the Debtor has filed seven monthly operating reports for the months of September, October, November, and December of 2023 and January, February, and March of 2024 [Doc. Nos. 153, 188, 227, 246, 269, 308, 334] (each, as identified by date, a "Monthly Operating Report," and, collectively, the "Monthly Operating Reports"). An eighth monthly operating report for April of 2024 should be filed shortly before the confirmation hearing currently scheduled for May 16, 2024.

15.     On March 18, 2024, the Debtor proposed its *Plan of Reorganization* [Doc. No. 296] (the "Plan") and filed its *Disclosure Statement* [Doc. No. 297] (the "Disclosure Statement") the next day on March 19, 2024.

16.     The Disclosure Statement also incorporated multiple attached exhibits [Doc. No. 297-1]: a *Summary of Liabilities, Claims, and Payment Schedule* as Exhibit A (the "Claim

Summary"), a *Liquidation Analysis* (the "Liquidation Analysis") as Exhibit B, and the *Projections of Income, Expenses, and Payments* as Exhibit C (the "Business Projection").

17.     Shortly after the Debtor filed the Disclosure Statement, this Court *sua sponte* entered the *Order Conditionally Approving Disclosure Statement, Fixing Last Day to File Objections to the Disclosure Statement, Fixing Last Day to File Acceptances/Rejections of the Plan, Setting Hearing on Confirmation of the Plan, Directing that Ballots Be Filed, and Directing the Plan Proponent to File Report on Ballots* [Doc. No. 302] (the "Order Conditionally Approving the Disclosure Statement and Setting the Timelines for Solicitation and Confirmation").

18.     The Order Conditionally Approving the Disclosure Statement and Setting the Timeline for Solicitation and Confirmation provided, *inter alia*, the following:

- May 9, 2024:   Deadline to File Objections to the Disclosure Statement, Deadline to File Ballots Accepting or Rejecting of the Plan, and Deadline to File Objections to Confirmation; and
- May 16, 2024: Hearing Date for Confirmation.

19.     In light of this Objection, pursuant to Bankruptcy Rules 3020(b) and 9014(c) and Civil Rule 16 as made applicable by Bankruptcy Rule 7016(a), Westfield respectfully suggests and requests that the May 16, 2024, court date be treated as a pre-confirmation scheduling conference rather than a confirmation hearing.

## IV.     THE BONDS, INDEMNITY AGREEMENTS, AND WESTFIELD'S SECURED CLAIM

20.     Prior to the Petition Date, Westfield issued various surety bonds (the "Bonds") with an aggregate penal sum of $111,777,977.42[1] on behalf, or at the request, of the Debtor with respect to multiple construction contracts (each a "Bonded Contract," and, collectively, the "Bonded Contracts").  A list of the Bonds is attached as Exhibit A.  The Debtor serves as a principal under

---

[1] This amount is actually one half of the total penal sums as each project had a payment bond and performance bond in the same amount.

all of the Bonds.

21.     The Bonds include performance bond no. 164584X in the amount of $9,586,280.00 (the "Atlantic Avenue Bond"), issued by Westfield on behalf of the Debtor as principal in relation to the Debtor's contract (the "Atlantic Avenue Contract") with the City of Raleigh ("Raleigh") for a project commonly known as the Atlantic Avenue improvement project (the "Atlantic Avenue Project").[2]  A true and correct copy of the Atlantic Avenue Bond is attached as Exhibit B.  The entire Atlantic Avenue Contract is over 500 pages, and a copy can be made available to the Debtor, the Court, or any other party upon request.

22.     In consideration of Westfield's issuance or procurement of the Bonds, the Debtor executed as an undersigned indemnitor that certain *Agreement of Indemnity* dated May 8, 2018; that certain *Agreement of Indemnity* dated May 21, 2019; and that certain *Agreement of Indemnity* dated May 1, 2020 (each an "Indemnity Agreement" as identified by date, and collectively, the "Indemnity Agreements").   Redacted but otherwise true and correct copies of the Indemnity Agreements are attached as Exhibit C.

23.     The Indemnity Agreements constitute security agreements between Westfield, the Debtor, Mr. Smith, and all the other undersigned indemnitors and grant Westfield a security interest on all of the Debtor's, Mr. Smith's, and other undersigned indemnitors' right, title, and interest in any of their owned or after acquired property including, but not limited to, the following:

    i.     All . . . real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities),

---

[2] Westfield references the Atlantic Avenue Bond, Atlantic Avenue Contract, Raleigh, and the Atlantic Avenue Project because the Debtor has explicitly included such in the Liquidation Analysis as a potential cause of action "belonging" to the estate.  While Westfield believes it pertinent to discuss the above in light of the Liquidation Analysis, Westfield further discusses the above in this Objection as an example and highlights that any discussion, treatment, or argument with respect to the above applies with equal force to the other Bonds, Bonded Contracts, obligees under the Bonds, and bonded projects.

general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and

ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the [above].

*See* Indemnity Agreements at ¶ 5.

24. The Indemnity Agreements further constitute absolute assignments of the following property:

i. All the rights and claims of the Debtor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

ii. All the right, title and interest of the Debtor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

iii. All the rights, title and interest of the Debtor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

iv. All actions, causes of actions, claims and demands whatsoever which the Debtor may have or acquire against any subcontractor, laborer or materialmen, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

v. All percentages retained and any and all sums that may be due or hereafter become due to the Debtor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Debtor has an interest.

25.     The Indemnity Agreements additionally establish a trust over any Bonded Contract balances for the benefit of Westfield and any subcontractors or suppliers in relation to the Bonded Contracts.  *See* Indemnity Agreements at ¶ 4.

26.     Westfield perfected its security interest with respect to the collateral encumbered by the 2018 Indemnity Agreement and 2019 Indemnity Agreement by filing a UCC-1 financing statement in North Carolina on May 10, 2023, file no. 20230059889H, and it perfected its security interest with respect to the collateral encumbered by the 2020 Indemnity Agreement by filing a UCC-1 financing statement in North Carolina on March 29, 2023, file no. 20230040942H (each a "Financing Statement" as identified by date, and collectively, the "Financing Statements").  True and correct copies of the Financing Statements are attached as Exhibit D.

27.     Westfield also possesses certain common law rights against the Debtor as principal under the Bonds, including, but not limited to, equitable subrogation, exoneration, indemnification, and reimbursement.

28.     In addition to, and not in lieu of, these common law rights, Westfield possesses contractual rights under the Indemnity Agreements against the Debtor, Mr. Smith, and all other undersigned indemnitors, including, but not limited to, the following:

i.      exoneration, *see* Indemnity Agreements at ¶ 2a,
ii.     indemnification, *see* Indemnity Agreements at ¶ 2a,
iii.    a right to demand a collateral deposit, *see* Indemnity Agreements at ¶ 2b,
iv.     a right of specific performance of the Indemnity Agreements, *see* Indemnity Agreements at ¶ 2c,
v.      a right to subordinate certain of the undersigned indemnitors' rights to those of Westfield, *see* Indemnity Agreements at ¶ 2f,
vi.     a right to take possession and complete or arrange for the completion of any Bonded Contract that, *inter alia*, has been breached, defaulted, abandoned, or forfeited by the Debtor or for which the Debtor has failed to pay obligations incurred in connection with the Bonded Contract, *see* Indemnity Agreements at ¶ 6,
vii.    a right to demand and inspect any undersigned indemnitors' books and records, *see* Indemnity Agreements at ¶ 11,

<table>
<tr><td>viii.</td><td>a right to adjust, settle, or compromise any claim, demand, suit, or judgment related to the Bonded Contracts, *see* Indemnity Agreements at ¶ 15, and</td></tr>
<tr><td>ix.</td><td>a right to act as attorney-in-fact on behalf of any undersigned indemnitor with respect to, *inter alia*, the collection of any monies due to the Debtor under any Bonded Contract, the prosecution of any claim, action, or proceeding, or the compromise or settlement of any and all claims the Debtor may have against any third party, *see* Indemnity Agreements at ¶¶ 22b and 22c.</td></tr>
</table>

29. All of the collateral under the security agreement, the absolute assignment, and the trust established in the Indemnity Agreements and perfected by the Financing Statements and all of the common law and contractual rights discussed above (collectively, the "Westfield Collateral"), *inter alia*, provide security to Westfield, whether in the UCC Article 9 sense or more broadly.

## V. WESTFIELD'S SECURITY WITH RESPECT TO, AND LAWSUIT AGAINST, MR. SMITH

30. Importantly, both Mr. Smith and his wife, Tina Smith ("Ms. Smith"), are debtors under the March 29, 2023 Financing Statement. Westfield, therefore, has a perfected security interest in Mr. and Ms. Smith's property as follows:

i. All . . . real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and

ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the [above].

*See* Indemnity Agreements at ¶ 5.

31.     Further, Westfield commenced suit against, *inter alia*, Mr. and Ms. Smith on April 2, 2024, in the United States District Court for the Eastern District of North Carolina, case no. 5:24-CV-00202.  A copy of Westfield's complaint is attached as Exhibit E.

32.     Westfield's complaint consists of seven counts:

(I) for specific performance of the Indemnity Agreements to compel the indemnitors to provide collateral,

(II) for specific performance of the Indemnity Agreements to compel the indemnitors to provide access to books and records,

(III) for breach of the Indemnity Agreements,

(IV) for avoidance of certain fraudulent transfers and related injunctive relief pursuant to the North Carolina Uniform Voidable Transactions Act,

(V) for judgments against Mr. and Ms. Smith under § 39-23.8(b)(1)(a) and (b) of the North Carolina Uniform Voidable Transactions Act as the beneficiaries of the fraudulent transfers,

(VI) for judgment against Smith Holdings Land Trust under § 39-23.8(b)(1)(a) of the North Carolina Uniform Voidable Transactions Act as the initial transferee of the fraudulent transfers, and

(VII) for judgment against JSmith NC Destination Management, LLC under § 39-23.8(b)(1)(b) of the North Carolina Uniform Voidable Transactions Act as the immediate transferee of the fraudulent transfers from Smith Holdings Land Trust.

## VI.     THE DEBTOR'S ABANDONMENT, BREACH, AND/OR DEFAULT UNDER THE BONDED CONTRACTS, SUBSEQUENT TERMINATIONS, AND WESTFIELD'S TAKEOVER OR TENDER FOR THEIR COMPLETION

33.     In March of 2023, the Debtor and Mr. Smith approached Westfield and advised it that the Debtor had experienced financial difficulties culminating in the Debtor's inability to perform its obligations under the Bonded Contracts or its payment obligations in relation to the Bonded Contracts.  The Debtor and Mr. Smith further advised Westfield that the Debtor's financial difficulties had become so great that the Debtor would not be able to complete the Bonded Contracts, pay subcontractors or suppliers in relation to the Bonded Contracts, or even fund the Debtor's own overhead, payroll, and other related expenses without Westfield's assistance.

34.     At the Debtor's and Mr. Smith's behest, Westfield then began providing financial assistance to perform the Bonded Contracts, pay all requisite subcontractors and suppliers, and fund certain of the Debtor's overhead, payroll, and other related expenses, including with respect to the Atlantic Avenue Contract.  In relation to Westfield providing this assistance, the Debtor mailed various letters of direction to the contract counterparties, i.e., the owners/obligees, to the Bonded Contracts, including one to Raleigh with respect to the Atlantic Avenue Contract.  The letters of direction (a) informed the counterparties of Westfield's involvement with the Bonded Contracts and the Debtor's cooperation with Westfield for such involvement and (b) directed them to make any payments due or becoming due under the Bonded Contracts to Westfield, including, but not limited to, any payments with respect to any change orders, retainages, claims, or extras. A copy of the letter of direction to Raleigh with respect to the Atlantic Avenue Contract is attached as Exhibit F as an example.

35.     At this point, all of Westfield's rights and the applicable provisions under the Indemnity Agreement had been triggered due to the Debtor's actions, or, rather, inactions, with respect to the Bonded Contracts, including with respect to the Atlantic Avenue Contract. Moreover, counterparties under certain of the Bonded Contracts later terminated the applicable contract pursuant to the applicable terms.  For instance, by August 16, 2023, after certain notices and conferences pursuant to the terms of the Atlantic Avenue Bond, Raleigh mailed a *Declaration of Default and Termination of Contract for Cause* letter (the "Raleigh Termination Letter") to the Debtor and Westfield.  A true and correct copy of the Raleigh Termination Letter is attached at Exhibit G.

36.     Thereafter, Westfield entered into that certain *Tender and Completion Agreement* dated December 21, 2023 (the "Raleigh Tender Agreement").  A true and correct copy of the

Raleigh Tender Agreement is attached as Exhibit H.  Under the Raleigh Tender Agreement Westfield, *inter alia*, (a) agreed to tender $6,806,541.69 to Raleigh in satisfaction of its obligations under the Atlantic Avenue Bond (the performance bond) and under the Atlantic Avenue Contract, (b) pursuant to its rights discussed above, released and fully discharged Raleigh, for itself and as an assignee and/or subrogee to the Debtor, with respect to any and all claims asserted or assertable against Raleigh with respect to the Atlantic Avenue Contract, and (c) agreed to "indemnify, defend, and hold harmless [Raleigh] from and against any and all claims, rights, demands, causes of action, suits, adversary proceedings, and/or damages of whatsoever kind or nature arising from or in any way related to the [Atlantic Avenue Contract] . . . asserted against [Raleigh] by [the Debtor]." *See* the Raleigh Tender Agreement at ¶¶ 6 and 13.  In exchange, Raleigh waived claims for damages (including significant liquidated damages), released Westfield under the Atlantic Avenue Bond (performance bond), and conditionally released the Debtor from any liability in relation to the project.  The settlement and tender were reached after significant investigation by Westfield and its professional consultants, a competitive bidding process to identify a replacement contractor, and negotiations with the City of Raleigh.  At no time did JSmith prior to bankruptcy or the Debtor after filing take any action to advance the project, pursue any claim for wrongful termination, or prosecute any work on the project.

37.     Thus, prior to the Petition Date, including with respect to the Atlantic Avenue Contract, either (a) due to the Debtor's inability to staff and fund performances of the Bonded Contracts or (b) upon a breach and termination of the applicable Bonded Contract, Westfield began arranging, overseeing, funding, performing, and/or executing the completion and/or closeout of all existing construction projects under the Bonded Contracts pursuant to its obligations under the Bonds, and the Debtor no longer had any rights, interests, equity, or payments due under the

Bonded Contracts.

38.     Westfield is currently facing a loss in excess of at least $35 million with a maximum possible loss in excess of $100 million.

39.     Westfield's efforts and financial support have resulted in the ongoing completion of various Bonded Contracts in North Carolina for multiple local municipalities, the North Carolina Department of Transportation, and other government and private entities. Westfield's efforts also helped maintain the employment of approximately 83 employees of the Debtor leading up to the filing of this case. Without Westfield's efforts and financial support (provided at the express request of the Debtor), the Debtor would have been forced to close its doors and leave all of its creditors in the cold.  Notably, during this time, Westfield funded salary to Mr. Smith totaling $51,119.50.

## VII.     THE DEBTOR'S IMPROPER DEMAND LETTER ON RALIEGH

40.     Despite Westfield's clear rights under the Indemnity Agreements, the Raleigh Tender Agreement, and everything else discussed above, on April 5, 2024, the Debtor, in its own name, and not as debtor-in-possession or on behalf of the estate, mailed a letter to Raleigh (a) asserting that Raleigh breached the Atlantic Avenue Contract and (b) demanding commencement of a mediated settlement conference with Raleigh in relation to the alleged "breaches" (the "JSmith Demand Letter").  A true and correct copy of the JSmith Demand Letter is attached as Exhibit I.  The Debtor did not include Westfield as a recipient of the JSmith Demand Letter.  Interestingly, when asked about the claim against Raleigh, Debtor's counsel advised Westfield's counsel that the claim would be pursued by the reorganized Debtor, not for the benefit of the estate.  This claim is nothing more than Mr. Smith attempting to pursue a claim that the Debtor did not pursue pre-petition, on a project it could not perform, in order to pursue a claim for which Westfield (the

largest creditor of the estate) is ultimately responsible.  While Westfield adamantly asserts that it is entitled to all rights of and from the claim and that no rights remain with the Debtor pursuant to the terms of the Indemnity Agreements and the doctrine of equitable subrogation, this claim is being used solely to leverage a more favorable settlement or compromise of Westfield's claim against Mr. Smith as a personal indemnitor.

## VIII.  WESTFIELD'S LIEN STRIPPING AND GENERAL UNSECURED CREDITOR TREATMENT UNDER THE DISCLOSURE STATEMENT AND THE PLAN

41.    The Plan proposes the following treatment regarding Westfield:

The Claims of Westfield, as described herein, and arising from the Indemnity Agreements, shall be treated as General Unsecured Claims in Class 18 below, as the value of the Westfield Collateral, given the senior security interests of other Secured Creditors, including FCB, is not sufficient to support treatment of any portion of the Westfield POC as a Secured Claim in the Bankruptcy Case. Westfield shall, within thirty (30) days of the Effective Date, cause the Westfield Financing Statements to be cancelled, removed, or otherwise terminated, as to the Debtor, and with the North Carolina Secretary of State.

The Plan [Doc. No. 296 at 51].

42.    The Plan in turn proposes the following treatment for General Unsecured Claims (as defined in the Plan):

The Debtor shall pay the holders of Claims in this Class, consistent with the Liquidation Analysis attached as an Exhibit to the Disclosure Statement, the aggregate sum of $500,000.00 (the "Total Unsecured Dividend"), in equal twenty (20) quarterly installments over a period of five (5) years, through ten (10) semi-annual payments of $50,000.00, commencing on the earlier of June 30th of December 31st, following the Effective Date, and continuing semi-annually thereafter, with said payments being distributed to the Class *pro rata*.  The Debtor, at its election, may execute a Promissory Note in favor of this Class, in an amount equal to the Total Unsecured Dividend to be paid hereunder.

The Debtor may also investigate and pursue avoidance actions pursuant to §§ 547 and 548.  Any funds collected through such actions, and preserved for the benefit of the estate, shall be distributed in accordance with the priorities established by the Bankruptcy Code and Orders of this Court.

The Plan [Doc. No. 296 at 52].

## IX.    MR. SMITH'S PROPOSED "NEW VALUE" CONTRIBUTION TO RETAIN HIS EQUITY INTEREST IN THE DEBTOR

43.    As previously stated, Mr. Smith is the sole member, owner, and manager of the Debtor, and the Plan contemplates Mr. Smith providing "new value" to the estate in exchange for retention of his equity interest in the Debtor.  The Plan [Doc. No. 296 at 52].  The proposed new value Mr. Smith is supposed to contribute to the estate is unclear.  Under the Plan, Mr. Smith proposes to contribute $25,000.00.  The Plan [Doc. No. 296 at 52].  However, the Disclosure Statement indicates that Mr. Smith proposes to contribute $50,000.00.  The Disclosure Statement [Doc. No. 297 at 20-21].

44.    The Plan also contemplates market testing whatever new value Mr. Smith proposes by allowing parties "to place a bid or proposal in excess of the New Value Contribution."  The Plan [Doc. No. 296 at 52].  And it further sets a deadline for submitting bids, with a related time bar for bids not complying with the deadline.  The Plan [Doc. No. 296 at 52-53].  However, the Plan's use of "within" and "prior to" in reference to the bid deadline is confusing, ambiguous, and open to interpretation, and the deadline/timeline for submitting bids therefore is not clear. *Compare* the Plan [Doc. No. 296 at 52-53] ("shall submit any such bid or proposal, in writing, … **within** ten (10) calendar days prior to the initial setting by the Bankruptcy Court for the Confirmation Hearing (the 'Bid Deadline')") *with* the Plan [Doc. No. 296 at 53] ("failure to submit a competing written bid or proposal prior to the Bid Deadline, shall bar consideration of any such competing written bid or proposal").

## X.    TREATMENT OF THE DEBTOR'S/ESTATE'S CAUSES OF ACTION UNDER THE PLAN AND THE PLAN INJUNCTION

45.    With respect to certain of the Debtor's litigation claims, the Plan proposes as follows:

The Debtor intends to pursue, as a method by which to fund payments to Creditors under this Plan, the turnover and recovery of any amounts to which it is entitled, including but not limited to: (1) Tax credits from the Internal Revenue Service; (2) Prepetition accounts receivable from various third parties; and (3) Avoidance, recovery, and preservation for the benefit of the Estate, any payments and transfers pursuant to §§ 544, 547, and 548 of the Bankruptcy Code, as well as the Uniform Voidable Transactions Act, codified by the North Carolina General Assembly in N.C. Gen. Stat. § 39-23.1, *et seq.* (the "UVTA").

The Plan [Doc. No. 296 at 53]. The Plan goes on to state:

All transactions avoided or otherwise set aside pursuant to §§ 544, 547, 548, and/or 549, if any, shall be preserved for the benefit of the Estate pursuant to § 551 and applicable case law. Funds received from such transactions shall be distributed to Creditors according to the priorities of the Bankruptcy Code.

The Plan [Doc. No. 296 at 54].

46. The Debtor also includes as a line item in its Liquidation Analysis, but nowhere else, "Claims Against City of Raleigh," which presumably involves the Atlantic Avenue Contract as discussed in section VII above.

47. Despite the lip-service paid to preserving claims and causes of action to fund payments to creditors and for the benefit of the estate, the Disclosure Statement makes abundantly clear who exactly any preserved claims and causes of action are supposed to benefit, i.e., the Reorganized Debtor (as defined in the Plan). *See* the Disclosure Statement [Doc. No. 297 at 28, Article VIII.B] ("The Reorganized Debtor shall retain all property both real and personal, and tangible and **intangible**, subject to such future use or disposition as **may be in the best interest of the Reorganized Debtor**.") (emphasis added). Moreover, the return for the General Unsecured Creditors pool is capped at $500,000.00 with no toggle in the event that either (a) any recoveries exceed that amount or (b) the Reorganized Debtor somehow, despite the odds, actually does become profitable post-confirmation.

48.     The Debtor also proposes blanket reservations of its claims and causes of actions without any disclosure with respect to the universe and potential value of those causes of action, including the following language:

> Confirmation of this Plan shall constitute a finding that the Debtor does not waive, release, or discharge, but rather retains and reserves any and all prepetition and post-petition Claims that it could or might assert against any party or entity arising under or otherwise related to any state or federal statute, state or federal common law, and any and all violations arising out of rights or claims provided for by Title 11 of the United States Code, by the Bankruptcy Rules, or by the Local Rules, including all rights to assert and pursue any and all avoidance actions, preference actions, and any other actions pursuant to §§ 545, 546, 547, 548, and 550, except to the extent such avoidance actions, preference actions, or other actions were assigned to Creditor(s) as part of the Plan.  Further, the Debtor retains all rights to assert and pursue all Claims under § 542, including without limitation actions to seek turnover assets of the Estate, actions to recover accounts receivable, and/or actions to invalidate setoffs.

The Plan [Doc. No. 296 at 54-55].

> Notwithstanding anything to the contrary therein, the provisions of the Plan, Disclosure Statement, or Confirmation Order shall not have and are not intended to have, any res judicata or collateral estoppel effect with respect to any causes of action that the Debtor may assert, regardless of whether and to what extent such causes of action are specifically described in the Plan or Disclosure Statement. Unless any causes of action are expressly waived, relinquished, released, compromised, or settled in the Plan or by Final Order of the Court, all such causes of action are expressly reserved and preserved for later adjudication and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, or laches shall apply so such causes of action upon or after confirmation of the Plan.  Furthermore, notwithstanding any provision or interpretation to the contrary, nothing in the Plan or Confirmation Order, including the entry thereof, shall be deemed to constitute a release, waiver, impediment, relinquishment, or bar, in whole or in part, of or to any recovery or any other claim, right, or cause of action possessed by the Debtor prior to the Effective Date.  This shall include, but is not limited to any and all prepetition and postpetition Claims that it could or might assert against any party or entity arising under or otherwise related to any state or federal statute, state or federal common law, and any and all violations arising out of rights or claims provided for by Title 11 of the United States Code, by the Bankruptcy Rules, or by the Local Rules, including all rights to assert and pursue any and all avoidance actions, preference actions, and any other actions pursuant to §§ 545, 546, 547, 548, 550, and 542, including without limitation actions to seek turnover the assets of the Estate, actions to recover accounts receivable, and/or actions to invalidate setoffs.

The Plan [Doc. No. 296 at 58].

49. Notwithstanding the Debtor's blanket reservation of its claims and causes of action without actually providing any information on the retained claims and causes of action, the Debtor proposes a plan injunction that could be construed as enjoining Westfield, in its own name or as subrogee, from asserting a claim, counterclaim, crossclaim, affirmative defense, setoff, recoupment, or the like or from otherwise defending itself, in its own name or as subrogee, in any of the undisclosed, retained claims and causes of action:

> As of the Confirmation Date, except as otherwise provided in the Plan or the Confirmation Order, all persons that have held, currently hold, or may hold a Claim, Equity Interest, or other debt or liability that is treated pursuant to the terms of the Plan or that is otherwise enjoined pursuant to § 1141, are enjoined from taking any of the following actions against the Debtor on account of any such Claims, Equity Interests, debtor or liabilities, other than actions brought to enforce obligations under the Plan: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of recoupment of any kind against any debt, liability, or obligation; and/or (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Notwithstanding the foregoing, the Plan does not release or waive any Claims the Debtor may have against any party in interest.

The Plan [Doc. No. 296 at 61].

## XI. DESPITE HAVING THE BURDEN TO ESTABLISH THE ELEMENTS FOR CONFIRMATION AND WESTFIELD'S BEST EFFORTS AT COLLABORATING AND OBTAINING NECESSARY INFORMATION, THE DEBTOR HAS CHOSEN TO RELY ON OBFUSCATION, SECRECY, AND GAMESMANSHIP TO AVOID PRODUCING ANY SHRED OF INFORMATION

50. As discussed above, the Debtor and other undersigned indemnitors to the Indemnity Agreements have an abundantly clear contractual duty to provide Westfield with access to their books and records. In degradation of this contractual duty, the Debtor and other undersigned indemnitors have chosen to ignore this duty both pre- and post-bankruptcy to the point that

Westfield was compelled to file suit against the non-debtor indemnitors for specific performance of the Indemnity Agreements to compel access to such books and records.

51.     For instance, on March 29, 2024, counsel for Westfield spoke with counsel for the Debtor and raised the question of being provided with the Debtor's bank statements along with other documents, though what other documents was left for a latter discussion.

52.     Westfield's counsel followed up with Debtor's counsel on April 3, 2024, regarding the Debtor's willingness to turnover the previously discussed bank statements and further provided a full list of the documents requested.  Westfield's counsel also informed Debtor's counsel at that time that Westfield would likely also be filing a Bankruptcy Rule 2004 motion for production of documents given the fast-approaching deadlines with respect to confirmation.

53.     Neither the bank statements nor any other documents were provided to Westfield upon this request.

54.     On April 8, 2024, Westfield provided a courtesy copy of its draft *Motion Pursuant to Federal Rule of Bankruptcy Procedure 2004 for an Order Authorizing Examination of the Debtor and Requiring the Production of Documents* (the "2004 Motion") and inquired about setting up a meeting to discuss limiting the scope of the document request and resolving Westfield's potential confirmation objection.  Westfield's counsel followed up with respect to consensually working out the issues and limiting the scope of the document request on April 10, 2024.  The Debtor did not respond to either of these reasonable inquiries.

55.     Accordingly, on April 10, 2024, Westfield filed 2004 Motion [Doc. No. 322], and this Court granted such motion on April 12, 2024 [Doc. No. 328].  As part of the order granting the 2004 Motion (the "2004 Order"), the Debtor had until April 26, 2024 at 5:00 p.m. Eastern Time

to produce the requested documents contained in Exhibit A, which was attached both to the 2004 Motion and the 2004 Order.

56.     Despite having notice of Westfield's intent to file the 2004 Motion as early as April 3, 2024, and Westfield's repeated efforts in good faith to find a consensual resolution, the Debtor waited until the 11th hour to contest the 2004 Order by filing a *Motion for Reconsideration of Order Granting the Motion Pursuant to Federal Rule of Bankruptcy Procedure 2004 for an Order Compelling the Production of Documents* (the "Motion to Reconsider") at 4:06 p.m. on April 26, 2024.

57.     As more fully argued in Westfield's forthcoming objection to the Motion to Reconsider, the Motion to Reconsider was less about merit and more about litigative gamesmanship meant to delay and deprive Westfield of needed information.

58.     Whatever the case, having access to the requested documents would have greatly aided Westfield in its evaluation of the Plan and Disclosure Statement, given the scant record and evidence Westfield and the other parties in interest have to work from, and potentially could have obviated the need for this Objection and a contested confirmation.  But here we are.

## XII.     THE OBJECTION

59.     As outlined above and set forth below, the Plan should not be confirmed because the Debtor cannot carry its burden in establishing that the Plan satisfies the elements and requirements for confirmation from section 1129 of the Bankruptcy Code.

### A.     Neither the Supreme Court nor the Fourth Circuit Has Ever Recognized the New Value Exception to the Absolute Priority Rule Despite Having the Opportunity to Do So.

60.     The Supreme Court first discussed the new value exception to the absolute priority rule in 1939, stating:

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, . . . [has] stress[ed] the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders [including to provide new working capital and to pay dissenting creditors]. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court . . . that 'Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances.' If, however, those conditions we have mentioned are satisfied, the creditor cannot complain that he is not accorded 'his full right of priority against the corporate assets.' If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders. To the extent of the inadequacy of their contributions the stockholders would be . . . 'in the position of a mortgagor buying at his own sale.'

In view of these considerations we believe that to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

*Case v. L.A. Lumber Prods. Co., Ltd.*, 308 U.S. 106, 121-22 (1939) (internal citations omitted).

61.     Later, in 1988, the Supreme Court clarified that (a) the above-quoted language from *Case* constituted dicta, (b) it remained debatable whether Congress intended to retain the new value exception as espoused in *Case* after codification of the absolute priority rule through enactment of the Bankruptcy Code, specifically, section 1129(b), and (c) whatever the case may be, providing sweat equity, i.e., "labor, experience, and expertise," cannot in any event overcome the absolute priority rule. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n.3, 203-206 (1988).

62.     The Supreme Court most recently weighed in on the applicability of the new value exception to the absolute priority rule, as codified in section 1129(b) of the Bankruptcy Code, over 24 years ago around the turn of the century and the new millennia. *See 203 N. LaSalle*, 526 U.S.

434. *203 N. LaSalle* put the question of the existence of the new value exception to the absolute priority rule squarely in front of the Supreme Court. Again, however, the Supreme Court characterized the above-quoted language from *Case* as dicta. *Id.* at 444-46. More importantly, the Supreme Court in *203 N. LaSalle* refused to decide whether the new value exception to the absolute priority rule existed or not and held instead that the plan there simply failed to satisfy the absolute priority rule found in section 1129(b) of the Bankruptcy Code. *Id.* at 443.

63. The Fourth Circuit first opined on whether the new value exception to the absolute priority rule remained viable after its codification through section 1129(b) of the Bankruptcy Code in 1992 but has not revisited the issue since. *See Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496 (4th Cir. 1992). In *Bryson Props.*, the Fourth Circuit noted that "no clear bankruptcy policy . . . dictates a result" one way or the other with respect to the in/validity of the new value exception to the absolute priority rule. *Id.* at 504. Similar to the Supreme Court in *Ahlers* and *203 N. LaSalle*, the Fourth Circuit in *Bryson Props.* never explicitly adopted the new value exception as an exception to the absolute priority rule. *See id.* at 505. Instead, it ruled that the facts at hand there demonstrated that the absolute priority rule had not been satisfied. *Id.*

64. Accordingly, it is not clear that the new value exception is even applicable with respect to the absolute priority rule generally or in the Fourth Circuit. Confirmation of the Plan should, therefore, be denied.

**B.      Regardless, the Plan Is Not Fair and Equitable Under Fourth Circuit Precedent.**

65. Importantly, the Fourth Circuit in *Bryson Props.* added a layer on top of the new value exception, if one so exists, ruling that:

> [W]hile it is not impermissible to propose a plan which only adjusts the interests of one creditor, this situation certainly must cause a court to scrutinize closely

the equities involved. Under the Plan or through outside payments, the claims of all creditors, other than Travelers, will be paid in full. Only Travelers is truly impaired. This combination of factors leads us to conclude that even if some limited new capital exception were viable under the Bankruptcy Code, it would not be so expansive as to apply under the facts of this case. A plan must be fair and equitable in a broad sense, as well as in the particular manner specified in 11 U.S.C. § 1129(b)(2). Here, the debtors have carried their opportunity for self-dealing too far.

*Bryson Props.*, 961 F.2d at 505.

66.     As alluded in the quote above, in *Bryson Props.* the requisite creditor held a secured claim for $7,905,068.00 and an unsecured deficiency claim for $3,329,238.00. *Id.* at 499. The *Bryson Props.* debtor did not propose a class for general unsecured claims but, rather, broke out what would otherwise be general unsecured claims into three separate classes, classes five, six, and seven, respectively, with the objecting creditor's unsecured deficiency claim constituting class seven. *Id.* Further, the plan there provided that the debtor's partners, in exchange for retention of their partnership interests in the debtor, would make a cash contribution of $625,000.00 and extend a line of credit of $850,000.00 to the debtor. *Id.*

67.     The *Bryson Props.* plan further proposed to only pay the creditor a 3.5% return on the creditor's unsecured deficiency claim. *Id.* It proposed the same treatment for the other two classes of unsecured claims, but the Fourth Circuit quickly pointed out that "the general partner remain[ed] liable for the balance of the Class six claims under general partnership law claims, and certain partners [had] personally guaranteed the Class five claim." *Id.* Thus, even though all three classes of general unsecured claims superficially received the same treatment under the plan there, two of the classes, but not the class constituting the objecting creditor's unsecured deficiency claim, had viable options for further recoveries outside of bankruptcy to make them whole.

68.     The plan in *Bryson Props.* also included a provision regarding the distribution of proceeds in the event that the collateral securing the objecting creditor was later sold. *Id.*

Specifically, the proceeds would first be distributed to satisfy the outstanding balance of the creditor's secured claim; next to pay back the partners for the $850,000.00 line of credit; then to pay back the partners for the $625,000.00 contribution; further to pay the creditor the difference between its secured claim and the balance on the applicable amortization schedule; and, finally, 33.3% of any remaining proceeds would be distributed to the creditor on its unsecured deficiency claim. *Id.*

69.     Accordingly, the plan in *Bryson Props.* provided the partners "not only the exclusive right to contribute, but [also] the right to return of their new capital prior to Travelers' recovery of its unsecured claim." *Id.* at 504.

70.     Similar to *Bryson Props.*, Westfield is the only creditor that the Debtor does not plan to substantially pay back.  While it is true that the Plan proposes to bifurcate the other creditors' claims here into secured and unsecured amounts, it appears that, at least for certain creditors, such bifurcation is shrinking.  *See* Objection of Flagstar Financial & Leasing LLC to Confirmation of Debtor's Chapter 11 Plan [Doc. No. 329 at 4, ¶ 16] (the "Flagstar Objection").

71.     As things stand, however, Westfield's claim will make up the vast majority of the general unsecured claims pool, and Westfield only stands to receive between a 0.4% and 1% dividend for its claim against the Debtor with little avenue to recover anything further outside of bankruptcy.

72.     Unlike the partners in *Bryson Props.* that had the resources to muster a combined $1,475,000.00, Mr. Smith apparently only has the resources to contribute either $25,000.00 or $50,000.00.[3]  Moreover, like the payback to the partners in *Bryson Props.* prior to paying the

---

[3] It is not entirely clear what resources are at Mr. Smith's disposal.  Despite having a clear duty to provide books and records to Westfield pursuant to the Indemnity Agreements, Westfield has had the most difficult time receiving any documents from Mr. Smith.  Further, on information and belief, Mr. Smith has likely fraudulently transferred and/or

applicable creditor's unsecured deficiency claim, the Plan here proposes a hard cap on any return to Westfield while providing unfettered benefits to the Reorganized Debtor (a) on any claims or causes of action, whether prepetition or postpetition, disclosed or undisclosed in excess of $500,000.00 paid to unsecured creditors and (b) on any increases in the going concern value in excess of $500,000.00 paid to unsecured creditors.

73.     Mr. Smith is not only obligated to indemnify Westfield for its losses but is also obligated to collateralize Westfield for its ongoing exposure.  He has done neither.  Therefore, even the $25,000.00 or $50,000.00 will come from assets that should rightfully belong to Westfield under the Indemnity Agreements, is nothing more than the proceeds of the $100,000.00 per year salary the Debtor has paid Mr. Smith during bankruptcy, and the $51,119.50 Westfield funded in salary prior to the filing of this case.  There is no question that **after** Mr. Smith knew of the imminent failure of his company and of the growing certainty of his personal liability to Westfield and other creditors, he transferred two houses that he personally owned to a third party trust and, subsequently, to a company that is solely owned and controlled by him and his wife. This demonstrates the self-motivation and incentive for Mr. Smith to attempt to retain the company without any real value to the estate or its creditors.

74.     For the same reasons as in *Bryson Props.*, this result is neither fair nor equitable, and confirmation of the Plan must, therefore, be denied.

### C.     Assuming, *Arguendo*, that there Is a Viable New Value Exception to the Absolute Priority Rule, Regardless, the New Value Proposed by the Debtor Is neither New nor Valuable.

75.     Westfield must first note here that it has extreme mistrust of, and skepticism toward, the Debtor and Mr. Smith, and, due to this suspicion, it does not foresee being able to vote in favor

---

hidden certain assets to stymie Westfield's efforts to recover from him on its claim as stated more fully in the indemnity complaint attached as Exhibit E.

of any version of a Plan from the Debtor where Mr. Smith remains in the driver's seat. Whatever the case, Westfield will not be voting to accept the Plan currently. Assuming that at least one impaired class accepts the Plan here, which seems likely given the Flagstar Objection essentially saying as much, the Plan here will have to be confirmed in cramdown, triggering the absolute priority rule.

76.     The Plan may only be confirmed in cramdown "if the [P]lan does not discriminate unfairly and is fair and equitable" pursuant to section 1129(b) of the Bankruptcy Code. *In re Maharaj*, 681 F.3d 558, (4th Cir. 2012) (internal punctuation omitted). "The [Bankruptcy] Code inclusively sets forth, at section 1129(b)(2), specific requirements that must be met for a plan to be 'fair and equitable.' Among those requirements is the absolute priority rule." *Id.* at 562.

77.     Specifically, the absolute priority rule states, in relevant part, that, with respect to a class of unsecured claims, either a "plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" or "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." *See* 11 U.S.C. § 1129(b)(2)(B).

78.     Here, as stated above, Mr. Smith is proposing to contribute either $25,000.00 or $50,000.00, depending upon whether the provision from the Plan or Disclosure Statement, respectively, controls (collectively, the "New Value Contribution"), in order to retain his equity interests in the Debtor while the Plan proposes to classify Westfield as unsecured and not pay its claim in full. That is, under the Plan, Mr. Smith will retain his equity interest in the Debtor while Westfield's purported unsecured claim senior to any equity interest will remain largely unsatisfied.

79. Thus, the Debtor is attempting to effectuate the new value exception to the absolute priority rule as espoused in the quote from *Case* above. In a recent Fourth Circuit bankruptcy case, the bankruptcy court explained that courts generally rely on a five-factor test to determine whether some proposed new value is sufficient enough to withstand the absolute priority rule: "Those five factors require the new value to be (i) new, (ii) substantial, (iii) in money or money's worth, (iv) necessary for a successful reorganization, and (v) reasonably equivalent to the value of the [equity interest] being retained or received." *See In re Cleary Packaging, LLC*, case no. 21-10765-MMH, 2023 WL 8703920, at *15 (Bankr. D. Md. December 15, 2023) (collecting cases). This Court too has recently relied on such five-factor test with respect to the new value exception. *See Platinum Corral*, 2022 WL 127431, at *12 (collecting cases).

80. Before addressing the five factors, it should be noted that the term "exception" in "new value exception" is misleading:

> The doctrine is not actually an exception to the [A]bsolute [P]riority [R]ule but is rather a corollary principle, or, more simply a description of the limitations of the rule itself. It is, as indicated [in the above-quoted language from *Case*], the set of conditions under which former shareholders may lawfully obtain a priority interest in the reorganized venture . . . [such that a] creditor cannot complain that he is not accorded full right of priority against the corporate assets.
>
> **As long as courts carefully apply the new value exception, it will not operate as a mechanism by which old equity can escape the requirements of the absolute priority rule.**

*Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906, 917 (9th Cir. 1993) (emphasis added); *see also Bryson Props.*, 961 F.2d at 503 n.11 (4th Cir. 1992) (quoting a commentor on the debate as explaining that the use of "exception" constitutes a catachresis "because the conditions required to satisfy the new value 'exception' also satisfy the absolute priority rule").

81.     Thus, if a New Value Exception does exist, where applicable, the Absolute Priority Rule should also be satisfied, at least in spirit, such that any dissenting/impaired class "cannot complain that [they are] not accorded '[their] full right of priority against the corporate assets.'" *Case*, 308 U.S. at 122.   Put another way, if the proposed new value is sufficient and "the reorganization plan represents a reasonable business risk, creditors should be willing to **forego immediate recoveries in exchange for the expectation of greater recoveries in the future, in which case they would consent to viable plans providing for new capital infusions**." *Bryson Props.*, 961 F.2d at 504.

82.     Here, however, the Debtor's New Value Contribution is strictly designed to escape the requirements of the absolute priority rule.   Nor does it help satisfy any creditors or provide for greater recoveries in the future.

83.     Moving onto the five factors, but while keeping the above in mind, Westfield need only address the first, second, and fifth factors.

### i.     The alleged New Value Contribution from Mr. Smith is not "new."

84.     To the extent that the New Value Contribution stems from wages, distributions, or the like from the Debtor (or Westfield for that matter) to Mr. Smith, it may be characterized as sweat equity or forgoing wages and therefore is not "new" for the purposes of the New Value Exception.  *See Cleary Packaging*, 2023 WL 8703920, at *16 and *16 n.57; *Ahlers*, 485 U.S. at 206 (holding that future labor does not constitute new value).

85.     Moreover, Westfield is by far the largest proposed unsecured creditor, to the point that it is not unfair to say that the other proposed unsecured creditors only represent a *de minimis* portion of the proposed general unsecured creditor pool, and Mr. Smith is jointly and severally liable with the Debtor to Westfield.   Westfield also funded Mr. Smith's salary prior to the

bankruptcy filing, so his proposed equity contribution does not even repay Mr. Smith's direct benefit from Westfield's support of the Debtor.

86. Yet, "[c]ourts place great emphasis on the proposed new value actually being 'new' and in the nature of a fresh, outside capital infusion that will help pay creditors or otherwise aid the reorganization." *Id.* That is, "contributor[s of new value] must be bearing a *new* economic risk—it is not enough that the contributor of 'new' capital is simply continuing an existing risk, satisfying an existing risk, or only changing the form of an existing risk." *Id.* at *16 n.57 (quoting *In re Creekside Landing, Ltd.*, 140 B.R. 713, 717 (Bankr. M.D. Tenn. 1992). Put simply, Mr. Smith's partial satisfaction of a debt he already owes to Westfield cannot constitute a "new" contribution for the purposes of the New Value Exception.

87. Importantly, Westfield does not currently know the source of funds for the New Value Contribution, and there is a strong chance that such funds constitute collateral for which Westfield has a perfected security interest. Additionally, given Westfield's complaint against Mr. Smith, the New Value Contribution could constitute a further fraudulent transfer by Mr. Smith under the North Carolina Uniform Voidable Transactions Act, N.C.G.S. §§ 39-23.1 – 39-23.12, that the Debtor is enlisting this Court to sanction.

88. Accordingly, the first factor does not apply here nor does the New Value Exception, and the Plan therefore violates the Absolute Priority Rule and cannot be confirmed.

> **ii.    The proposed New Value Contribution does not provide sufficient value, i.e., it is neither substantial nor reasonably equivalent to the equity interest being retained by Mr. Smith.**

89. Courts have various tools at their disposal to evaluate whether alleged new value is substantial or reasonably equivalent to the retained equity, one of which is holding the new value up to market testing. *See Cleary Packaging*, 2023 WL 8703920, at *14; *Platinum Corral*, 2022 WL 127431, at *12-13. However, as the *Cleary Packaging* court recognized, market testing of

any proposed new value contribution from an equity interest holder is not strictly dispositive of the sufficiency of the proposed new value. *Id.* at 14. Market testing is better characterized as possible evidence to establish reasonably equivalency. *Id.* at 14 n.48. "What is important is the evidence before the [c]ourt in [the] matter" at hand. *Id.* at 14.

90.     "Commentators have observed that prior to making the time-consuming determination as to whether the new value contribution is reasonably equivalent to the value being received [the equivalence prong], a significant number of courts have required that the new value contribution be 'substantial' in comparison to such things as (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution." *Id.* at 17-18 (quoting *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997).

91.     Thus, whether the New Value Contribution is substantial is largely determined by the ratio between the amount to be contributed in relation to the amount of the proposed general unsecured pool. *See Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 197 (B.A.P. 9th Cir. 2003) (finding that debtor's contribution of either 3.7% or 4.4% of total unsecured claims was not substantial enough to constitute new value); *In re Sovereign Group 1985-27, Ltd.*, 142 B.R. 702, 710 (E.D. Pa. 1992) (holding that a contribution of only 3.6% of the unsecured claim was not substantial enough to constitute new value); *In re Snyder*, 967 F.2d 1126, 1132 (7th Cir. 1992) (concluding that a contribution is not substantial enough to constitute new value when the disparity between the contribution and the unsecured debt is so extreme).

92.     In *Cleary Packaging*, the Debtor proposed a new value contribution of $25,000.00 in a case where the total amount of claims was $5,027,068.28 and the total amount of proposed distributions under the plan there was $1,380,643.00, respectively representing a ratio of

0.497308% and 1.81075%.  *Id.* at 18.  Like the other cases cited above, the *Cleary Packaging* court found the proposed new value to be woefully inadequate with respect to the "substantial" factor. *Id.* at 18.

93.     As previously stated, here, the Debtor includes Westfield as a creditor in the general unsecured class, which it proposes to pay a total of $500,000.00 over five years.  Westfield's current claim, representing the aggregate penal limit of Westfield's bonds, exclusive of attorneys' and other professional fees and costs, is $111,777,977.42.  Based off the other proofs of claim filed in the case, the Debtor believes the total general unsecured claims to be $123,714,319.22.  Put another way, the Debtor anticipates there only being $11,936,341.80 in total other claims in the general unsecured class besides Westfield's.

94.     As things stand, the $500,000.00 to be paid to the general unsecured class represents a roughly 0.4% dividend, with Westfield taking the lion's share of roughly $447,111.90. That said, even adjusting Westfield's claim to around $35,000,000.00 (which has already been expended), the total general unsecured class would be around $46,936,341.80 and would receive a roughly 1% dividend, with Westfield likely receiving around $350,000.00.  Looking strictly at the New Value Contribution, and being generous and using the higher value of $50,000.00 rather than $25,000.00, the New Value Contribution only represents 0.0447315304446% return if Westfield's claim is valued at $111,777,977.42 and a 0.1428571428571% return if Westfield's claim is valued at $35,000,000.00.  These ratios would obviously be worse by half if the New Value Contribution is only $25,000.00.  Regardless of what values are used, the New Value Contribution clearly is not "substantial" for the purposes of the new value exception, and the Plan therefore violates the Absolute Priority Rule.

95.    Similar to the "substantial" factor, whether there is a reasonable equivalence between the New Value Contribution and the equity interest being retained by Mr. Smith in satisfaction of the fifth factor depends upon a comparison between the amount contributed and the amount received for that contribution. *Id.*; *see also Platinum Corral*, 2022 WL 127431, at *13 ("Thus, evidence of futility could avoid the need for an extensive and concerted marketing effort. However, in that event, further evidence of the actual value to be received by Class 12 in retaining all equity must be presented, along with a comparison of the relative return to Class 11.").

96.    In relation of the facts discussed above in *Cleary Packaging*, that court stated in comparing the amount contributed to the amount received: "Moreover, and perhaps more importantly, the Principal is retaining his *100% ownership* in the Debtor while the Debtor pays creditors only *27% of their claims* under a 60-month plan. During this period, the Principal will continue to receive all of his benefits, salaries, and perks, and be entitled to the full residual value of the Debtor at the end of the plan term." *Cleary Packaging*, 2023 WL 8703920, at *18.

97.    Here, if Mr. Smith is allowed keep his equity interest in the Debtor, in exchange for $50,000.00, he would receive (a) the going-concern value of the Reorganized Debtor plus any related equity distributions, (b) the Debtor's real property that the Debtor has given a market value of $18,930.00, and (c) his yearly salary, which prior to the bankruptcy was $264,120.00 annually but that has been capped at $100,000.00 annually during the bankruptcy, all while any returns over $500,000.00 from any retained claims or causes will only be for the benefit of the Reorganized Debtor and not the estate. This highlights that claims, such as the claim against the City of Raleigh (which ultimately is a claim against Westfield), are either worthless and being pursued for other purposes or have value and are not being retained for the estate. Westfield asserts it is the former, but one must be true.

98.     Neither the Disclosure Statement nor the Plan explicitly states what Mr. Smith's salary will be post-bankruptcy.  However, the Debtor's projections indicate that it will have annual payroll expenses of roughly $1,700,000.00.  Accordingly, it is not unfair to say that, given the amounts known, his salary over the same 5-year period wherein unsecured creditors will only be receiving $500,000.00 will likely be between $500,000.00 and $1,320,600.00.  Whatever the case may be regarding Mr. Smith's compensation, payment of $50,000.00 in exchange for a, b, and c listed above while the unsecured class will receive 1% or less in total dividends, and even fewer in relation to the New Value Contribution, cannot constitute reasonable equivalence for New Value Exception purposes.

99.     The Debtor has included a market testing feature in the Plan here.  And in the absence of any offers for Mr. Smith's equity in the Debtor above the $25,000.00 or $50,000.00 proposed New Value Contribution, Westfield anticipates that the Debtor will argue that the market has spoken and deemed Mr. Smith's equity in the Debtor, i.e., the going concern value of the Debtor, to be unsubstantial if not nil, and the proposed New Value Contribution, therefore, satisfies the absolute priority rule.  *See Platinum Corral*, 2022 WL 127431, at *12 ("'You would have to pay me to take it.  Less than zero.  Zero or less than zero.  There is no value in the equity.'  The Debtor says that since $100,000 is more than zero, the new value exception is satisfied.").  Importantly, however, market testing only speaks to one of the five factors, reasonable equivalency.  Moreover, such argument, without more, holds no water.  *Id.*  The market has not spoken as the Debtor has not provided any indication of its intent to market the sale of the company, to market any individual assets of the company, or to engage any third-party professional to attempt to truly test the market for the purchase.  To suggest that the market has been tested by

filing a Plan that generally only informs those involved in this Case of the opportunity to purchase the Debtor is inaccurate at best.

100. Thus, again, the Plan violates the absolute priority rule and cannot be confirmed.

**D. Mr. Smith's Proposed New Value Contribution, Coupled with (A) the Debtor's/Estate's Proposed Retention of Claims and Causes of Action without Adequate Disclosure, (B) the Plan Injunction, and (C) the Plan's Complete Disregard to Capture Any Value for the Benefit of Creditors Like Westfield from (I) the Proceeds of the Retained Claims and Causes of Action or (II) Any Increase in the Reorganized Debtor's Going Concern Value, Is Inequitable and Clearly Evinces a Scheme to Enrich the Reorganized Debtor and Mr. Smith at the Expense, and to the Detriment, of the Creditors, Especially Westfield.**

101. As noted above, the Debtor has proposed a blanket retention of pre- and post-petition causes of action. However, the Debtor has not even attempted, whether in its Schedules and Statements, the Disclosure Statement, or the Plan, to disclose what the full universe of these alleged claims and causes of action might be. For instance, the Debtor has only disclosed two potential causes of action as assets as shown on its Amended Schedule A/B, Part 11, Questions 74 and 75, despite the blanket retention language of the Plan.

102. Notwithstanding this lack of disclosure, the Disclosure Statement makes clear that the Debtor intents to reap the benefits of the retained claims and causes of action due to the fact that (a) neither the Disclosure Statement nor the Plan provide for a toggle mechanism to provide value from the claims and causes of action to creditors and (b) the Debtor has explicitly stated that "[t]he Reorganized Debtor shall retain all property both real and personal, and tangible and **intangible**, subject to such future use or disposition as **may be in the best interest of the Reorganized Debtor**." *See* the Disclosure Statement [Doc. No. 297 at 28, Article VIII.B] (emphasis added).

103. This outcome cannot stand. Any unscheduled or otherwise undisclosed claims or causes of action should remain property of the estate pursuant to section 554(d) of the Bankruptcy

Code., not unfettered property of the reorganized Debtor. *See Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 418 (B.A.P. 9th Cir. 2007) ("property of the estate that is not scheduled and not otherwise administered before a case is closed is not abandoned to the debtor at the time of closing, but rather remains property of the estate—forever"). Further, the vesting of property in the Debtor upon confirmation pursuant to section 1141(b) of the Bankruptcy Code should not provide the Debtor with "unfettered control over property of the estate," including the retained, undisclosed claims and causes of action. Rather, if this is the line the Debtor wants to walk, "the full panoply of equitable remedies, from constructive trust through [and including] equitable and judicial estoppel, [should be] available to assure that [the Debtor] do[es] not overreach." *Id.* at 420-21. And such should be made clear with respect to the proposed Plan injunction.

104.     These disclosure issues are especially prescient here. The scant information provided to date gives Westfield an idea of the Debtor's, and Mr. Smith's, ultimate aims. Specifically, the Debtor discloses that it will retain all avoidance actions. While the Disclosure Statement and Plan do not fully disclose what these might be, the Debtor's Schedules and Statements, in response to Part 2, Question 3 of the Debtor's Statement of Financial Affairs, which directs the Debtor to list payments or transfers to creditors within the 90-day preference period prior to the Petition Date, the Debtor instructs parties in interest to, *inter alia*, view an attached exhibit of payments made by Westfield.[4] The Debtor also "discloses" what Westfield assumes is

---

[4] A point of clarity is worth noting. The Debtor states these payments were for the benefit of the Debtor. This is not true. The Debtor is a principal under all the Bonds, and surety bonds are not issued for the benefit of the principal thereunder. Rather, surety bonds are for the benefit of the contract counterparty, the obligee, to the principal for which the principal serves as primary obligor and the surety serves as secondary obligor. That is, surety bonds provide assurance to the bond principal's contract counterparty of the principal's obligations to, and performance under, a given bonded contract. Surety bonds also provide assurance to certain bond beneficiaries as third-parties under, or related parties to, a given bonded contract, such as subcontractors and suppliers. Obligees and bond beneficiaries are the only people that may make a claim on the bond. Principals cannot make claims on surety bonds like they can

its intent to retain "Claims Against City of Raleigh." Westfield assumes this because such is not explicitly disclosed as the Debtor's intent but is rather hidden as a line item in the Liquidation Analysis.

105. By all appearances, the Debtor's and Mr. Smith's intent is to retain various claims and causes of action involving and/or affecting Westfield, likely enjoin Westfield from defending itself post-confirmation of the Plan and Plan injunction, and retain, both for the Reorganized Debtor and for Mr. Smith personally, given the proposed retention of his equity, all the benefits of the claims and causes of action, all while (a) likely increasing Westfield's already ballooning losses and (b) only paying Westfield a tiny sliver of its full claim.

106. To add insult to injury, the Debtor's and Mr. Smith's scheme largely, if not fully, involves claims and causes of action to recover funds that either (a) are not property of the estate and for which neither the Debtor nor Mr. Smith, have any rights and (b) even if such funds did constitute property of the estate, the Debtor would likely recover the funds from Westfield to only then have to turn around and mostly, if not fully, pay them back to Westfield. Given this lack of value to the Debtor and the estate, the only plausible reason the Debtor would pursue these claims and causes of action would be if it thought that it would be able to keep all the value, which the Disclosure Statement and Plan as written improperly allows.

i. **Recoveries with respect to any Bonded Contracts, especially the Atlantic Avenue Contract, are subject to Westfield's right of equitable subrogation and, therefore, do not constitute property of the estate that the Debtor may retain.**

107. "Equitable subrogation is a remedy well established under North Carolina Law." *In re Kline*, 242 B.R. 306, 312 (Bankr. W.D.N.C. 1999) (citing *In re White*, 183 B.R. 713, 714

---

make draws on a line of credit. In this respect, while surety bonds do act as a kind of credit for the principal thereunder, they do not provide financing to the principal in the traditional sense.

(Bankr. M.D.N.C. 1995) (citing *Wallace v. Benner*, 156 S.E. 795, 798-99 (N.C. 1931)). The North

Carolina Supreme Court has recognized equitable subrogation as follows:

> Subrogation is a mode of equitable relief which operates on principles of natural justice without regard to form and independent of any contractual relation between the parties to be affected by it. It has been defined as that change by which another person is put into the place of a creditor, so that the rights and securities of the creditor pass to the person who, by being subrogated to him, enters into his right. It is a legal fiction, by force of which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person, who is thus substituted to the rights, remedies, and securities of another. The party who is subrogated is regarded as entitled to the same rights, and indeed as constituting one and the same person with the creditor whom he succeeds.

*Id.* (citing *Peek v. Wachovia Bank & Trust Co.*, 86 S.E.2d 745, 755 (N.C. 1955) (internal quotation

marks omitted); *See also General Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949 (5th

Cir. 1999) ("Equitable subrogation is the legal fiction through which a person or entity, the

subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having

fulfilled an obligation for which the other was responsible.").

108.    Thus, using the Atlantic Avenue Contract as an example, Westfield subrogated to

all of the Debtor's rights and remedies with respect to the Atlantic Avenue Contract and every

other Bonded Contract for that matter, and such rights and remedies ceased being the Debtor's

property prepetition and, therefore, do not constitute property of the estate.

109.    As the Supreme Court has long held, and bankruptcy courts have long affirmed:

> Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee [or the debtor-in-possession here]. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors. . . . So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962); *see also In re Jones Const. & Renovation, Inc.*, 337 B.R. 579, 583-85 (Bankr. E.D. Va. 2006); *Mid-Atlantic, Inc. v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1124 (4th Cir. 1986).

110.     More specific to sureties such as Westfield, "[t]he doctrine of equitable subrogation 'arises when a contractor defaults on its obligations and a surety completes the work called for by the contract [or] pays all of the related bills.'" *Jones Const.*, 337 B.R. at 583 (quoting *In re Larbar Corp.*, 177 F.3d 439 (6th Cir. 1999). "The Law is clear that a surety under these circumstances has a right to the payments due the contractor to the extent of full reimbursement." *Id.* (quoting *Larbar*, 177 F.3d 439 (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962) and *Prairie State Nat'l Bank v. United States*, 164 U.S. 227 (1896))). And such rights are superior to any interest held by the Debtor's estate or any creditors here. *See generally Prairie State Nat'l Bank v. United States*, 164 U.S. 227 (1896); *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404 (1908); *Pearlman*, 371 U.S. 132 (1962); *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843 (1st Cir. 1969); *In re Larbar Corp.*, 177 F.3d 439 (6th Cir. 1999); *Jones Const.*, 337 B.R. at 583-85.

111.     Such superiority for a surety's equitable subrogation rights exists regardless of whether a surety ultimately possesses any funds for which it has subrogated. *See Transamerica Ins. Co. v. United States*, 164 U.S. 277 (Fed. Cir. 1993). "Moreover, this right relates back to the date of the surety's issuance of bonds for the contract." *Jones Const.*, 337 B.R. at 583 (citing *Prairie State*, 164 U.S. 240 and *Nat'l Surety Corp. v. United States*, 118 F.3d 1542, 1546 (Fed. Cir. 1997)). Importantly, a surety's right to contract funds pursuant to its subrogation rights arises when the bond principal defaults on its obligations under the bonded contract regardless of whether the surety has actually made any payments to discharge its obligations under the applicable bond.

*Jones Const.*, 337 B.R. at 583-85. The fact that a surety is so obligated is what triggers its subrogation rights to bonded contract proceeds (and claims and defenses). *Id.*

112. Here, Westfield has both completed (or is in the process of completing) the work under the Bonded Contracts and has paid bills related to the Bonded Contracts, including the Atlantic Avenue Contract. Accordingly, Westfield possesses the rights to funds stemming from the Bonded Contracts.

113. Thus, along with the Debtor's rights and remedies with respect to the Bonded Contracts generally, the rights to any Bonded Contract balances or funds stemming from the Bonded Contracts vested in Westfield prepetition. Such monies therefore are not property of the Debtor's estate, and Westfield has superior rights to them over the Debtor and all other creditors. *See id.* at 583-85.

114. Accordingly, pursuant to Westfield's right of equitable subrogation, no claims or causes of actions related to the Bonded Contracts, including, but not limited to, the Atlantic Avenue Contract, properly belong to the Debtor and neither do any proceeds thereto.

      **ii.    Even if recoveries with respect to any Bonded Contracts are property of the estate, any monies recovered should properly be paid to Westfield either pursuant to its right of equitable subrogation or as an unsecured creditor and the rightful beneficiary of any avoidance action proceeds.**

115. As previously stated, the Plan impermissibly and inequitably does not provide any toggle mechanism to distribute value to creditors in the event of a windfall from the retained claims and causes of action (or a substantial increase to the Debtor's going concern value), and the Reorganized Debtor, and Mr. Smith, instead intend to retain any such value, which cannot be countenanced or encouraged.

116. However, to the extent the Debtor does so distribute such value, especially with respect to the retained claims and causes of action. There is absolutely no sense in prosecuting

claims and causes of action related to the Bonded Contracts. First, pursuant to its right of equitable subrogation discussed above, any monies recovered, which would likely be recovered from Westfield, would simply be returned to Westfield according to its superior rights to the funds related to the Bonded Contracts which it has completed, taken over, and/or paid out.

117. Second, even ignoring Westfield's superior rights as equitable subrogee, Westfield is by far the largest proposed unsecured creditor. Any avoidance actions with respect to the Bonded Contracts are post-petition claims for which no pre-petition liens attach, and Westfield is unaware of any post-petition grant of any liens on the Debtor's avoidance actions. Thus, any recovery from any avoidance actions would (a) likely be recovered from Westfield, or its transferee, and (b) then mostly be paid to Westfield.

118. It is clear why the Debtor wants to retain all the undisclosed claims and causes of action, to reap the benefits of any windfalls. Otherwise, pursuing claims and causes of action with respect to the Bonded Contracts is strictly a circuitous route to simply end up in the same place. Allowing the former scenario would be unfair and against the spirit of the Bankruptcy Code and, *inter alia*, the absolute priority rule. For these reasons, the Plan should be denied.

**E.     Among Other Reasons, the Plan Is Not Feasible because, if the New Value Proposed by the Debtor Is Sufficient, There Is No Equity or Going Concern Value to Reorganize Around.**

119. Assume, *arguendo*, that the Debtor does indeed make the argument above or even offers sufficient evidence to show that the going concern value of the Debtor is basically worthless. Further, and we do not even have to assume this, most all of the "assets" owned by the Debtor constitute encumbered collateral. Accordingly, there is nothing for the Debtor to reorganize around, save its goodwill, or at least what is left of it.

120.     Under section 1129(a)(11) of the Bankruptcy Code, the Plan must be feasible in order to be confirmed, i.e., confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

121.     Whether the income or earnings projections or proposed method of financing or funding the plan is speculative, uncertain, and/or conditional in nature is a key factor courts consider in determining feasibility. *See In re Aspen Village at Lost Mountain Assisted Living, LLC*, 609 B.R. 555, 564-69 (Bankr. N.D. Ga. 2019) (finding a plan feasible where the debtor had a binding letter of intent to provide financing and its monthly operating reports showed positive net monthly income of approximately $40,000.00, as opposed to that in a distinguished case where that debtor "experienced negative operating income for eight months"); *In re Shefa, LLC*, 525 B.R. 165, 176-77 (E.D. Mich. 2015) (finding a nonbinding letter of intent insufficient to support feasibility); *In re American Capital Equipment, LLC*, 688 F.3d 145, (3d Cir. 2012) (finding that a plan was not feasible where its sole source of funding stemmed from "speculative litigation proceeds").

122.     Additionally, a plan should not be confirmed where the provisions in the plan constitute a "visionary scheme" rather than a realistic reorganization. *See, e.g., In re Wiersma*, 227 F. Appx. 603, 606 (9th Cir. 2007) (for feasibility, plan proponents must show the plan has a reasonable probability of success and is more than a visionary scheme); *In re Danny Thomas Properties II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001) (stating that courts have a "duty under § 1129(a)(11) to protect creditors against 'visionary schemes'"); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity

security holders more under a proposed plan than the debtor can possibly attain after confirmation."); *In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 789-90 (Bankr. S.D. Ohio 1995) (same); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) (same); *c.f. In re Ford Steel, LLC*, 629 B.R. 871, 880 n.36 (Bankr. S.D. Tex. 2021) (finding in the conversion or dismissal context that visionary schemes do not constitute a "reasonable likelihood of rehabilitation").

123.    Whether a debtor has positive or negative cash flow, as evidenced in the debtor's monthly operating reports, is another key factor courts consider in determining feasibility. *See, e.g., Pookrum v. Bank of America, N.A.,* 512 B.R. 781, 788-89 (D. Md. 2014).

124.    Here, except for a standard agreement for insurance premium financing, Westfield is unaware of any DIP financing or post-confirmation financing to assist the Debtor or Reorganized Debtor.  Importantly, Westfield also is not aware of whether the Debtor will be able to procure surety bonds, which is generally a quite vital necessity for securing lucrative contracts in the construction industry.  The only "funding" Westfield is aware of is (a) the going concern value of the Debtor, which, as stated above, and likely argued by the Debtor itself, is worthless or near worthless, (b) the Debtor's equity in its "assets," there is none,[5] and (c) the Debtor's goodwill, the value of which has not been established.

125.    Essentially, the only thing Westfield has to evaluate feasibility here is the Debtor's hope that it will be able to win enough contracts with good enough margins in order to survive. But the Debtor cannot demonstrate that this is a feasible or reliable source of funding because that is exactly what the Debtor relied upon prior to having to file the Case at bar.  Moreover, the Debtor

---

[5] In fact, roughly 30% of the Debtor's income is from projected lease revenue with respect to property ostensibly fully encumbered by either Westfield's lien or First Citizens Bank & Trust's lien.  Whatever the case may be, it is not immediately clear to Westfield how the Debtor even plans to meet is post-confirmation projected payroll expenses of $1,700,000.00, let alone its other obligations under the Plan.

could not successfully operate its business prior to filing bankruptcy and now attempts to compete in the same market with no surety credit, no bank credit, and no certain prospects for work that would support its operational costs, ongoing funding of secured debt, and repayment to the creditors of the estate.

126.     The Debtor has filed its Business Projection, but without further evidence, it is not clear at all how reliable the Business Projection may be.  Moreover, to the extent that the Business Projection is remotely accurate, it does not paint any kind of rosy picture with respect to feasibility. The Business Projection projects that the Debtor will collect the same amount per month from accounts receivable from April to December of 2024.  Despite listing the same amounts of income each of those months, for September of 2024, the Business Projection shows a different amount of total income.  Such uniformity would imply a lack of the Debtor's ability to project income from the "contracts" it plans to utilize for income, which should be able to be done as construction contracts generally have scheduled timeframes, progress payments, and completion dates.  While construction delays can disrupt these timelines and higher costs can eat into revenues, such is immaterial with respect to forecasting based off known contractual figures, terms, and sums. Further, the Business Projection also indicates that the Debtor forecasts that its five-year net income through 2028 will only be $278,851.07, for an average of roughly $55,770.21 per year. From a cash flow perspective, this five-year projection is abysmal, at best, and provides absolutely no room for any error, in an industry where the likelihood for error should be baked into the books and records.

127.     The Monthly Operating Reports filed to date similarly paint a dreary picture.  While the Debtor's combined bank accounts appear to have cash in them, the Debtor has experienced, by Westfield's estimation, a net negative cash flow of <$129,769.84> from the end of September

2023 through the end of March of 2024. Moreover, the Monthly Operating Reports do not provide any information on the Debtor's receivables or payables, which would be information expected to be found therein if the Debtor has won any construction contracts postpetition.

128. Given the above, the only conclusion to be gleaned is that the Debtor's idea of reorganizing around worthless going concern value with little to no equity in any assets, a net negative cash flow throughout the Case, and wishful, yet still bad, projections over the next five years may only be understood as a textbook visionary scheme. The Plan cannot be feasible on the evidence presented, and any further evidence would have a tall mountain to climb to establish feasibility. For all these reasons, this Court must exercise its duty to protect creditors from visionary schemes and deny confirmation of the Plan on, *inter alia*, feasibility grounds.

**F.      The Plan Is Completely Lacking in Evidentiary Support to (a) Justify Lien Stripping with Respect to Westfield or (b) Establish that It Is in the Best Interest of Creditors.**

129. Under section 1129(a)(7) of the Bankruptcy Code, "with respect to each impaired class of claims or interest," the Plan must provide that each impaired class of claims or interests "will receive or retain . . . on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 on such date." This is the best interest of creditors test.

130. Similar to the Business Projection on file, the Liquidation Analysis provided by the Debtor, without more, does not inherently establish creditors will be better off in chapter 11 than under a chapter 7 liquidation. Moreover, the Liquidation Analysis is speculative and inaccurate.

131. For instance, the $406,066.15 figure for equity in the vehicles and trailers found in Schedule B-1 includes equity amounts that would only be captured if the Debtor is exactly correct about its stated dispute with the liens in question. The undisputed amount of equity in the vehicles and trailers found in Schedule B-1 is only, by Westfield's calculation, $165,066.15. Additionally,

it is not clear to Westfield that the Debtor's assumption that a chapter 7 trustee would seek to liquidate encumbered assets, or that creditors would not first move for stay relief and abandonment, is necessarily correct, in which case, any liquidation costs and chapter 7 trustee fees would likely be much less.

132.     Moreover, again by Westfield's calculations, the aggregate market value of the Debtor's personal property provided on the Liquidation Analysis should be $10,894,886.26, not $7,923,444.05.  That number is further skewed by the fact that the Debtor lists multiple litigation claims and causes of action as unknown and may not account for the entire universe of retained litigation claims and causes of action given the Debtor's extensive retention of litigation claims and causes of action as discussed above.  Thus, the Debtor's total personal property may be worth more than either figure above.  At any rate, the $10,894,886.26 figure suggests that (a) lien stripping may be inappropriate with respect to Westfield and (b) the Debtor needs to adduce much more evidence to establish lien stripping is warranted here.

133.     Accordingly, the Plan does not clearly satisfy the best interest of creditors test and should, therefore, be denied confirmation.

**G.      Due to the Facts and Arguments Above, and Taking into Account the Totality of the Circumstances, Westfield submits that the Plan Has Not Been Proposed in Good Faith.**

134.     "'Good faith' is not defined by the [Bankruptcy] Code; however, '[i]t is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result which is consistent with the objectives and purposes of the Bankruptcy Code.'" *Patel*, 2022 WL 1420045, at *4.  As previously stated, "[t]he two recognized policies of Chapter 11 are 'preserving going concerns' and 'maximizing property available to satisfy creditors.'"  *Id.* (citing *203 N. LaSalle*, 526 U.S. at 435).

135.     A  good  faith  determination  generally  depends  upon  the  "totality  of  the circumstances surrounding the proposed plan."  *Id.*

136.     For all the reasons discussed above, there is no going concern value to preserve, and, to the extent that some inkling of going concern value does exists, the Debtor certainly is not maximizing property available to satisfy creditors.  Rather, the Debtor's Disclosure Statement and Plan display a design to thwart creditors, especially Westfield, while attempting to maximize value for the Debtor and, ultimately, its sole member, manager, and president, Mr. Smith.  This Court should not confirm this seriously deficient, bad faith Plan.

## XIII.   RESERVATION OF RIGHTS

137.     Notwithstanding anything herein to the contrary, nothing herein shall be construed as an acceptance by Westfield of the characterization or amount of its claim against the Debtor, and its proof of claim currently on file shall be controlling.  Westfield reserves all rights, claims, defenses, liens, causes of action, setoffs, recoupments, and the like under any law whatsoever whether assertable in its own name or through a right of subrogation, equitable or otherwise. Westfield further reserves the right to supplement or amend this Objection at any time prior to the confirmation and on any grounds, including on alternative grounds.

*[Rest of Page Intentionally Left Blank]*

## XIII.  CONCLUSION

WHEREFORE, Westfield respectfully requests that this Court disapprove the Disclosure Statement, deny confirmation of the Plan, and grant such other relief that the Court deems just and proper.

Respectfully submitted,

**MANIER & HEROD, P.C.**

*/s/ Jeffrey S. Price*

Jeffrey S. Price (NC Bar No. 42590)
S. Marc Buchman (by special appearance)
1201 Demonbreun St., Suite 900
Nashville, TN 37203
T: (615) 742-0030
F: (615) 242-4203
jprice@manierherod.com
mbuchman@manierherod.com

*Counsel for Westfield Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2024, the foregoing document was served on all parties registered to receive electronic notice in this case via the Court's ECF system.

*/s/ Jeffrey S. Price*

Jeffrey S. Price

# Exhibit A

| Bond Number | Principal Name | Obligee | Bond Amount |
|---|---|---|---|
| 056042Q | BridgePoint Civil, LLC n/k/a JSmith Civil, LLC | North Carolina Department of Transportation | $ 15,346,704.64 |
| 056042C | BridgePoint Civil, LLC n/k/a JSmith Civil, LLC | Southeastern Wayne Sanitary District | $ 829,015.00 |
| 056041G | BridgePoint Civil, LLC n/k/a JSmith Civil, LLC | City of Winston-Salem, North Carolina and/or the City/County Utility Commission | $ 4,255,032.00 |
| 056043K | JSmith Civil, LLC | Clancy & Theys Construction | $ 10,259,988.00 |
| 056043T | JSmith Civil, LLC | Metcon Inc. | $ 2,624,764.00 |
| 104757J | JSmith Civil, LLC | City of Durham | $ 1,412,029.00 |
| 104757M | JSmith Civil, LLC | Lennar Carolinas, LLC | $ 3,863,620.00 |
| 136335M | JSmith Civil, LLC | Town of Windsor | $ 1,243,784.00 |
| 136335N | JSmith Civil, LLC | Town of Magnolia | $ 835,965.00 |
| 136335T | JSmith Civil, LLC | Town of Apex | $ 1,460,788.00 |
| 136335V | JSmith Civil, LLC | Driven Contractors, LLC | $ 854,601.00 |
| 164584N | JSmith Civil, LLC | New Atlantic Contracting, Inc. | $ 4,620,172.00 |
| 164584X | JSmith Civil, LLC | City of Raleigh | $ 9,586,280.00 |
| 164584Y | JSmith Civil, LLC | New Atlantic Contracting, Inc. | $ 1,930,076.00 |
| 164585C | JSmith Civil, LLC | New Atlantic Contracting, Inc. | $ 3,827,224.00 |

| Bond Number | Principal Name | Obligee | Bond Amount |
|---|---|---|---|
| 164585J | JSmith Civil, LLC | Shelco, LLC | $ 2,218,000.00 |
| 164585K | JSmith Civil, LLC | City of High Point | $ 7,416,040.00 |
| 207337Y | JSmith Civil, LLC | Highland Paving Co, LLC | $ 7,724,694.00 |
| 207338C | JSmith Civil, LLC | Samet Corporation | $ 11,071,611.78 |
| 207338J | JSmith Civil, LLC | North Carolina Department of Transportation | $ 4,649,993.00 |
| 207338P | JSmith Civil, LLC | North Carolina Department of Transportation | $ 15,747,596.00 |
| | | **Total:** | **$111,777,977.42** |

# Exhibit B

**APPROVED**

*By Garrett Chidsey at 2:32 pm, Jan 20, 2022*

# PERFORMANCE BOND

Bond No.164584X

| Contractor | Surety |
|---|---|
| Name: JSmith Civil, LLC | Name: Westfield Insurance Company |
| Address *(principal place of business)*: | Address *(principal place of business)*: |
| 3733 N US Hwy 117 | P.O. Box 5001 |
| Goldsboro, NC  27530 | Westfield Center, OH  44251-5001 |

| Owner | Contract |
|---|---|
| Name: City of Raleigh | Description *(name and location)*: |
| Mailing address *(principal place of business)*: | Atlantic Avenue Improvement Project, ES-2021-02 |
| 222 W. Hargett Street | |
| Raleigh, NC  27601 | Contract Price:  $9,586,280.00 |
| | Effective Date of Contract:  September 21, 2021 |

**Bond**

Bond Amount: $9,586,280.00     Nine Million Five Hundred Eighty Six Thousand Two Hundred Eighty Dollars and 00/100

Date of Bond:   September 21, 2021

*(Date of Bond cannot be earlier than Effective Date of Contract)*

Modifications to this Bond form:

☐ None ☐ See Paragraph 16

Surety and Contractor, intending to be legally bound hereby, subject to the terms set forth in this Performance Bond, do each cause this Performance Bond to be duly executed by an authorized officer, agent, or representative.

| Contractor as Principal | Surety |
|---|---|
| JSmith Civil, LLC | Westfield Insurance Company |
| *(Full formal name of Contractor)* | *(Full formal name of Surety) (corporate seal)* |
| By: _____ | By: _____ |
| *(Signature)* | *(Signature)(Attach Power of Attorney)* |
| Name: Jeremy Smith | Name: Scott D. Mathers |
| *(Printed or typed)* | *(Printed or typed)* |
| Title: President | Title: Attorney-in-Fact |
| Attest: _____ | Attest: _____ |
| *(Signature)* | *(Signature)* |
| Name: Patti King | Name: Angela D. Ramsey |
| *(Printed or typed)* | *(Printed or typed)* |
| Title: Corporate Secretary | Title: Witness |

*Notes: (1) Provide supplemental execution by any additional parties, such as joint venturers. (2) Any singular reference to Contractor, Surety, Owner, or other party is considered plural where applicable.*

1. The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Paragraph 3.

3. If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond will arise after:

   3.1. The Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice may indicate whether the Owner is requesting a conference among the Owner, Contractor, and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Paragraph 3.1 will be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor, and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement does not waive the Owner's right, if any, subsequently to declare a Contractor Default;

   3.2. The Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

   3.3. The Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

4. Failure on the part of the Owner to comply with the notice requirement in Paragraph 3.1 does not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

5. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

   5.1. Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

   5.2. Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

   5.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owners concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

   5.4. Waive its right to perform and complete, arrange for completion, or obtain a new contractor, and with reasonable promptness under the circumstances:

<ol start="5">
<li style="list-style:none">
<ol>
<li style="list-style:none">
<ol start="4">
<li style="list-style:none">
<ol>
<li value="1">After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or</li>
<li value="2">Deny liability in whole or in part and notify the Owner, citing the reasons for denial.</li>
</ol>
</li>
</ol>
</li>
</ol>
</li>
</ol>

6. If the Surety does not proceed as provided in Paragraph 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Paragraph 5.4, and the Owner refuses the payment, or the Surety has denied liability, in whole or in part, without further notice, the Owner shall be entitled to enforce any remedy available to the Owner.

7. If the Surety elects to act under Paragraph 5.1, 5.2, or 5.3, then the responsibilities of the Surety to the Owner will not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety will not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication for:

   7.1. the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

   7.2. additional legal, design professional, and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 5; and

   7.3. liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

8. If the Surety elects to act under Paragraph 5.1, 5.3, or 5.4, the Surety's liability is limited to the amount of this Bond.

9. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price will not be reduced or set off on account of any such unrelated obligations. No right of action will accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors, and assigns.

10. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders, and other obligations.

11. Any proceeding, legal or equitable, under this Bond must be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and must be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this paragraph are void or prohibited by law, the minimum periods of limitations available to sureties as a defense in the jurisdiction of the suit will be applicable.

12. Notice to the Surety, the Owner, or the Contractor must be mailed or delivered to the address shown on the page on which their signature appears.

13. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement will be deemed deleted therefrom and provisions conforming to such

statutory or other legal requirement will be deemed incorporated herein. When so furnished, the intent is that this Bond will be construed as a statutory bond and not as a common law bond.

14. Definitions

    14.1. *Balance of the Contract Price*—The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made including allowance for the Contractor for any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

    14.2. *Construction Contract*—The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

    14.3. *Contractor Default*—Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

    14.4. *Owner Default*—Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

    14.5. *Contract Documents*—All the documents that comprise the agreement between the Owner and Contractor.

15. If this Bond is issued for an agreement between a contractor and subcontractor, the term Contractor in this Bond will be deemed to be Subcontractor and the term Owner will be deemed to be Contractor.

16. Modifications to this Bond are as follows: **[Describe modification or enter "None"]**

# PAYMENT BOND

Bond No.164584X

| Contractor | Surety |
|---|---|
| Name: JSmith Civil, LLC | Name: Westfield Insurance Company |
| Address *(principal place of business)*: | Address *(principal place of business)*: |
| 3733 N US Hwy 117 | P.O. Box 5001 |
| Goldsboro, NC 27530 | Westfield Center, OH 44251-5001 |

| Owner | Contract |
|---|---|
| Name: City of Raleigh | Description *(name and location)*: |
| Mailing address *(principal place of business)*: | Atlantic Avenue Improvement Project, ES-2021-02 |
| 222 W. Hargett Street | |
| Raleigh, NC 27601 | Contract Price: $9,586,280.00 |
| | Effective Date of Contract: September 21, 2021 |

**Bond**

Bond Amount: $9,586,280.00   Nine Million Five Hundred Eighty Six Thousand Two Hundred Eighty Dollars and 00/100

Date of Bond: September 21, 2021
*(Date of Bond cannot be earlier than Effective Date of Contract)*
Modifications to this Bond form:
☐ None ☐ See Paragraph 18

Surety and Contractor, intending to be legally bound hereby, subject to the terms set forth in this Payment Bond, do each cause this Payment Bond to be duly executed by an authorized officer, agent, or representative.

| Contractor as Principal | Surety |
|---|---|
| JSmith Civil, LLC | Westfield Insurance Company |
| *(Full formal name of Contractor)* | *(Full formal name of Surety) (corporate seal)* |
| By: _____ | By: _____ |
| *(Signature)* | *(Signature)(Attach Power of Attorney)* |
| Name: Jeremy Smith | Name: Scott D. Mathers |
| *(Printed or typed)* | *(Printed or typed)* |
| Title: President | Title: Attorney-in-Fact |
| Attest: _____ | Attest: _____ |
| *(Signature)* | *(Signature)* |
| Name: Patti King | Name: Angela D. Ramsey |
| *(Printed or typed)* | *(Printed or typed)* |
| Title: Corporate Secretary | Title: Witness |

*Notes: (1) Provide supplemental execution by any additional parties, such as joint venturers. (2) Any singular reference to Contractor, Surety, Owner, or other party is considered plural where applicable.*

1. The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to the Owner to pay for labor, materials, and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

2. If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies, and holds harmless the Owner from claims, demands, liens, or suits by any person or entity seeking payment for labor, materials, or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

3. If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond will arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 13) of claims, demands, liens, or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials, or equipment furnished for use in the performance of the Construction Contract, and tendered defense of such claims, demands, liens, or suits to the Contractor and the Surety.

4. When the Owner has satisfied the conditions in Paragraph 3, the Surety shall promptly and at the Surety's expense defend, indemnify, and hold harmless the Owner against a duly tendered claim, demand, lien, or suit.

5. The Surety's obligations to a Claimant under this Bond will arise after the following:

   5.1. Claimants who do not have a direct contract with the Contractor

      5.1.1. have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and

      5.1.2. have sent a Claim to the Surety (at the address described in Paragraph 13).

   5.2. Claimants who are employed by or have a direct contract with the Contractor have sent a Claim to the Surety (at the address described in Paragraph 13).

6. If a notice of non-payment required by Paragraph 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Paragraph 5.1.1.

7. When a Claimant has satisfied the conditions of Paragraph 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

   7.1. Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

   7.2. Pay or arrange for payment of any undisputed amounts.

   7.3. The Surety's failure to discharge its obligations under Paragraph 7.1 or 7.2 will not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Paragraph 7.1 or 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

16.1.5. The date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;

16.1.6. The total amount earned by the Claimant for labor, materials, or equipment furnished as of the date of the Claim;

16.1.7. The total amount of previous payments received by the Claimant; and

16.1.8. The total amount due and unpaid to the Claimant for labor, materials, or equipment furnished as of the date of the Claim.

16.2. *Claimant*—An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials, or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond is to include without limitation in the terms of "labor, materials, or equipment" that part of the water, gas, power, light, heat, oil, gasoline, telephone service, or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials, or equipment were furnished.

16.3. *Construction Contract*—The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

16.4. *Owner Default*—Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

16.5. *Contract Documents*—All the documents that comprise the agreement between the Owner and Contractor.

17. If this Bond is issued for an agreement between a contractor and subcontractor, the term Contractor in this Bond will be deemed to be Subcontractor and the term Owner will be deemed to be Contractor.

18. Modifications to this Bond are as follows: **[Describe modification or enter "None"]**

General
Power
of Attorney

CERTIFIED COPY

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.
Westfield Center, Ohio

*Know All Men by These Presents,* That WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY, corporations, hereinafter referred to individually as a "Company" and collectively as "Companies," duly organized and existing under the laws of the State of Ohio, and having its principal office in Westfield Center, Medina County, Ohio, do by these presents make, constitute and appoint **Scott D. Mathers, SEVERALLY**

of     Raleigh     and State of NC its true and lawful Attorney-in-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver **any and all bonds, recognizances, undertakings, or other instruments or contracts of suretyship-**

**Surety Bond No.:     164584X**
**Principal: JSmith Civil, LLC**
**Obligee: City of Raleigh**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**LIMITATION: THIS POWER OF ATTORNEY CANNOT BE USED TO EXECUTE NOTE GUARANTEE, MORTGAGE DEFICIENCY, MORTGAGE GUARANTEE, OR BANK DEPOSITORY BONDS.**
and to bind any of the Companies thereby as fully and to the same extent as if such bonds were signed by the President, sealed with the corporate seal of the applicable Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney(s)-in-Fact may do in the premises. Said appointment is made under and by authority of the following resolution adopted by the Board of Directors of each of the WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY:

"*Be It Resolved,* that the President, any Senior Executive, any Secretary or any Fidelity & Surety Operations Executive or other Executive shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*The Attorney-in-Fact,* may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements of indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be as binding upon the Company as if signed by the President and sealed and attested by the Corporate Secretary."

"*Be It Further Resolved,* that the signature of any such designated person and the seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signatures or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached." (Each adopted at a meeting held on February 8, 2000).

*In Witness Whereof,* WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY have caused these presents to be signed by their **National Surety Leader** and **Senior Executive** and their corporate seals to be hereto affixed this **17th** day of **DECEMBER** A.D.. **2019** .

Corporate
Seals
Affixed



WESTFIELD INSURANCE COMPANY
WESTFIELD NATIONAL INSURANCE COMPANY
OHIO FARMERS INSURANCE COMPANY

By:
**Gary W. Stumper,** *National Surety Leader* and
*Senior Executive*

State of Ohio
County of Medina     ss.:

On this **17th** day of **DECEMBER** A.D., **2019** . before me personally came **Gary W. Stumper** to me known, who, being by me duly sworn, did depose and say, that he resides in **Hartford, CT;** that he is **National Surety Leader** and **Senior Executive** of WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY, the companies described in and which executed the above instrument; that he knows the seals of said Companies; that the seals affixed to said instrument are such corporate seals; that they were so affixed by order of the Boards of Directors of said Companies; and that he signed his name thereto by like order.

Notarial
Seal
Affixed

**David A. Kotnik,** Attorney at Law, *Notary Public*
My Commission Does Not Expire (Sec. 147.03 Ohio Revised Code)

State of Ohio
County of Medina     ss.:

I. **Frank A. Carrino,** Secretary of WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY. do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Companies, which is still in full force and effect; and furthermore, the resolutions of the Boards of Directors, set out in the Power of Attorney are in full force and effect.

*In Witness Whereof,* I have hereunto set my hand and affixed the seals of said Companies at Westfield Center, Ohio, this **21st** day of September A.D., 2021 .





Frank A. Carrino  *Secretary*

Frank A. Carrino, *Secretary*

BPOAC2 (combined) (06-02)

# Exhibit C

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.

Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio  44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
   a. **Generally**.  The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement.  The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit**.  Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief**.  The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence**.  In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:
  - i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or
  - ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or
  - iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.
f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**
   a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):
      - i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and
      - ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and
      - iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and
      - iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and
      - v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.
   b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:
      - i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or
      - ii. Any breach of the provisions of any of the paragraphs of this Agreement; or
      - iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or
      - iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or
      - v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or
      - vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4.  **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5.  **SECURITY INTEREST.**
    a.  **Security Interest in the Collateral**. To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
        i.  All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
        ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
    b.  **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS**. At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION**. Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION**. The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION**. The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS**. The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED**. The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION**. The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require. The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES**. In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS**. Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
    a. Any right to a trial by jury; or
    b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
    c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

d. Exhaustion of remedies.

20. **OTHER INDEMNITY**. The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**. In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise. Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**. The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
   a. Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
   b. Collect any and monies due the Contractor from contracts referred to in the Bonds; and
   c. Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
   d. Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**. This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party. Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given. No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect. The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement. This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY. THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION**. The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER**. No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS**. The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS**. The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER**. _____

_____
_____
_____
_____
_____
_____
_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 8ᵗʰ day of May, 2018.**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO -** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK -** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS -** ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA –** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA -** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN –** A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ –** ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR –** ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

BD 5079 OFWWN (10-2016)

**CORPORATE INDEMNITOR**

Corporation Name:    **Bridgepoint General Contracting, Inc.**
Corporation Address:    **112 South Duke St., Suite 7**
    **Durham, NC 27701**
Signature:
Printed Name:    **Shelley A. McPhatter**
Title:    **President**

State of:    **North Carolina**
County of:    Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587 , that he/she is the President
of Bridgepoint General Contracting, Inc. ,
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)

My Commission Expires: 3-28-2021

**CORPORATE INDEMNITOR**

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

Corporation Name:    **Bridgepoint Construction Services, Inc.**
Corporation Address:    **112 South Duke St., Suite 7**
    **Durham, NC 27701**
Signature:
Printed Name:    **Shelley A. McPhatter**
Title:    **President**

State of:    **North Carolina**
County of:    Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587 ,
that he/she is the President of Bridgepoint Construction Services, Inc.
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)

My Commission Expires: 3-28-2021

**CORPORATE INDEMNITOR**

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

| | |
|---|---|
| Corporation Name: | **Bridgepoint Civil, LLC** |
| Corporation Address: | **3733 N US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Managing Member** |

State of: **North Carolina**
County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587 ,
that he/she is the Managing Member of Bridgepoint Civil, LLC ,
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **BPC Holdings, LLC** |
| Corporation Address: | **112 South Duke St., Suite 7** |
| | **Durham, NC 27701** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Managing Member** |

State of: **North Carolina**
County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587 ,
that he/she is the Managing Member
of BPC Holdings, LLC , the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

Page **10** of **13**

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **BPC Enterprises, LLC** |
| Corporation Address: | **112 South Duke St., Suite 7** |
| | **Durham, NC 27701** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Managing Member** |

State of: **North Carolina**
County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelly A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587 ,
that he/she is the Managing Member of BPC Enterprises, LLC ,
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)

My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

## INDIVIDUAL INDEMNITOR

BD 5079 OFWWN (10-2016)

Individual Name:  **Shelley A. McPhatter**
Individual Address:  **1520 Crenshaw Point**
                     **Wake Forest, NC 27587**

Signature: _____

State of:  **North Carolina** _____
County of:  Wake _____

On this  22  day of  May ____, 20 18 , before me personally came Shelley A. McPhatter ____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

                                        _____
                                        (Notary Public)

                                        My Commission Expires:  3-28-2021

                                        ┌────────────────────────────────────┐
                                        │  PAMELA PAYNE WHITE                 │
                                        │  NOTARY PUBLIC                      │
                                        │  WAKE COUNTY, N.C.                  │
                                        │  My Commission Expires 3-28-2021.   │
                                        └────────────────────────────────────┘

                    **INDIVIDUAL INDEMNITOR**

Individual Name: _____
Individual Address: _____

Signature: _____

State of: _____
County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

                                        _____
                                        (Notary Public)

                                        My Commission Expires: _____

                    **INDIVIDUAL INDEMNITOR**

BD 5079 OFWWN (10-2016)

Individual Name: **Jeremy A. Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**

Signature:

State of: **North Carolina**
County of: **Wayne**

On this <u>14th</u> day of <u>May</u>_____, 20<u>18</u>, before me personally came <u>Jeremy A. Smith</u>_____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_____
(Notary Public)
My Commission Expires: 11.28.20

**INDIVIDUAL INDEMNITOR**

Individual Name: **Tina W. Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**

Signature: *Tina Smith*

State of: **North Carolina**
County of: **Wayne**

On this <u>14th</u> day of <u>May</u>, 20<u>18</u>, before me personally came <u>Tina W. Smith</u>_____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_____
(Notary Public)
My Commission Expires: 11.28.20

BD 5079 OFWWN (10-2016)

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.
Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio 44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
   a. **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever nature (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief**. The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence**. In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:

    i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or

    ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or

    iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.

f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT**.

  a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):

    i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

    ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

    iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

    iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

    v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

  b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:

    i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or

    ii. Any breach of the provisions of any of the paragraphs of this Agreement; or

    iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or

    iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or

    v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or

    vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4. **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5. **SECURITY INTEREST.**
   a. **Security Interest in the Collateral.** To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
      i. All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
      ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
   b. **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS.** At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION.** Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION.** The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION.** The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS.** The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED.** The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION.** The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require. The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES.** In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS.** Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:

    a. Any right to a trial by jury; or

    b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or

    c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

    d.  Exhaustion of remedies.

20. **OTHER INDEMNITY**.  The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**.  In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.  It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.  Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**.  The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
    a.  Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
    b.  Collect any and monies due the Contractor from contracts referred to in the Bonds; and
    c.  Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
    d.  Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**.  This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party.  Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given.  No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT**.  This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect.  The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement.  This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY.  THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

BD 5079 OFWWN (10-2016)

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION.** The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER.** No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS.** The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS.** The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER.** _____
_____
_____
_____
_____
_____
_____
_____
_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 21st day of May, 2019 .**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO** - IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK** - ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS** - ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

Corporation Name: **Bridgepoint Civil, LLC**
Corporation Address: **3733 N US Highway 117**
**Goldsboro, NC 27530**

Signature:
Printed Name: **Jeremy A. Smith**
Title: **Member / Manager**

State of: **North Carolina**
County of: Wayne

On this 21st day of May, 2019, before me personally came Jeremy A. Smith ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member / Manager
of Bridgepoint Civil, LLC , the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY NC

(Notary Public)
My Commission Expires: 11/28/20

## CORPORATE INDEMNITOR

Corporation Name: **BPC Holdings, LLC**
Corporation Address: **3733 N US Highway 117**
**Goldsboro, NC 27530**

Signature:
Printed Name: **Shelley A. McPhatter**
Title: **Member / Manager**

State of: **North Carolina**
County of: Durham

On this 21st day of May, 2019, before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587 ,
that he/she is the Member / Manager of BPC Holdings, LLC ,
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

(Notary Public)
My Commission Expires: March 4, 2022

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **BPC Enterprises, LLC** |
| Corporation Address: | **3733 N US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Member / Manager** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | Durham |

On this 21st day of May, 2019, before me personally came Shelley A. McPhatter, to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587, that he/she is the Member / Manager of BPC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

## INDIVIDUAL INDEMNITOR

Page **10** of **12**

BD 5079 OFWWN (10-2016)

Individual Name:   **Shelley A. McPhatter**
Individual Address:  **1520 Crenshaw Point**
                    **Wake Forest, NC 27587**

Signature:

State of:   **North Carolina**
County of:  Durham

On this <u>21st</u> day of <u>May</u>, <u>2019</u>, before me personally came <u>Shelley A. McPhatter</u>
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.



(Notary Public)
My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

**INDIVIDUAL INDEMNITOR**

Individual Name:   **David McConnell White**
Individual Address:  **1520 Crenshaw Point**
                    **Wake Forest, NC 27587**

Signature:

State of:   **North Carolina**
County of:  Durham

On this <u>21st</u> day of <u>May</u>, <u>2019</u>, before me personally came <u>David McConnell White</u>, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)
My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

**INDIVIDUAL INDEMNITOR**

BD 5079 OFWWN (10-2016)

Individual Name:    **Jeremy A. Smith**
Individual Address:   **118 Crosswinds Dr.**
                       **Goldsboro, NC 27530**

Signature:

State of:    **North Carolina**
County of:   Wayne

On this 21st day of May, 2019, before me personally came Jeremy A. Smith,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, N.C.

_____ (Notary Public)
My Commission Expires: 11/28/20

**INDIVIDUAL INDEMNITOR**

Individual Name:    **Tina W. Smith**
Individual Address:   **118 Crosswinds Dr.**
                       **Goldsboro, NC 27530**

Signature:   *Tina Smith*

State of:    **North Carolina**
County of:   Wayne

On this 21st day of May, 2019, before me personally came Tina W. Smith,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, N.C.

_____ (Notary Public)
My Commission Expires: 11/28/20

BD 5079 OFWWN (10-2016)

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.

Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio 44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
   a. **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief**. The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence**. In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:

    i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or

    ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or

    iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.

f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**

a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):

    i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

    ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

    iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

    iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

    v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:

    i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or

    ii. Any breach of the provisions of any of the paragraphs of this Agreement; or

    iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or

    iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or

    v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or

    vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4. **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5. **SECURITY INTEREST.**
   a. **Security Interest in the Collateral**. To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
      i. All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
      ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
   b. **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

BD 5079 OFWWN (10-2016)

11. **BOOKS AND RECORDS**.  At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.  If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION**.  Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.  The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION**.  The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION**.  The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS**.  The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED**.  The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION**.  The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require.  The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES**.  In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS**.  Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.  The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors.  In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
    a. Any right to a trial by jury; or
    b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
    c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

BD 5079 OFWWN (10-2016)

d.  Exhaustion of remedies.

20. **OTHER INDEMNITY**.  The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**.  In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.  It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.  Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**.  The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
   a.  Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
   b.  Collect any and monies due the Contractor from contracts referred to in the Bonds; and
   c.  Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
   d.  Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**.  This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party.  Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given.  No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect.  The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement.  This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY**.  **THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION.** The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER.** No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS.** The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS.** The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER.** _____
_____
_____
_____
_____
_____
_____
_____
_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 1st day of _May_, 2020.**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO -** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT ,OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK -** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS -** ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

BD 5079 OFWWN (10-2016)

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Manager and Member and President** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

*(Notary seal: PATRICIA L. KING, NOTARY PUBLIC, WAYNE COUNTY, NC)*

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Kevin Amory** |
| Title: | **Manager and Treasurer** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

*(Notary seal: PATRICIA L. KING, NOTARY PUBLIC, WAYNE COUNTY, NC)*

**CORPORATE INDEMNITOR**

BD 5079 OFWWN (10-2016)

Corporation Name: **JSC Holdings, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Jeremy Smith**
Title: **Manager and Member and President**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

Corporation Name: **JSC Holdings, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Tina Smith**
Title: **Member**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

BD 5079 OFWWN (10-2016)

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
                            **Goldsboro, NC 27530**
Signature:
Printed Name: **Jeremy Smith**
Title: **Member and Manager and President**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member and Manager and President of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

                                         (Notary Public)
My Commission Expires: 11/28/20

*PATRICIA L. KING — NOTARY PUBLIC — WAYNE COUNTY, NC (notary seal)*

## CORPORATE INDEMNITOR

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
                            **Goldsboro, NC 27530**
Signature:
Printed Name: **Tina Smith**
Title: **Member**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

                                         (Notary Public)
My Commission Expires: 11/28/20

*PATRICIA L. KING — NOTARY PUBLIC — WAYNE COUNTY, NC (notary seal)*

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **JSC Enterprises, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Kevin Amory** |
| Title: | **Manager and Treasurer** |

State of: **North Carolina**

County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **JSC Holdings, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Kevin Amory** |
| Title: | **Manager and Treasurer** |

State of: **North Carolina**

County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

Corporation Name: _____

Corporation Address: _____

_____

Signature: _____

Printed Name: _____

Title: _____


State of: _____

County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, who, being by me duly sworn, did depose and say that he/she resides at _____
_____, that he/she is the _____
of _____, the corporation which executed the attached Agreement of Indemnity, that
he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate
seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name
to the said Agreement of Indemnity by like order.


_____
(Notary Public)

My Commission Expires: _____


## CORPORATE INDEMNITOR

Corporation Name: _____

Corporation Address: _____

_____

Signature: _____

Printed Name: _____

Title: _____


State of: _____

County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, who, being by me duly sworn, did depose and say that he/she resides at _____
_____, that he/she is the _____
of _____, the corporation which executed the attached Agreement of Indemnity, that
he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate
seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name
to the said Agreement of Indemnity by like order.


_____
(Notary Public)

My Commission Expires: _____

## INDIVIDUAL INDEMNITOR

Individual Name: **Jeremy Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**
Signature:

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: 11/28/20

*PATRICIA L. KING*
*NOTARY*
*PUBLIC*
*WAYNE COUNTY, NC*

## INDIVIDUAL INDEMNITOR

Individual Name: **Tina Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**
Signature: *Tina Smith*

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: 11/28/20

*PATRICIA L. KING*
*NOTARY*
*PUBLIC*
*WAYNE COUNTY, NC*

BD 5079 OFWWN (10-2016)

# Exhibit D

**File Number: 20230059889H**
**Date Filed: 5/10/2023 4:31:00 PM**
**Elaine F. Marshall**
**NC Secretary of State**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Manier & Herod**

B. E-MAIL CONTACT AT FILER (optional)
**JPrice@manierherod.com**

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**Manier & Herod**
**1201 Demonbreun ST, STE 900**
**Nashville, TN 37203**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BridgePoint General Contracting, Inc.** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **600 N Duke Street** | **Durham** | **NC** | **27701** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BridgePoint Construction Services, Inc.** | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **600 N Duke Street** | **Durham** | **NC** | **27701** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Westfield Insurance Company** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1 Park Circle PO Box 5001** | **Westfield Center** | **OH** | **44251** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**4906.74097**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME

**BridgePoint General Contracting, Inc.**

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BridgePoint Civil, LLC n/k/a JSmith Civil, LLC** | | | |
| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27534** | **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **JSmith Civil, LLC** | | | |
| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27534** | **USA** |

21. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BPC Holdings, LLC n/k/a JSC Holdings, LLC** | | | |
| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27533** | **USA** |

22. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| **BridgePoint General Contracting, Inc.** |

OR

| 18b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

19. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **JSC Holdings, LLC** | | | |

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27533** | **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BPC Enterprises LLC n/k/a JSC Enterprises, LLC** | | | |

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27530** | **USA** |

21. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **JSC Enterprises, LLC** | | | |

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1202 Parkway Drive** | **Goldsboro** | **NC** | **27530** | **USA** |

22. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

24. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME

**BridgePoint General Contracting, Inc.**

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

19. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **McPhatter** | **Shelley** | | |
| 19c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **600 N Duke Street** | **Durham** | **NC** / **27701** | **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **White** | **David** | | |
| 20c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **1520 Crenshaw Point** | **Waker Forest** | **NC** / **27587** | **USA** |

21. ADDITIONAL DEBTOR'S NAME: Provide only <u>one</u> Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

# Exhibit A

**Name of First Debtor:** BridgePoint General Contracting, Inc.

The security interest is derived from an Agreement of Indemnity, dated May 21, 2019 (the "2019 Indemnity Agreement") executed by Debtors BridgePoint Civil, LLC n/k/a JSmith Civil, LLC; BPC Holdings, LLC n/k/a JSC Holdings, LLC; BPC Enterprises LLC n/k/a JSC Enterprises, LLC; Shelley A. McPhatter; David McConnell White; Jeremy A. Smith; and Tina W. Smith (the "2019 Indemnitors") and an Agreement of Indemnity, dated May 8, 2018 (the "2018 Indemnity Agreement" and collectively with the 2019 Indemnity Agreement, the "Indemnity Agreements") executed by the Indemnitors and Debtors BridgePoint General Contracting, Inc.; BridgePoint Construction Services, Inc. (collectively, the "Indemnitors"). The Indemnity Agreements grant a security interest in favor of Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company (collectively, the "Surety") in relation to the collateral more specifically set forth below. Copies of the Indemnity Agreements are attached as **Exhibit A-1 and Exhibit A-2.** Unless otherwise defined herein, all capitalized terms herein have the meaning set forth in the Indemnity Agreements.

Paragraph 3 of the Indemnity Agreements state:

3. **ASSIGNMENT.**
   a. **Rights Assigned.** Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively, "assigns"):

   i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

   ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

   iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

   iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialmen, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any

contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

v.  All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.

Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio 44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
    a. **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
        i. By reason of having executed or procured the execution of the Bonds; or
        ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
        iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
    b. **Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
    c. **Right to Injunctive Relief**. The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
    d. **Prima Facie Evidence**. In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:
   i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or
   ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or
   iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.
f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**
   a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):
      i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and
      ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and
      iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and
      iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and
      v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.
   b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:
      i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or
      ii. Any breach of the provisions of any of the paragraphs of this Agreement; or
      iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or
      iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or
      v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or
      vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4. **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5. **SECURITY INTEREST.**
   a. **Security Interest in the Collateral.** To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
      i. All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
      ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
   b. **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS**. At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION**. Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION**. The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION**. The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS**. The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED**. The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION**. The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require. The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES**. In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS**. Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
   a. Any right to a trial by jury; or
   b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
   c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

      d.  Exhaustion of remedies.

20. **OTHER INDEMNITY**.  The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**.  In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.  It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.  Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**.  The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
      a.  Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
      b.  Collect any and monies due the Contractor from contracts referred to in the Bonds; and
      c.  Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
      d.  Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**.  This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party.  Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given.  No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect.  The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement.  This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY.  THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION.** The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER.** No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS.** The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS.** The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER.** _____

_____

_____

_____

_____

_____

_____

_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 8ᵗʰ day of May, 2018_____.**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO** - IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK** - ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS** - ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

**CORPORATE INDEMNITOR**

Corporation Name: **Bridgepoint General Contracting, Inc.**
Corporation Address: **112 South Duke St., Suite 7**
**Durham, NC 27701**
Signature:
Printed Name: **Shelley A. McPhatter**
Title: **President**

State of: **North Carolina**
County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587 , that he/she is the President
of Bridgepoint General Contracting, Inc.
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

*Pamela Payne White*
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

**CORPORATE INDEMNITOR**

Corporation Name: **Bridgepoint Construction Services, Inc.**
Corporation Address: **112 South Duke St., Suite 7**
**Durham, NC 27701**
Signature:
Printed Name: **Shelley A. McPhatter**
Title: **President**

State of: **North Carolina**
County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelley A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587 ,
that he/she is the President of Bridgepoint Construction Services, Inc.
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

*Pamela Payne White*
(Notary Public)
My Commission Expires: 3-28-2021

**CORPORATE INDEMNITOR**

Page 9 of 13

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

Corporation Name:     **Bridgepoint Civil, LLC**
Corporation Address:  **3733 N US Highway 117**
                      **Goldsboro, NC 27530**
Signature:            _Shelley A. McPhatter_
Printed Name:         **Shelley A. McPhatter**
Title:                **Managing Member**


State of:    **North Carolina**
County of:   Wake

On this **22** day of **May**, 20**18**, before me personally came Shelley A. McPhatter,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587
that he/she is the Managing Member of Bridgepoint Civil, LLC
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_Pamela Payne White_
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.


## CORPORATE INDEMNITOR

Corporation Name:     **BPC Holdings, LLC**
Corporation Address:  **112 South Duke St., Suite 7**
                      **Durham, NC 27701**
Signature:            _Shelley A. McPhatter_
Printed Name:         **Shelley A. McPhatter**
Title:                **Managing Member**


State of:    **North Carolina**
County of:   Wake

On this **22** day of **May**, 20**18**, before me personally came Shelley A. McPhatter,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587
that he/she is the Managing Member
of BPC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that
he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate
seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name
to the said Agreement of Indemnity by like order.

_Pamela Payne White_
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **BPC Enterprises, LLC** |
| Corporation Address: | **112 South Duke St., Suite 7** |
| | **Durham, NC 27701** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Managing Member** |

State of: **North Carolina**

County of: Wake

On this 22 day of May , 20 18 , before me personally came Shelly A. McPhatter ,
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake
Forest, NC 27587 ,
that he/she is the Managing Member of BPC Enterprises, LLC ,
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation,
that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board
of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

Pamela Payne White
(Notary Public)

My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

## INDIVIDUAL INDEMNITOR

Individual Name: **Shelley A. McPhatter**
Individual Address: **1520 Crenshaw Point**
**Wake Forest, NC 27587**
Signature:

State of: **North Carolina**
County of: Wake

On this __22__ day of __May__, 20 18 , before me personally came Shelley A. McPhatter ,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_Pamela Payne White_
(Notary Public)
My Commission Expires: 3-28-2021

PAMELA PAYNE WHITE
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 3-28-2021.

**INDIVIDUAL INDEMNITOR**

Individual Name: _____
Individual Address: _____
_____
Signature: _____

State of: _____
County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_____
(Notary Public)
My Commission Expires: _____

**INDIVIDUAL INDEMNITOR**

BD 5079 OFWWN (10-2016)

Individual Name: **Jeremy A. Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**
Signature:

State of: **North Carolina**
County of: **Wayne**

On this 14th day of May_____, 2018, before me personally came Jeremy A. Smith_____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_____
(Notary Public)
My Commission Expires: 11.28.20

**INDIVIDUAL INDEMNITOR**

Individual Name: **Tina W. Smith**
Individual Address: **118 Crosswinds Dr.**
**Goldsboro, NC 27530**
Signature: *Tina Smith*

State of: **North Carolina**
County of: **Wayne**

On this 14th day of May, 2018, before me personally came Tina W. Smith_____,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

_____
(Notary Public)
My Commission Expires: 11.28.20

BD 5079 OFWWN (10-2016)

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.

Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio 44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS.** The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY.**
   a. **Generally.** The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit.** Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief.** The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence.** In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:

    i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or

    ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or

    iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.

f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**

a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):

    i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

    ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

    iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

    iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

    v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:

    i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or

    ii. Any breach of the provisions of any of the paragraphs of this Agreement; or

    iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or

    iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or

    v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or

    vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4.  **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5.  **SECURITY INTEREST.**
    a.  **Security Interest in the Collateral.** To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
        i.   All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
        ii.  All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
    b.  **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS.** At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION.** Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION.** The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION.** The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS.** The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED.** The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION.** The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require. The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES.** In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS.** Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
    a. Any right to a trial by jury; or
    b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
    c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

d.  Exhaustion of remedies.

20. **OTHER INDEMNITY**. The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**. In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise. Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**. The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
   a.  Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
   b.  Collect any and monies due the Contractor from contracts referred to in the Bonds; and
   c.  Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
   d.  Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**. This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party. Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given. No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT**. This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect. The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement. This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY. THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION.** The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER.** No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS.** The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS.** The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER.** _____

_____

_____

_____

_____

_____

_____

_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 21st day of May, 2019 .**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO** - IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK** - ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS** - ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

# CORPORATE INDEMNITOR

Corporation Name: **Bridgepoint Civil, LLC**
Corporation Address: **3733 N US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Jeremy A. Smith**
Title: **Member / Manager**

State of: **North Carolina**
County of: Wayne

On this 21st day of May, 2019, before me personally came Jeremy A. Smith
to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member / Manager
of Bridgepoint Civil, LLC                , the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

(Notary Public)
My Commission Expires: 11/28/20

# CORPORATE INDEMNITOR

Corporation Name: **BPC Holdings, LLC**
Corporation Address: **3733 N US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Shelley A. McPhatter**
Title: **Member / Manager**

State of: **North Carolina**
County of: Durham

On this 21st day of May, 2019, before me personally came Shelley A. McPhatter
to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587
that he/she is the Member / Manager      of BPC Holdings, LLC
the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

(Notary Public)
My Commission Expires: March 4, 2022

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

| | |
|---|---|
| Corporation Name: | **BPC Enterprises, LLC** |
| Corporation Address: | **3733 N US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Shelley A. McPhatter** |
| Title: | **Member / Manager** |

State of: **North Carolina**

County of: Durham

On this 21st day of May, 2019, before me personally came Shelley A. McPhatter, to me known, who, being by me duly sworn, did depose and say that he/she resides at 1520 Crenshaw Point, Wake Forest, NC 27587, that he/she is the Member / Manager of BPC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

## INDIVIDUAL INDEMNITOR

BD 5079 OFWWN (10-2016)

Individual Name: **Shelley A. McPhatter**
Individual Address: **1520 Crenshaw Point**
**Wake Forest, NC 27587**

Signature:

State of: **North Carolina**
County of: Durham

On this 21st day of May, 2019, before me personally came Shelley A. McPhatter
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

## INDIVIDUAL INDEMNITOR

Individual Name: **David McConnell White**
Individual Address: **1520 Crenshaw Point**
**Wake Forest, NC 27587**

Signature:

State of: **North Carolina**
County of: Durham

On this 21st day of May, 2019, before me personally came David McConnell White, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: March 4, 2022

HELEN H TAPP
Notary Public, North Carolina
Granville County
My Commission Expires
March 04, 2022

## INDIVIDUAL INDEMNITOR

BD 5079 OFWWN (10-2016)

Individual Name:     **Jeremy A. Smith**
Individual Address:    **118 Crosswinds Dr.**
                       **Goldsboro, NC 27530**

Signature:

State of:   **North Carolina**
County of:  **Wayne**

On this **21st** day of **May**, 20**19**, before me personally came **Jeremy A. Smith**,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: **11/28/20**

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

**INDIVIDUAL INDEMNITOR**

Individual Name:     **Tina W. Smith**
Individual Address:    **118 Crosswinds Dr.**
                       **Goldsboro, NC 27530**

Signature:     *Tina Smith*

State of:   **North Carolina**
County of:  **Wayne**

On this **21st** day of **May**, 20**19**, before me personally came **Tina W. Smith**,
to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and
acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: **11/28/20**

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

BD 5079 OFWWN (10-2016)



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Jeff S. Price**

B. E-MAIL CONTACT AT FILER (optional)
**JPrice@manierherod.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Manier & Herod**
**1201 Demonbreun ST, STE 900**
**Nashville, TN 37203**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **JSmith Civil, LLC** | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **3733 N. US Highway 117** | CITY **Goldsboro** | STATE **NC** · POSTAL CODE **27530** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME **JSC Holdings, LLC** | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS **3733 N. US Highway 117** | CITY **Goldsboro** | STATE **NC** · POSTAL CODE **27530** | COUNTRY **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **Westfield Insurance Company** | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **1 Park Circle PO Box 5001** | CITY **Westfield Center** | STATE **OH** · POSTAL CODE **44251** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

See Attachment

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**  International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

12. ADDITIONAL SPACES FOR ITEM 4(Collateral)

i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialmen, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest. See Exhibit A.

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| **JSmith Civil, LLC** |

OR

| 18b. INDIVIDUAL'S SURNAME | | SUFFIX |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **JSC Enterprises, LLC** | | | | |

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3733 N. US Highway 117** | **Goldsboro** | **NC** | **27530** | **USA** |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| **Smith** | **Jeremy** | | | |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **118 Crosswinds Drive** | **Goldsboro** | **NC** | **27530** | **USA** |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| **Smith** | **Tina** | | | |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **118 Crosswinds Drive** | **Goldsboro** | **NC** | **27530** | **USA** |

**22.** ☑ ADDITIONAL SECURED PARTY'S NAME  **or**  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Westfield National Insurance Company** | | | | |

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1 Park Circle PO Box 5001** | **Westfield Center** | **OH** | **44251** | **USA** |

**23.** ☑ ADDITIONAL SECURED PARTY'S NAME  **or**  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Ohio Farmers Insurance Company** | | | | |

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1 Park Circle PO Box 5001** | **Westfield Center** | **OH** | **44251** | **USA** |

**24. MISCELLANEOUS:**

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| JSmith Civil, LLC |

OR

| 18b. INDIVIDUAL'S SURNAME |
|---|
| |

| FIRST PERSONAL NAME |
|---|
| |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME |
|---|
| BPC Holdings, LLC n/k/a JSC Holdings, LLC |

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3733 N. US Highway 117 | Goldsboro | NC | 27530 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME |
|---|
| BridgePoint Civil, LLC n/k/a JSmith Civil, LLC |

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3733 N. US Highway 117 | Goldsboro | NC | 27530 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME |
|---|
| BPC Enterprises, LLC n/k/a JSC Enterprises, LLC |

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3733 N. US Highway 117 | Goldsboro | NC | 27530 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME |
|---|
| |

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME |
|---|
| |

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

24. MISCELLANEOUS:

**Name of First Debtor:** JSmith Civil, LLC

The security interest is derived from an Agreement of Indemnity, dated May 1, 2020 (the "Indemnity Agreement") executed by Debtors JSmith Civil, LLC; JSC Holdings, LLC; JSC Enterprises, LLC; Jeremy Smith; and Tina Smith (collectively, the "Indemnitors"). The Indemnity Agreement grants a security interest in favor of Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company (collectively, the "Surety") in relation to the collateral more specifically set forth below. A copy of the Indemnity Agreement is attached as **Exhibit A-1**. Unless otherwise defined herein, all capitalized terms herein have the meaning set forth in the Indemnity Agreement.

Paragraph 3 of the Indemnity Agreement states:

3. **ASSIGNMENT.**
   a. **Rights Assigned.** Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively, "assigns"):

   i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

   ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

   iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

   iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialmen, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

   v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

Exhibit A-1

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.
Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio  44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
   a. **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief**. The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence**. In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

BD 5079 OFWWN (10-2016)

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:
    i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or
    ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or
    iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.
f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**
    a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):
        i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and
        ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and
        iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and
        iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and
        v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.
    b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:
        i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or
        ii. Any breach of the provisions of any of the paragraphs of this Agreement; or
        iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or
        iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or
        v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or
        vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4. **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5. **SECURITY INTEREST.**
   a. **Security Interest in the Collateral.** To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
      i. All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
      ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
   b. **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

c. **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES.** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT.** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND.** The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES.** The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS**. At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION**. Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION**. The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION**. The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS**. The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED**. The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION**. The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require. The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES**. In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS**. Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
   a. Any right to a trial by jury; or
   b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
   c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

d.   Exhaustion of remedies.

20. **OTHER INDEMNITY**.  The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**.  In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.  It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.  Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**.  The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
   a.   Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
   b.   Collect any and monies due the Contractor from contracts referred to in the Bonds; and
   c.   Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
   d.   Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**.  This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party.  Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given.  No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect.  The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement.  This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY.  THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION**. The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER**. No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS**. The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS**. The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER**. _____
_____
_____
_____
_____
_____
_____
_____
_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 1st day of _May_, 2020.**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO -** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT ,OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK** - ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS -** ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

BD 5079 OFWWN (10-2016)

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Manager and Member and President** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Kevin Amory** |
| Title: | **Manager and Treasurer** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

| Corporation Name: | **JSC Holdings, LLC** |
|---|---|
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Manager and Member and President** |

| State of: | **North Carolina** |
|---|---|
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

**CORPORATE INDEMNITOR**

| Corporation Name: | **JSC Holdings, LLC** |
|---|---|
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | *Tina Smith* |
| Printed Name: | **Tina Smith** |
| Title: | **Member** |

| State of: | **North Carolina** |
|---|---|
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

**CORPORATE INDEMNITOR**

BD 5079 OFWWN (10-2016)

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Jeremy Smith**
Title: **Member and Manager and President**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member and Manager and President of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

## CORPORATE INDEMNITOR

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Tina Smith**
Title: **Member**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)

My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Kevin Amory**
Title: **Manager and Treasurer**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

## CORPORATE INDEMNITOR

Corporation Name: **JSC Holdings, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Kevin Amory**
Title: **Manager and Treasurer**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

PATRICIA L. KING
NOTARY
PUBLIC
WAYNE COUNTY, NC

BD 5079 OFWWN (10-2016)

## CORPORATE INDEMNITOR

Corporation Name: _____

Corporation Address: _____

                             _____

Signature: _____

Printed Name: _____

Title: _____

State of: _____

County of: _____

On this _____ day of _____, 20_____, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____ _____, that he/she is the _____ of _____, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)
My Commission Expires: _____


## CORPORATE INDEMNITOR

Corporation Name: _____

Corporation Address: _____

                             _____

Signature: _____

Printed Name: _____

Title: _____

State of: _____

County of: _____

On this _____ day of _____, 20_____, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____ _____, that he/she is the _____ of _____, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)
My Commission Expires: _____

**INDIVIDUAL INDEMNITOR**

Individual Name:     **Jeremy Smith**
Individual Address:  **118 Crosswinds Dr.**
                     **Goldsboro, NC 27530**
Signature:

State of:    **North Carolina**
County of:   **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

                                                    (Notary Public)
                                    My Commission Expires: 11/28/20

**INDIVIDUAL INDEMNITOR**

Individual Name:     **Tina Smith**
Individual Address:  **118 Crosswinds Dr.**
                     **Goldsboro, NC 27530**
Signature:           Tina Smith

State of:    **North Carolina**
County of:   **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

                                                    (Notary Public)
                                    My Commission Expires: 11/28/20

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **WESTFIELD INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, JSC ENTERPRISES, LLC f/k/a BPC ENTERPRISES, LLC, JEREMY SMITH, TINA SMITH (individually and as Trustee of Smith Holdings Land Trust), SMITH HOLDINGS LAND TRUST, and JSMITH NC DESTINATION MANAGEMENT, LLC,** | ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |
| | ) |

Case No.

---

## COMPLAINT

---

Plaintiff Westfield Insurance Company ("Westfield" or the "Surety"), by and through counsel, states the following for its Complaint against (1) Defendant JSC Holdings, LLC f/k/a BPC Holdings, LLC, (2) Defendant JSC Enterprises, LLC f/k/a BPC Enterprises, LLC, (3) Defendant Jeremy Smith, (4) Defendant Tina Smith (individually and in her capacity as Trustee of Defendant Smith Holdings Land Trust), (5) Defendant Smith Holdings Land Trust, and (6) Defendant JSmith NC Destination Management, LLC (collectively, the "Defendants"):

## THE PARTIES

1.      Westfield is an Ohio corporation with its principal place of business located at Westfield's corporate headquarters in Westfield Center, Ohio, which is the location from which

Westfield's high-level officers direct, control, and coordinate Westfield's activities. Thus, Westfield is a citizen of Ohio for the purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

2.      Upon information and belief, Defendant JSC Holdings, LLC f/k/a BPC Holdings, LLC is a North Carolina limited liability company, whose former and/or current members have been and remain citizens of North Carolina. Thus, Defendant JSC Holdings, LLC f/k/a BPC Holdings, LLC is a citizen of North Carolina for the purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

3.      Upon information and belief, Defendant JSC Enterprises, LLC f/k/a BPC Enterprises, LLC is a North Carolina limited liability company, whose former and/or current members have been and remain citizens of North Carolina. Thus, Defendant JSC Enterprises, LLC f/k/a BPC Enterprises, LLC is a citizen of North Carolina for the purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

4.      Upon information and belief, Defendant Jeremy Smith is a citizen of North Carolina and is settlor and/or beneficiary of Defendant Smith Holdings Land Trust.

5.      Upon information and belief, Defendant Tina Smith is a citizen of North Carolina and is the Trustee of Defendant Smith Holdings Land Trust (in addition to being a settlor and/or beneficiary of Defendant Smith Holdings Land Trust).

6.      Upon information and belief, Defendant Smith Holdings Land Trust is an express trust formed under the North Carolina Uniform Trust Code, N.C. Gen. Stat. Ann. § 36C-1-101 *et seq.*, whose Trustee and beneficiaries are citizens of North Carolina. Thus, Defendant Smith Holdings Land Trust is a citizen of North Carolina for the purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

7. Upon information and belief, Defendant JSmith NC Destination Management, LLC is a North Carolina limited liability company, whose members have been and remain citizens of North Carolina. Thus, Defendant JSmith NC Destination Management, LLC is a citizen of North Carolina for the purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

## JURISDICTION AND VENUE

8. This Court possesses original subject matter jurisdiction over Westfield's claims against the Defendants pursuant to 28 U.S.C. § 1332(a) because the matter in controversy (a) exceeds the sum or value of $75,000.00 exclusive of interest and costs and (b) is between citizens of different states (Ohio Plaintiff and North Carolina Defendants).

9. This Court possesses the power to declare the respective rights and other legal relations of Westfield and the Defendants as requested herein pursuant to 28 U.S.C. §2201(a).

10. This Court possesses the authority to award the injunctive relief requested herein pursuant to Rule 65 of the Federal Rules of Civil Procedure.

11. Venue is proper in the Eastern District of North Carolina under 28 U.S.C. §113(a), 28 U.S.C. § 1391(b)(1), and/or 28 U.S.C. § 1391(b)(2) because the Defendants reside in the Eastern District of North Carolina and a substantial part of the events giving rise to the claims occurred in the Eastern District of North Carolina.

12. Venue is also proper in the Eastern District of North Carolina in relation to Westfield's claims against Defendant JSC Holdings, LLC f/k/a BPC Holdings, LLC, Defendant JSC Enterprises, LLC f/k/a BPC Enterprises, LLC, Defendant Jeremy Smith, and Defendant Tina Smith (each of those Defendants individually an "Indemnitor" and collectively the "Indemnitors") pursuant to the agreement of indemnity at the center of this action, through which each of the Indemnitors expressly waived, abandoned, and agreed not to assert as a defense "[a]ny objection

to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction."

## FACTUAL ALLEGATIONS

### The Indemnity Agreement

13.     As a condition of obtaining surety bonds from Westfield and/or in consideration of Westfield refraining from canceling other surety bonds, non-party JSmith Civil, LLC f/k/a Bridgepoint Civil, LLC (the "Contractor"), Indemnitor JSC Holdings, LLC f/k/a BPC Holdings, LLC, Indemnitor JSC Enterprises, LLC f/k/a BPC Enterprises, LLC, Indemnitor Jeremy Smith, and Indemnitor Tina Smith executed the Agreement of Indemnity attached hereto as **Exhibit 1** and dated May 1, 2020 in favor of Westfield (the "Indemnity Agreement").

14.     With respect to the Indemnitors' duty to exonerate and indemnify Westfield from any and all liability for losses and/or expenses, Paragraph 2.a. of the Indemnity Agreement states, in relevant part:

> **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
>
> i.   By reason of having executed or procured the execution of the Bonds; or
>
> ii.  By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
>
> iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.

15.     With respect to the Indemnitors' duty to collateralize Westfield upon demand as soon as liability exists or is asserted against Westfield, Paragraph 2.b. of the Indemnity Agreement states:

**Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.

16.     With respect to Westfield's right to specific performance of the Indemnitors' duties to Westfield via injunctive relief, Paragraph 2.c. of the Indemnity Agreement states:

**Right to Injunctive Relief.** The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.

17.     With respect to Westfield's right to indemnity for all payments it makes under the belief that liability, necessity, or expediency existed and the procedure for establishing prima facie evidence of the fact and amount of the Indemnitors' liability to Westfield, Paragraph 2.d. of the Indemnity Agreement states:

**Prima Facie Evidence.** In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

18.     With respect to the trust fund nature of the proceeds of all contracts covered by Westfield's bonds and the Indemnitors' duty to use such proceeds to satisfy obligations for which Westfield would be liable under its bonds, Paragraph 4 of the Indemnity Agreement states:

**TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment

of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

19. With respect to Westfield's right, at its option and sole discretion, to take possession of and arrange for the completion of any work encompassed by any contracts covered by Westfield's bonds at the Indemnitors' expense, Paragraph 6 of the Indemnity Agreement is entitled "COMPLETION/CURE" and states, in relevant part:

> [T]he Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

20. With respect to Westfield's authority, in its sole and absolute discretion, to advance or lend money to the Contractor and the Indemnitors' obligation to reimburse any such advances/loans, Paragraph 10 of the Indemnity Agreement states:

> **ADVANCES**. The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

21.     With respect to the Indemnitors' duty to furnish Westfield with free access to the

Indemnitors' books, records, and accounts, Paragraph 11 of the Indemnity Agreement states:

> **BOOKS AND RECORDS.** At any time, and until such time as the liability of the Surety under any and all of the Bond is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts. If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

22.     With respect to Westfield's right to settle any claim against any of its bonds,

Paragraph 15 of the Indemnity Agreement states:

> **SETTLEMENTS**. The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

23.     With respect to the Indemnitors' waiver of any right to a trial by jury and/or waiver

of any objection to venue, Paragraph 19 of the Indemnity Agreement states:

> **SUITS**. Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising. The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors. In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
>
> a.     Any right to a trial by jury; or
>
> b.     Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or

c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

d. Exhaustion of remedies.

24. With respect to the cumulative nature of Westfield's rights the Indemnity Agreement, Paragraph 20 of the Indemnity Agreement states:

> **OTHER INDEMNITY**. The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

25. With respect to the procedure for terminating the Indemnitors' obligations to Westfield in writing sent by certified mail and the ineffectiveness of any alleged oral and/or constructive notice of termination, Paragraph 23 of the Indemnity Agreement states:

> **TERMINATION**. This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party. Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given. No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

26. Paragraph 24 of the Indemnity Agreement clarifies that all previously executed Indemnity Agreement remain in full force and effect notwithstanding the execution of subsequent Indemnity Agreement as follows:

> **ENTIRE AGREEMENT**. This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and

representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect. The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement. This Agreement may not be modified except in writing signed by all parties.

27.     Paragraph 25 of the Indemnity Agreement further clarifies that the Indemnitors may

be bound under multiple indemnity agreements as follows:

**APPLICABILITY**. THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.

28.     Paragraph 27 of the Indemnity Agreement further clarifies that the Indemnity

Agreement cannot be amended except in writing signed by all parties as follows:

**NO WAIVER**. No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

29.     Paragraph 28 of the Indemnity Agreement further confirms that the Indemnitors'

collateral, indemnity, and other obligations extend to and encompass all bonds executed before

and after the effective date of the Indemnity Agreement as follows:

**MISCELLANEOUS**. The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the

time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

## The Bonds and Westfield's Liability/Losses Thereunder

30.     In reliance upon its rights under the Indemnity Agreement (and other agreements of indemnity executed by the Indemnitors and others), Westfield issued certain performance, payment, and/or other surety bonds that named the Contractor as principal (collectively, the "Bonds") and related to various of the Contractor's construction contracts in North Carolina (collectively, the "Bonded Contracts") including, but not limited to, the following Bonds under which Westfield has incurred and continues to incur liability and losses:

| ISSUE DATE | BOND NO. | OWNER/OBLIGEE | PENAL SUM |
|---|---|---|---|
| 03/19/2020 | Performance Bond 056042Q | NCDOT | $15,346,705 |
| 03/19/2020 | Payment Bond 056042Q | NCDOT | $15,346,705 |
| 06/08/2020 | Performance Bond 056043K | Clancy & Theys Construction | $10,259,988 |
| 06/08/2020 | Payment Bond 056043K | Clancy & Theys Construction | $10,259,988 |
| 03/11/2021 | Performance Bond 136335M | Town of Windsor, North Carolina | $1,243,784 |
| 03/11/2021 | Payment Bond 136335M | Town of Windsor, North Carolina | $1,243,784 |
| 03/25/2021 | Performance Bond 136335N | Town of Magnolia, North Carolina | $835,965 |
| 03/25/2021 | Payment Bond 136335N | Town of Magnolia, North Carolina | $835,965 |
| 04/20/2021 | Performance Bond 136335V | Driven Contractors, LLC | $854,601 |
| 04/20/2021 | Payment Bond 136335V | Driven Contractors, LLC | $854,601 |
| 05/18/2021 | Performance Bond 104757M | Lennar Carolinas, LLC | $34,145.00 |
| 05/18/2021 | Payment Bond 104757M | Lennar Carolinas, LLC | $34,145.00 |

| ISSUE DATE | BOND NO. | OWNER/OBLIGEE | PENAL SUM |
|---|---|---|---|
| 05/21/2021 | Performance Bond 136335T | Town of Apex, North Carolina | $15,559.00 |
| 05/21/2021 | Payment Bond 136335T | Town of Apex, North Carolina | $15,559.00 |
| 07/28/2021 | Performance Bond 164584N | New Atlantic Contracting, Inc. | $4,620,172 |
| 07/28/2021 | Payment Bond 164584N | New Atlantic Contracting, Inc. | $4,620,172 |
| 08/09/2021 | Performance Bond 164585J | Shelco, LLC | $2,218,000 |
| 08/09/2021 | Payment Bond 164585J | Shelco, LLC | $2,218,000 |
| 09/08/2021 | Performance Bond 164584Y | New Atlantic Contracting, Inc. | $1,930,076 |
| 09/08/2021 | Payment Bond 164584Y | New Atlantic Contracting, Inc. | $1,930,076 |
| 09/08/2021 | Performance Bond 164585C | New Atlantic Contracting, Inc. | $3,827,224 |
| 09/08/2021 | Payment Bond 164585C | New Atlantic Contracting, Inc. | $3,827,224 |
| 09/21/2021 | Performance Bond 164584X | City of Raleigh, North Carolina | $9,586,280 |
| 09/21/2021 | Payment Bond 164584X | City of Raleigh, North Carolina | $9,586,280 |
| 11/04/2021 | Performance Bond 164585K | City of High Point, North Carolina | $7,416,040 |
| 11/04/2021 | Payment Bond 164585K | City of High Point, North Carolina | $7,416,040 |
| 12/20/2021 | Performance Bond 207337Y | Highland Paving, LLC | $7,724,694 |
| 12/20/2021 | Payment Bond 207337Y | Highland Paving, LLC | $7,724,694 |
| 02/02/2022 | Performance Bond 207338C | Samet Corporation | $11,071,612 |
| 02/02/2022 | Payment Bond 207338C | Samet Corporation | $11,071,612 |
| 03/11/2022 | Performance Bond 207338J | NCDOT | $4,649,993 |
| 03/11/2022 | Payment Bond 207338J | NCDOT | $4,649,993 |
| 04/01/2022 | Performance Bond 207338P | NCDOT | $15,747,596 |
| 04/01/2022 | Payment Bond 207338P | NCDOT | $15,747,596 |
| | | **Total** | **$194,764,868.00** |

31.     In March 2023, representatives of the Contractor, including Indemnitor Jeremy Smith, advised Westfield that the Contractor was encountering significant cash flow issues that were impacting the Contractor's ability to perform under the Bonded Contracts and requested a meeting with Westfield.

32.     As reflected by the Working Progress Report attached hereto as **Exhibit 2**, the Contractor subsequently represented to Westfield that the Contractor's cost of completing its remaining Bonded Contracts (including overhead) would exceed the remaining balances of those Bonded Contracts by $7,552,270.64.

33.     During its subsequent investigation, Westfield learned that the Contractor lacked the financial wherewithal to pay its own employees and/or to complete its remaining Bonded Contracts, which in turn exposed Westfield to significant liability and/or losses under the Bonds and triggered the Indemnitors' collateral, indemnity, and other obligations to Westfield under the Indemnity Agreement.

34.     Accordingly, in an effort to mitigate Westfield's liability/losses under the Bonds (and without any contractual or other obligation to the Contractor or the Indemnitors to do so), Westfield began exercising its rights under the Indemnity Agreement and/or the Bonds including, but not limited to, advancing/loaning amounts to fund the Contractor's ongoing performance under the Bonded Contracts, making direct payments to the Contractor's subcontractors and/or suppliers under the Bonds, and advancing/loaning amounts to fund the Contractor's payroll and other obligations.

35.     Despite Westfield's mitigation efforts, the Contractor was defaulted under various Bonded Contracts.

36.     Despite Westfield's mitigation efforts, the Contractor also defaulted in discharging its indebtedness and/or liabilities to third parties when due including, but not limited to, obligations owed to the Contractor's subcontractors, materialman, equipment providers, and/or laborers relative to the Bonded Contracts.

37.     Despite Westfield's mitigation efforts, the Contractor also failed to fully and timely observe and perform all of the terms and conditions of the Bonded Contracts and/or the Bonds.

38.     Despite Westfield's mitigation efforts, the Contractor also failed to pay obligations incurred in connection with the Bonded Contracts.

39.     Despite Westfield's mitigation efforts, the Contractor petitioned for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina, which bankruptcy proceeding bears Case No. 5:23-BK-02734 and remains ongoing.

40.     To date, Westfield has sustained, and continues to sustain, liability for losses and/or expenses (including, but not limited to, interest, court costs, and counsel fees) (a) by reason of having executed the Bonds on behalf of the Contractor, (b) by reason of the Indemnitors' failure to perform or comply with the covenants and conditions of the Indemnity Agreement, and (c) enforcing the covenants and conditions of the Indemnity Agreement in this action, which loss sustained/incurred currently exceeds $34,000,000.00 for which the Indemnitors are liable to Westfield under the Indemnity Agreement.

41.     While Westfield expressly reserves any and all of its rights, remedies, and defenses under the Bonds, the Bonded Contracts, or otherwise, additional liability exists and/or has been asserted against Westfield under the Bonds in excess of $3,500,000.00, in relation to which the

Indemnitors are obligated to deposit with Westfield cash or other collateral in kind and amount satisfactory to Westfield in its sole discretion.

**The Fraudulent Transfers**

42.     Upon information and belief, one or more of the Indemnitors including, but not necessarily limited to, Indemnitor Jeremy Smith and Indemnitor Tina Smith, made certain transfers and/or incurred certain obligations that are fraudulent and/or voidable as they relate to Westfield under North Carolina's Uniform Voidable Transactions Act, N.C. Gen. Stat. Ann. § 39-23.1 (the "Voidable Transactions Act").

43.     For example and without limitation, with knowledge of (a) the Contractor's financial inability to pay its own employees and/or to complete its remaining Bonded Contracts and (b) their corresponding collateral, indemnity, and other obligations to Westfield under the Indemnity Agreement, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred and/or conveyed certain real estate and/or their interest in certain real estate located in Wayne County, North Carolina and generally described as 118 Crosswinds Dr., Greensboro, NC 27530 (the "Crosswinds Property") to Defendant Smith Holdings Land Trust.

44.     The transfer/conveyance of the Crosswinds Property by Indemnitor Jeremy Smith and Indemnitor Tina Smith to Defendant Smith Holdings Land Trust is memorialized in the North Carolina General Warranty Deed filed in the Wayne County, North Carolina Register of Deeds on or about April 17, 2023 and attached hereto as **Exhibit 3**.

45.     With knowledge of (a) the Contractor's financial inability to pay its own employees and/or to complete its remaining Bonded Contracts and (b) their corresponding collateral, indemnity, and other obligations to Westfield under the Indemnity Agreement, Indemnitor Jeremy Smith and Indemnitor Tina Smith also transferred and/or conveyed certain real estate and/or their

interest in certain real estate located in Carteret County, North Carolina and generally described as 207 Smith Street, Atlantic Beach, NC 28512 (the "Smith Street Property") to Defendant Smith Holdings Land Trust.

46.     The transfer/conveyance of the Smith Street Property by Indemnitor Jeremy Smith and Indemnitor Tina Smith to Defendant Smith Holdings Land Trust is memorialized in the North Carolina General Warranty Deed filed in the Carteret County, North Carolina Register of Deeds on or about April 17, 2023 and attached hereto as **Exhibit 4**.

47.     Acting by and through its Trustee, who is Indemnitor Tina Smith upon information and belief, Defendant Smith Holdings Land Trust subsequently transferred and/or conveyed the Smith Street Property and/or its interest in the Smith Street Property to Defendant JSmith NC Destination Management, LLC.

48.     The transfer/conveyance of the Smith Street Property by Defendant Smith Holdings Land Trust to Defendant JSmith NC Destination Management, LLC is memorialized in the North Carolina General Warranty Deed filed in the Carteret County, North Carolina Register of Deeds on or about May 3, 2023 and attached hereto as **Exhibit 5**.

## CAUSES OF ACTION

### Count 1 – Specific Performance Against the Indemnitors (Collateral)

49.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

50.     Pursuant to Paragraph 2b. of the Indemnity Agreement, whenever liability exists or has been asserted against Westfield, whether or not Westfield shall have made any payment therefor, or if deemed necessary by Westfield in Westfield's sole discretion, Westfield may demand, and the Indemnitors shall deposit with Westfield, cash or other collateral to secure the

obligations of the Indemnity Agreement, in kind and amount satisfactory to Westfield in its sole discretion.

51.     Pursuant to Paragraph 2b. of the Indemnity Agreement, the Indemnitors acknowledged that their failure to deposit with Westfield, immediately upon demand, the sum demanded by Westfield as collateral shall cause irreparable harm to Westfield for which Westfield has no adequate remedy at law.

52.     Pursuant to Paragraph 2c. of the Indemnity Agreement, the Indemnitors expressly agreed that Westfield shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under the Indemnity Agreement including the obligation to pay to Westfield the sum demanded and waived any claims or defenses to the contrary.

53.     While Westfield expressly reserves any and all of its rights, remedies, and defenses under the Bonds, the Bonded Contracts, or otherwise, additional liability exists or has been asserted against Westfield under the Bonds in excess of $3,500,000.00.

54.     To date, however, the Indemnitors have not deposited any collateral with Westfield.

55.     The Indemnitors' failure to deposit collateral with Westfield constitutes a material breach of Paragraph 2b. of the Indemnity Agreement.

56.     As the Indemnitors expressly acknowledged in the Indemnity Agreement, Westfield lacks an adequate remedy at law in relation to the Indemnitors' material breach of Paragraph 2b. of the Indemnity Agreement.

57.     As the Indemnitors also expressly acknowledged in the Indemnity Agreement, the Indemnitors' material breach of Paragraph 2b. of the Indemnity Agreement has caused and continues to cause irreparable harm to Westfield because, among other things, Westfield is being deprived of its bargained for right to receive, hold, and/or utilize acceptable collateral relative to

the liability that has been and/or may be asserted against Westfield by reason of having issued the Bonds.

58.     The balance of the equities weighs heavily in favor of entering an injunction and/or judgment in favor of Westfield for specific performance of the Indemnitors' obligations under Paragraph 2b. of the Indemnity Agreement because, among other things, Westfield is merely seeking to enforce the terms of the Indemnity Agreement to which the Indemnitors voluntarily agreed and Westfield continues to be deprived of its bargain-for right to receive, hold, and/or utilize acceptable collateral relative to the claims that have been and/or may be asserted against Westfield relative to the Bonds.

59.     Compelling the Indemnitors to collateralize Westfield under Paragraph 2b. of the Indemnity Agreement would strengthen the public interests of enforcing the clear and unambiguous terms of written indemnity agreements in North Carolina, while instilling confidence in the surety industry in North Carolina.

60.     Though Westfield expressly reserves any and all of its rights, remedies, defenses, etc. under the Bonds, including the right additional collateral if deemed necessary, Westfield has determined that the deposit of collateral in the amount of $3,5000,000, in cash or other satisfactory to Westfield in its sole discretion, is necessary to secure the Indemnitors' obligations under the Indemnity Agreement.

61.     Therefore, Westfield is entitled to the entry of an injunction/judgment (a) compelling the Indemnitors to specifically perform their obligation to deposit collateral in the amount of $3,5000,000, in cash or other kind satisfactory to Westfield in its sole discretion, pursuant to Paragraph 2b. of the Indemnity Agreement and (b) barring the Indemnitors from

transferring, encumbering, or otherwise dissipating any property or assets assigned as collateral to Westfield under the Indemnity Agreement.

## Count II – Specific Performance Against the Indemnitors
### (Access to Books, Records, and Accounts)

62.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

63.     Pursuant to Paragraph 11 of the Indemnity Agreement, at any time, and until such time as the liability of Westfield under any and all of the Bonds is terminated, Westfield shall have the right to reasonable access to the books, records, and accounts of the Indemnitors.

64.     Pursuant to Paragraph 22 of the Indemnity Agreement, the Indemnitors agreed that Westfield shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under the Indemnity Agreement and waived any claims or defenses to the contrary.

65.     To date, however, the Indemnitors have failed and/or refused to grant Westfield access to the books, records, and accounts of the Indemnitors.

66.     The Indemnitors' failure to grant Westfield access to the books, records, and accounts of the Indemnitors constitutes a material breach of Paragraph 11 of the Indemnity Agreement.

67.     Westfield lacks an adequate remedy at law in relation to the Indemnitors' material breach of Paragraph 11 of the Indemnity Agreement.

68.     The Indemnitors' material breach of Paragraph 11 of the Indemnity Agreement has caused and continues to cause irreparable harm to Westfield because, among other things, Westfield is being deprived of its bargained for right to access information that is vital to Westfield's investigation and mitigation of its exposure to loss under the Bonds and/or Westfield's

investigation and enforcement of the various obligations the Indemnitors owe to Westfield under the Indemnity Agreement.

69.     The balance of the equities weighs heavily in favor of entering an injunction and/or judgment in favor of Westfield for specific performance of the Indemnitors' duty to furnish Westfield access to their books, records, and accounts as required by Paragraph 11 of the Indemnity Agreement because Westfield is merely seeking to enforce the terms of the Indemnity Agreement to which the Indemnitors voluntarily agreed and Westfield continues to be deprived of its bargained-for right to access information that is vital to Westfield's investigation and mitigation of its exposure to loss under the Bonds and/or Westfield's investigation and enforcement of the various obligations the Indemnitors owe to Westfield under the Indemnity Agreement.

70.     Compelling the Indemnitors to grant Westfield access to their books, records, accounts, etc. as required by Paragraph 11 of the Indemnity Agreement would strengthen the public interest of enforcing the clear and unambiguous terms of written indemnity agreements in North Carolina, while instilling confidence in the surety industry in North Carolina.

71.     Therefore, Westfield is entitled to the entry of an injunction/judgment compelling the Indemnitors to specifically perform their obligation to grant Westfield access to their books, records, accounts, etc.as required by Paragraph 11 of the Indemnity Agreement.

## **Count III – Breach of Contract Against the Indemnitors (Damages)**

72.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

73.     Paragraph 2a. of the Indemnity Agreement obligates the Indemnitors to exonerate and indemnify Westfield from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) which

Westfield may sustain (a) by reason of having executed the Bonds, (b) by reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of the Indemnity Agreement, and, (c) in enforcing by suit or otherwise any of the covenants and conditions of the Indemnity Agreement.

74.     Westfields has incurred and continues to incur losses and expenses, including counsel fees, that currently exceed $34,000,000.00 (a) by reason of having executed the Bonds, (b) by reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of the Indemnity Agreement, and (c) in enforcing by suit or otherwise any of the covenants and conditions of the Indemnity Agreement.

75.     Westfield incurred all such losses/expenses under the belief that Westfield was liable for the sums and amounts so disbursed and/or that it was necessary or expedient to make such disbursements under the circumstances.

76.     However, the Indemnitors have failed to exonerate and indemnify Westfield from and against any and all liability for losses and/or expenses as required by Paragraph 2a. of the Indemnity Agreement.

77.     The Indemnitors' failure to exonerate and indemnify Westfield from and against any and all liability for losses and/or expenses constitutes a material breach of Paragraph 2a. of the Indemnity Agreement.

78.     Westfield has been damaged as a result of the Indemnitors' material breach of Paragraph 2a. of the Indemnity Agreement in an amount to be proven at trial, which currently exceeds $34,000,000.00.

79.     Therefore, Westfield is entitled to the entry of a judgment against the Indemnitors in an amount sufficient to fully exonerate and indemnify Westfield from and against any and all

liability for losses and/or expenses, including counsel fees, which amount currently exceeds $34,000,000.00 and will be proven at trial.

**Count IV – Avoidance of Fraudulent Transfers and**
**Injunctive Relief in Relation Thereto**

80.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

81.     By virtue of its claims against Indemnitor Jeremy Smith and Indemnitor Tina Smith under the Indemnity Agreement, Westfield possesses "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith as defined by the Voidable Transactions Act.

82.     By virtue of its "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, (a) Westfield qualifies as a "Creditor" of Indemnitor Jeremy Smith and Indemnitor Tina Smith under the Voidable Transactions Act and (b) Indemnitor Jeremy Smith and Indemnitor Tina Smith qualify as "Debtors" under the Voidable Transactions Act.

83.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred and/or conveyed the Crosswinds Property and/or their interest in the Crosswinds Property to Defendant Smith Holdings Land Trust with the actual intent to hinder, delay and/or defraud their creditors including, but not limited to, Westfield, which renders the transfer/conveyance to be fraudulent and voidable as to Westfield pursuant to N.C. Gen. Stat. Ann. § 39-23.4(a)(1).

84.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred and/or conveyed the Smith Street Property and/or their interest in the Smith Street Property to Defendant Smith Holdings Land Trust with the actual intent to hinder, delay and/or defraud their creditors including, but not limited to, Westfield, which renders the

transfer/conveyance to be fraudulent and voidable as to Westfield pursuant to N.C. Gen. Stat. Ann. § 39-23.4(a)(1).

85.    Upon information and belief, the badges of fraud arising from the transfers of the Crosswind Property and the Smith Street Property include, but are not necessarily limited to, the following:

a.  Defendant Smith Holdings Land Trust is an "Insider" under the Voidable Transactions Act;

b.  Indemnitor Jeremy Smith and Indemnitor Tina Smith, as beneficiaries of Defendant Smith Holdings Land Trust and Trustee of Defendant Smith Holdings Land Trust, retained possession and control of the Crosswinds Property and the Smith Street Property;

c.  Indemnitor Jeremy Smith and Indemnitor Tina Smith concealed their transfers/conveyances of the Crosswinds Property and the Smith Street Property from Westfield;

d.  Indemnitor Jeremy Smith and Indemnitor Tina Smith were aware of their collateral, indemnity, and other obligations to Westfield before they transferred/conveyed the Crosswinds Property and the Smith Street Property;

e.  The transfers/conveyances of the Crosswinds Property and the Smith Street Property constituted the transfer/conveyance of substantially all of the assets of Indemnitor Jeremy Smith and Indemnitor Tina Smith;

f.  Indemnitor Jeremy Smith and Indemnitor Tina Smith did not receive consideration that was reasonably equivalent to the value of the Crosswinds Property and/or the Smith Street Property;

g.  Indemnitor Jeremy Smith and Indemnitor Tina Smith were insolvent or became insolvent shortly after the transfers/conveyances of the Crosswinds Property and the Smith Street Property were made;

h.  Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property shortly before substantial debts were incurred; and

i.  Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property without receiving a reasonably equivalent value in exchange for the transfer/conveyances, and they reasonably

should have believed that they would incur debts beyond their ability to pay as they became due.

86.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property to Defendant Smith Holdings Land Trust without receiving a reasonably equivalent value in exchange and they were engaged or were about to engage in a business and/or transactions for which their remaining assets were unreasonably small in relation to the business and/or transactions, which renders the transfers/conveyances fraudulent and voidable as to Westfield pursuant to N.C. Gen. Stat. Ann. § 39-23.4(a)(2).

87.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property to Defendant Smith Holdings Land Trust without receiving a reasonably equivalent value in exchange and intended to incur, or believed, or reasonably should have believed that they would incur debts beyond their ability to pay as they became due, which renders the transfers/conveyances fraudulent and voidable as to Westfield pursuant to N.C. Gen. Stat. Ann. § 39-23.4(a)(2).

88.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property to Defendant Smith Holdings Land Trust without receiving a reasonably equivalent value in exchange and were insolvent at that time or became insolvent because of transfer/conveyances, which renders the transfer/conveyances to be fraudulent and voidable as to Westfield, whose claims against Indemnitor Jeremy Smith and Indemnitor Tina Smith arose prior to transfer/conveyances, pursuant to N.C. Gen. Stat. Ann. § 39-23.5(a).

89.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith transferred/conveyed the Crosswinds Property and the Smith Street Property to an insider,

Defendant Smith Holdings Land Trust, for an antecedent debt and were insolvent at the time of the transfers/conveyances and the insider had reasonable cause to believe that Indemnitor Jeremy Smith and Indemnitor Tina Smith were insolvent, which renders the transfers/conveyances to be fraudulent and voidable as to Westfield, whose claims against Indemnitor Jeremy Smith and Indemnitor Tina Smith arose prior to the Initial Transfers, pursuant to N.C. Gen. Stat. Ann. § 39-23.5(b).

90.     By virtue of Indemnitor Jeremy Smith and Indemnitor Tina Smith transferring/conveying the Crosswinds Property and the Smith Street Property to Defendant Smith Holdings Land Trust, which transfers/conveyances were fraudulent and voidable under the Voidable Transactions Act, Westfield is entitled to the various forms of relief set forth in N.C. Gen. Stat. Ann. § 39-23.7 including, but not limited to

a. an avoidance of the transfer/conveyances to the extent necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith;

b. an attachment or other provisional remedy against any proceeds of the Crosswinds Property and the Smith Street Property;

c. an injunction against further disposition by Indemnitor Jeremy Smith and Indemnitor Tina Smith and/or transferees of the Crosswinds Property and the Smith Street Property including, but not limited to, Defendant Smith Holdings Land Trust and Defendant JSmith NC Destination Management, LLC;

d. appointment of a receiver to take charge of the assets fraudulently transferred to Defendant Smith Holdings Land Trust and/or Defendant JSmith NC Destination Management, LLC; and

e. any other relief the circumstances may require.

**Count V – Judgment Against Indemnitor Jeremy Smith and Indemnitor Tina Smith Pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a) and (b)**

91.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

92.     Upon information and belief, Indemnitor Jeremy Smith and Indemnitor Tina Smith are the persons for whose benefit the Crosswinds Property and the Smith Street Property were transferred/conveyed to Defendant Smith Holdings Plan Trust.

93.     Upon information and belief, Defendant Smith Holdings Land Trust did not take the Crosswinds Property and/or the Smith Street Property in good faith and for a reasonably equivalent value given to Indemnitor Jeremy Smith and Indemnitor Tina Smith.

94.     To the extent transfers/conveyances of the Crosswinds Property and/or the Smith Street Property are avoidable under N.C. Gen. Stat. Ann. § 39-23.7(a)(1), Westfield is entitled to a judgment against Indemnitor Jeremy Smith and Indemnitor Tina Smith, the persons for whose benefit the transfer/conveyances were made, for the value of the assets transferred or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a) and (b).

### Count VI – Judgment Against Smith Holdings Land Trust Pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a)

95.     Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

96.     Upon information and belief, Defendant Smith Holdings Land Trust is the first transferee of the Crosswinds Property and the Smith Street Property.

97.     Upon information and belief, Defendant Smith Holdings Land Trust did not take the Crosswinds Property and/or the Smith Street Property in good faith and failed to confer any value on Indemnitor Jeremy Smith and Indemnitor Tina Smith in exchange.

98.     To the extent the transfers/conveyances of the Crosswinds Property and/or the Smith Street Property to Defendant Smith Holdings Land Trust are avoidable under N.C. Gen. Stat. Ann. § 39-23.7(a)(1), Westfield is entitled to a judgment against Defendant Smith Holdings

Land Trust, as the first transferee of the Crosswinds Property and/or the Smith Street Property, for the value of the assets transferred or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a).

## COUNT VII – Judgment Against Defendant JSmith NC Destination Management, LLC Pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(b)

99.  Westfield hereby restates the allegations contained in the foregoing Paragraphs of this Complaint as if fully set forth herein.

100.  Upon information and belief, Defendant JSmith NC Destination Management, LLC is an immediate transferee of Defendant Smith Holdings Land Trust with respect to the Smith Street Property.

101.  Upon information and belief, Defendant JSmith NC Destination Management, LLC did not take the Crosswinds Property and/or the Smith Street Property in good faith and failed to confer any value on Indemnitor Jeremy Smith, Indemnitor Tina Smith, and/or Defendant Smith Holdings Land Trust in exchange.

102.  To the extent the transfer/conveyance of the Smith Street Property to Defendant Smith Holdings Land Trust and/or Defendant JSmith NC Destination Management, LLC is voidable under N.C. Gen. Stat. Ann. § 39-23.7(a)(1), Westfield is entitled to a judgment against Defendant JSmith NC Destination Management, LLC, as an immediate transferee of Defendant Smith Holdings Land Trust, for the value of the Smith Street Property or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(b).

WHEREFORE, PREMISES CONSIDERED, Westfield prays for the following relief:

a. For the issuance of process requiring each of the Defendants to answer Westfield's Complaint;

b. For the entry of an injunction/judgment compelling the Indemnitors to (i) specifically perform their obligation to deposit acceptable collateral with Westfield totaling $3,500,000 pursuant to Paragraph 2b. of the Indemnity Agreement and (ii) barring the Indemnitors from transferring, encumbering, or otherwise dissipating any of the property or assets assigned as collateral to Westfield under the Indemnity Agreement (Count I);

c. For the entry of an injunction/judgment compelling the Indemnitors to specifically perform their obligation to grant Westfield access to their books, records, accounts as required by Paragraph 11 of the Indemnity Agreement (Count II);

d. For the entry of a judgment against the Indemnitors, jointly and severally, in an amount sufficient to fully exonerate and indemnify Westfield from and against any and all liability for losses and/or expenses, including counsel fees, which amount currently exceeds $34,000,000.00 and will be proven at trial (Count III);

e. For the entry of an injunction/judgment granting Westfield the forms of relief set forth in N.C. Gen. Stat. Ann. § 39-23.7 including, but not limited to, (1) an avoidance of the transfer/conveyances of the Crosswinds Property and the Smith Street Property to the extent necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, (2) an attachment or other provisional remedy against any proceeds of the Crosswinds Property and the Smith Street Property, (3) an injunction against further disposition by Indemnitor Jeremy Smith and Indemnitor Tina Smith and/or transferees of the Crosswinds Property and the Smith Street Property including, but not limited to, Smith Holdings Land Trust and Defendant JSmith NC Destination Management, LLC, (4) appointment of a receiver to take charge of the assets fraudulently transferred to Defendant Smith Holdings Land Trust, and (5) any other relief the circumstances may require (Count IV);

f. For the entry of a judgment against Indemnitor Jeremy Smith and Indemnitor Tina Smith for the value of the Crosswinds Property and the Smith Street Property or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a) and (b) (Count V);

g. For the entry of a judgment against Defendant Smith Holdings Land Trust, as the first transferee of the Crosswinds Property and/or the Smith Street Property, for the value of the assets transferred or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(a) (Count VI);

h. For the entry of a judgment against Defendant JSmith NC Destination Management, LLC, as an immediate transferee of Defendant Smith Holdings Land Trust, for the

value of the Smith Street Property or the amount necessary to satisfy Westfield's "Claims" against Indemnitor Jeremy Smith and Indemnitor Tina Smith, pursuant to N.C. Gen. Stat. Ann. § 39-23.8(b)(1)(b) (Count VII); and

f.  For such further relief, both general and specific, as may be appropriate in accordance with the nature of this cause including, but not limited to, pre-judgment and post-judgment interest.

Respectfully submitted,

/s/ Jeffrey S. Price

Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
 (615) 244-0030
Fax: (615) 242-4203
jprice@manierherod.com
N.C. State Bar No. 42590
*Attorneys for Westfield Insurance Company*

Agreement of Indemnity

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.

Westfield Group ®
1 Park Circle PO Box 5001, Westfield Center, Ohio 44251-5001

**THIS AGREEMENT** entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company and/or Westfield National Insurance Company and/or Ohio Farmers Insurance Company, all located at Westfield Center, Ohio, herein collectively called Surety, witnesseth:

**WHEREAS**, in the transaction of business, certain bonds, undertakings, guarantees, and other writings obligatory in the nature of a bond ("Bonds") have been and will be required by or on behalf of the Indemnitors, and application has and/or will be made to the Surety to execute Bonds, and as a prerequisite to the execution of Bonds, the Surety requires complete indemnification, and

**WHEREAS**, it may be necessary or desirable for the Surety to execute Bonds as surety for or on behalf of the Indemnitors, and

**WHEREAS**, the Indemnitors have a substantial, material, and beneficial interest in obtaining Bonds or in the Surety refraining from canceling such Bonds, and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

1. **PREMIUMS**. The Indemnitors will pay to the Surety all premiums and charges of the Surety for each policy of insurance and each Bond in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability by reason of such Bond.

2. **INDEMNITY**.
   a. **Generally**. The Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain:
      i. By reason of having executed or procured the execution of the Bonds; or
      ii. By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
      iii. In enforcing by suit or otherwise any of the covenants and conditions of this Agreement. The Surety shall at all times have the right to be represented by the attorney of its own choosing.
   b. **Right to Collateral Deposit**. Whenever liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, or if deemed necessary by the Surety in the Surety's sole discretion, the Surety may demand, and the Indemnitors shall deposit with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion. The Indemnitors acknowledge that the failure of the Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.
   c. **Right to Injunctive Relief**. The Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Indemnitors under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary.
   d. **Prima Facie Evidence**. In the event of any payment by the Surety, the Indemnitors further agree that, in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Indemnitors to the Surety.

e. **Surety's Option to Reduce Liability**. The Surety may reduce the amount of liability of the Indemnitors to the Surety by applying to such liability any obligations of the Surety to any Indemnitor, which may include without limitation:

   i. Any money payable by the Surety as insurer or surety of any Indemnitor, or as insurer or surety of any other individual or legal entity; or

   ii. Any money payable to any Indemnitor as a return of unearned or other premiums; or

   iii. Any money payable to any Indemnitor to settle any claim of any Indemnitor against the Surety or any individual or other legal entity insured or bonded by the Surety.

f. **Subordination**. The Indemnitors jointly and severally subordinate all rights of indemnity, subrogation and contribution against each other to any obligation to the Surety until all obligations and duties of the Indemnitors to the Surety shall have been performed and satisfied in full and Surety shall have been released in full from all obligations under all Bonds.

The Surety shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

3. **ASSIGNMENT.**

   a. **Rights Assigned**. Each Indemnitor which is a party to a contract for which a Bond is given or is named as the "contractor" or "contracting party" in such Bond (each such Indemnitor being hereinafter referred to as a "Contractor") hereby grants, transfers, sets over and assigns, and will grant, assign, transfer and set over, to the Surety, its successors and assigns (collectively "assigns"):

      i. All the rights and claims of the Contractor in, or growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; regardless of whether such right or claim is construed as a right or claim in contract, tort, equity or otherwise; and

      ii. All the right, title and interest of the Contractor in and to all machinery, equipment, tools, materials and other personal property, whether tangible or intangible, which are now, or may hereafter be, about or upon the site or sites of any of the contractual work referred to in the Bonds, including materials purchased for or chargeable to any contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of such sites; and

      iii. All the rights, title and interest of the Contractor in and to all subcontracts or purchase orders let or to be let in connection with any contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts or purchase orders; and

      iv. All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman; and

      v. All percentages retained and any and all sums that may be due or hereafter become due to the Contractor or Indemnitors on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

   b. **When Effective**. All Indemnitors executing this Agreement hereby consent to the foregoing assignments from time to time, as applicable, by the Contractor for such Bonds in favor of the Surety. This assignment shall be effective upon the first occurrence of any of the following events:

      i. Any abandonment, forfeiture, or breach of any contracts referred to in the Bonds or of any breach of any of the Bonds; or

      ii. Any breach of the provisions of any of the paragraphs of this Agreement; or

      iii. Any default in discharging indebtedness or liabilities to third parties when due, such as, but not limited to, obligations to subcontractors, materialman; equipment providers, or laborers; or

      iv. Any assignment by the Contractor for the benefit of creditors, or the appointment, or any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or

      v. Any proceeding or circumstance which deprives the Contractor of the use of any of the machinery, equipment, plant, tools, materials or other personal property referred to in section (3.a.ii.) of this paragraph; or

      vi. The Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual.

This assignment is an absolute transfer and assignment of the foregoing interests to the Surety given to secure the Contractor and other Indemnitors' full and faithful performance of each and all of the paragraphs of this Agreement to be observed or performed by such Contractor or other Indemnitors, as applicable, and any other indebtedness and

Case 5:24-cv-00202-FL   Document 1-1   Filed 04/02/24   Page 2 of 14

liabilities of the Contractor or other Indemnitors to the Surety, whether heretofore or hereafter incurred, and such assignment in the case of each contract shall become effective as of the date of each such contract. Notwithstanding any contrary provision in this Agreement, the foregoing assignment shall not act to novate, relieve, waive, limit or impair the Contractor's obligations to any third party under any contract to fully perform and observe all of the terms and conditions of such contract to be performed or observed by the Contractor, such that the Contractor shall at all times remain primarily obligated to such third party to perform and observe all obligations of the Contractor in favor of such third party under such contract. The Indemnitors hereby acknowledge that the Surety shall have the right to apply the proceeds of any transfer or assignment by the Contractor, hereunder or otherwise, to any loss or expense incurred on any project or projects for which the Surety provided a bond for the Contractor and that such rights of the Surety are not limited to the specific project for which the Bonds were provided. No assignment to the Surety under this Agreement or otherwise shall obligate the Surety to perform any duties of the Contractor or of any Indemnitor.

4. **TRUST FUND.** It is expressly agreed that all monies due and to become due under any contract or contracts covered by the Bonds are deemed to be trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all obligations incurred in the performance of the contract and for labor, materials, and services furnished in connection with any such contract or contracts for which the Surety would be liable under any Bond, which trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust.

5. **SECURITY INTEREST.**
   a. **Security Interest in the Collateral.** To secure the Indemnitors' obligations under this Agreement, and to secure any other indebtedness and liabilities of any Indemnitor to the Surety under any Bond or otherwise, each Indemnitor hereby grants to the Surety a security interest in, and lien on, all of such Indemnitor's right, title and interest in any and all of the Indemnitor's property, whether now owned or hereafter acquired, created, or arising, including, but not limited to, the following assets (collectively, the "Collateral"):
      i. All of such Indemnitor's real property, personal property, accounts, accounts receivable, notes receivable chattel paper, commercial tort claims, deposit accounts, documents, machinery, equipment, fixtures, instruments, inventory, investment property (including certificated and uncertificated securities), general intangibles, goods (including rights to returned or repossessed goods and rights of stoppage in transit), cash and cash equivalents, contract rights and claims, payment intangibles, and supporting obligations, agreements, and letter of credit rights, proceeds of letters of credit, promissory notes, records, software, franchises, customer lists, insurance receivables and refunds, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses; and
      ii. All supporting obligations of, attachments, accessions, parts and appurtenances to, substitutions for, replacements of, products and proceeds including cash proceeds, noncash proceeds and proceeds of any insurance of, any and all of the Collateral.
   b. **Rights and Obligations with Respect to Collateral.** The Indemnitors shall perform any and all steps and take all actions reasonably required by the Surety from time to time to perfect, maintain, protect, and enforce the Surety's security interest in, and lien on, the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to file in any filing office in any jurisdiction any financing statements and amendments required to evidence the Surety's security interest in the Collateral. The Indemnitors hereby irrevocably authorize the Surety at any time and from time to time to correct or complete, or to cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed. At the Surety's request, the Indemnitors will execute notices appropriate under any applicable requirements of law that the Surety reasonably requests to evidence, perfect, or protect its security interest in and other liens on the Collateral in such form(s) as are satisfactory to the Surety. The Surety is hereby authorized to give notice to any creditor, bailee, consignee, warehouseman, landlord or any other person as may be reasonably necessary under applicable laws to evidence, protect, perfect, or enforce the security interest and lien granted to the Surety in the Collateral. The Indemnitors will insure the Collateral and maintain the Collateral, as the same is constituted from time to time, free and clear of all liens and the Indemnitors will defend or cause to be defended the Collateral against all of the claims and demands of all persons whomsoever. The Surety may, at any time without notice to the Indemnitors, exercise any right that it has under applicable law, including the Uniform Commercial Code, at equity, or as additionally provided for in this Agreement, including the right to exercise its power of attorney granted in this Agreement, to execute a quit claim deed, to file and record a financing statement, mortgage, or any other similar document in its favor, and to apply for the appointment of a receiver under applicable law by a court of competent jurisdiction.

BD 5079 OFWWN (10-2016)

c.  **Security Agreement & Financing Statement.** This Agreement, or any photographic or other reproduction of this Agreement, shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

6. **COMPLETION/CURE.** The Indemnitors hereunder warrant, covenant and agree with the Surety that the applicable Contractor under any Bond shall fully and timely observe and perform all of the terms and conditions of the underlying contract, and all other related documents and instruments pertaining to such Bond, that are required to be observed or performed by the Contractor thereunder, such that the applicable Contractor shall not cause or allow a default or breach by such Contractor to occur or remain uncured under such contract or other related documents and instruments pertaining to such Bond. In the event of any breach or default asserted by the obligee in any Bond, or in the event the Contractor has abandoned the work on or forfeited any contract or contracts covered by any Bond, or has failed to pay obligations incurred in connection with any such contracts, or in the event of the death, disappearance, criminal conviction imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under such Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, then, without limiting any other rights of remedies of the Surety under this Agreement, the Surety shall have the additional right, at its option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession (either temporarily or permanently) of any part or all of the work under any contract or contracts covered by any of the Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred. In addition to the Surety's rights described above, in the event the Contractor is not fully performing the underlying contract as required above, the Surety shall have the right to correct any such failure without taking possession of the work and the Indemnitors shall, promptly upon demand, pay to the Surety all losses and expenses so incurred.

7. **CHANGES**. The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or in the specifications accompanying such contracts, including, but not limited to, any change in the time for the completion of such contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of the Indemnitors.

8. **INDIVIDUAL SETTLEMENT**. In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the Indemnitors, by reason of the execution of a Bond or Bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of one or more of the Indemnitors, and hereby consent to any settlement or composition that may hereafter be made.

9. **EACH PARTY BOUND**. The liability of the Indemnitors hereunder shall not be affected by the failure of the Contractor or any other Indemnitor to sign any Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

10. **ADVANCES**. The Surety is authorized and empowered, but not obligated, to guarantee loans, to advance or lend to the Contractor any money, which the Surety, in its sole and absolute discretion, may see fit, for the purpose of any contracts referred to in, or guaranteed by any Bond; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that such money or any part thereof is not so used by the Contractor.

11. **BOOKS AND RECORDS**.  At any time, and until such time as the liability of the Surety under any and all of the Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.  If requested by the Surety, the Contractor shall promptly confirm the Surety's rights to any entity or other person referenced above.

12. **DECLINE EXECUTION**.  Unless otherwise specifically agreed in writing, the Surety may decline to execute or renew any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receipt of this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.  The Indemnitors hereby waive any and all claims against the Surety relative to such declinations.

13. **NOTICE OF EXECUTION**.  The Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under any of the Bonds, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, and the Indemnitors hereby waive notice of any other fact or circumstance which might materially increase their risk, to the end and effect that the Indemnitors shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

14. **WAIVER OF EXEMPTION**.  The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, country, or other governmental body.

15. **SETTLEMENTS**.  The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment related in any way to the Bond or contracts referenced in the Bond; whether arising on behalf of itself or in the name of any Contractor or other Indemnitor hereunder, and any such adjustment, settlement or compromise entered into by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety from the Indemnitors hereunder by reason of such adjustment, settlement or compromise.

16. **BROADLY CONSTRUED**.  The Indemnitors agree that their liability shall be construed as broadly as the liability of the Surety, regardless of whether such liability is incurred as a result of claims presented in contract, tort, equity, or otherwise.

17. **INTERPRETATION**.  The word "Indemnitors", or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require.  The word "including" shall mean "including but not limited to".

18. **OTHER SURETIES**.  In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

19. **SUITS**.  Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.  The Surety shall be entitled to enforce the obligations hereof directly against any Indemnitor, without the necessity of first proceeding against any other particular Indemnitor or Indemnitors.  In any proceeding or action relating to any Bond or the enforcement of this Agreement, the Indemnitors, unless requested by Surety to assert said rights, expressly waive, abandon and agree not to assert as a claim, defense or otherwise:
   a. Any right to a trial by jury; or
   b. Any objection to venue, claim of forum non conveniens or any claim that the court in which the action or proceeding is brought lacks personal or subject matter jurisdiction; or
   c. Any claim that the law applicable to any action or proceeding as determined by the Surety is improper or incorrect; or

Case 5:24-cv-00202-FL   Document 1-1   Filed 04/02/24   Page 5 of 14

d. Exhaustion of remedies.

20. **OTHER INDEMNITY**. The Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of any Bond, from the Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

21. **SEVERABILITY**. In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise. Invalidity of any provision or portion of this Agreement by reason of the laws of any state or for any other reason shall not render the other provisions or portions hereof invalid.

22. **ATTORNEY IN FACT**. The Indemnitors hereby irrevocably nominate, constitute, appoint, and designate the Surety as their attorney-in-fact, coupled with an interest, to exercise, at the Surety's sole and absolute discretion, all of the rights granted, assigned, transferred and set over to the Surety in this Agreement, in the name of the Indemnitors, or otherwise, including but not limited to the right to:
   a. Endorse negotiable instruments and to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also the full protection intended to be herein given to the Surety under all other provisions of this Agreement; and
   b. Collect any and monies due the Contractor from contracts referred to in the Bonds; and
   c. Prosecute or file any claim, action, or proceeding, and compromise or settle any and all claims, which any Indemnitor may have against any other Indemnitors or against any third party; and
   d. Sign and file on behalf of each Indemnitor a UCC-1 form naming the Surety as a secured party.

The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.

23. **TERMINATION**. This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been executed prior to such effective date, such that all promises, obligations, liens, security interests against Collateral, the Collateral, and the liabilities of the Indemnitors hereunder that arose, accrued, attached and/or perfected prior to such effective date of termination shall survive indefinitely, notwithstanding the giving of such notice of termination by such party. Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given. No oral notice to or constructive notice to any agent or employee of the Surety, or any other person, shall constitute notice of termination under this Agreement.

24. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous communications, and representations, whether oral or written, except that any other agreements of indemnity between the Surety and the Indemnitors, or any of them, shall remain in full force and effect. The Indemnitors acknowledge that they are relying on no written or oral representation, warranty, or understanding of any kind other than as set forth in this Agreement. This Agreement may not be modified except in writing signed by all parties.

25. **APPLICABILITY. THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT VENTURER OR CO-VENTURER WITH ANY INDIVIDUAL OR ENTITY WHATSOEVER, WHETHER OR NOT SUCH INDIVIDUAL OR ENTITY IS A PARTY TO THIS AGREEMENT), FROM TIME TO TIME, AND OVER AN INDEFINITE**

Case 5:24-cv-00202-FL   Document 1-1   Filed 04/02/24   Page 6 of 14

**PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

26. **WARRANTY OF FINANCIAL INFORMATION**. The Indemnitors hereby warrant the accuracy of all financial statements submitted or to be submitted to the Surety, and covenant and agree that the assets of the Indemnitors are dedicated to and imposed with a trust for the purpose of this Agreement. Such assets shall not be sold, transferred or conveyed by the Indemnitors to any other person, trust, or other legal entity for less than fair market value, without the prior written permission of the Surety. The Indemnitors hereby authorize the Surety to obtain additional information, including information from a credit report, now or at any time in the future, from any third party, about each Indemnitor. No delay on the part of the Surety in exercising any options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof. Each Indemnitor will promptly provide to the Surety upon the Surety's request current financial statements in form and detail satisfactory to Surety.

27. **NO WAIVER**. No waiver of any rights hereunder, and no modification or amendment of this Agreement, shall be deemed to be made by the Surety unless the same shall be in writing, duly signed on behalf of the Surety, and each such waiver (if any) shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Surety or the obligations of the Indemnitors to the Surety in any other respect at any other time.

28. **MISCELLANEOUS**. The Indemnitors agree to be bound by all the terms and conditions of this Agreement with respect to Bonds executed after, and also prior, to the effective date of this Agreement. The Indemnitors further agree that the execution of any Bonds prior to the effective date of this Agreement was in consideration for, and in reliance upon, the agreement of the Indemnitors, at the time of execution of such Bonds, to execute this Agreement. The Indemnitors, immediately upon becoming aware of any demand, notice, or proceeding to determine or fix any liability with which the Surety may be subsequently charged, shall notify the Surety in writing at the Surety's home office at One Park Circle, Westfield Center, Ohio 44251-5001, Attn: Surety Department.

29. **RESOLUTION:** The Indemnitors each have a substantial, material and beneficial interest in the obtaining of Bonds by any of the Indemnitors and in all transactions relative to which any Indemnitor has applied or will apply to The Surety for Bonds. The Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Each individual signing this Agreement on behalf of an Indemnitor hereby warrants that he/she has the full power and authority to execute this Agreement on behalf of such Indemnitor. The Indemnitors agree that the execution, delivery and performance of this Agreement, the compliance with its terms and provisions, and the fulfilling of the obligations herein, do not and will not conflict with the provisions of the charter documents or bylaws of any Indemnitor, or with the laws, rules, regulations, or order of any court or governmental authority, or with any other agreement binding upon Indemnitors.

30. **HEADINGS**. The headings of paragraphs, subparagraphs, sections, and subsections herein are included solely for convenience of reference and shall not affect or control the interpretation of any of the provisions of this Agreement.

31. **OTHER**. _____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**IN TESTIMONY WHEREOF, the Indemnitors have entered into this Agreement, which shall be effective the 1st day of _May_, 2020.**

**FRAUD WARNINGS:**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION); (NOT APPLICABLE IN AL, AR, CO, DC, FL, KS, KY, LA, ME, MD, NJ, NM, NY, OH, OK, OR, PA, RI, TN, VA, VT. WA AND WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI and WV** - ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY (OR WILLFULLY IN MARYLAND) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**APPLICABLE IN CO -** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT ,OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FL AND OK** - ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY, (IN FLORIDA, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

**APPLICABLE IN KS -** ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

**APPLICABLE IN KY, NY, OH AND PA** – ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES (NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION)*. *APPLIES IN NY ONLY.

**APPLICABLE IN ME, TN, VA AND WA** - IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES (MAY)* INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. *APPLIES IN ME ONLY.

**APPLICABLE IN MN** – A PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

**APPLICABLE IN NJ** – ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN OR** – ANY PERSON WHO KNOWLINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD THE INSURER BY SUBMITTING AN APPLICATION CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT MAY BE VIOLATING STATE LAW.

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Manager and Member and President** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

*Notary seal: PATRICIA L. KING, NOTARY PUBLIC, WAYNE COUNTY, NC*

**CORPORATE INDEMNITOR**

| | |
|---|---|
| Corporation Name: | **JSmith Civil, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Kevin Amory** |
| Title: | **Manager and Treasurer** |

| | |
|---|---|
| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSmith Civil, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

*Notary seal: PATRICIA L. KING, NOTARY PUBLIC, WAYNE COUNTY, NC*

**CORPORATE INDEMNITOR**

BD 5079 OFWWN (10-2016)

| Corporation Name: | **JSC Holdings, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Manager and Member and President** |

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Manager and Member and President of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

| Corporation Name: | **JSC Holdings, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | *Tina Smith* |
| Printed Name: | **Tina Smith** |
| Title: | **Member** |

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being by me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

| Corporation Name: | **JSC Enterprises, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Jeremy Smith** |
| Title: | **Member and Manager and President** |

| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Jeremy Smith, to me known, who, being me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member and Manager and President of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

**CORPORATE INDEMNITOR**

| Corporation Name: | **JSC Enterprises, LLC** |
| Corporation Address: | **3733 N. US Highway 117** |
| | **Goldsboro, NC 27530** |
| Signature: | |
| Printed Name: | **Tina Smith** |
| Title: | **Member** |

| State of: | **North Carolina** |
| County of: | **Wayne** |

On this 1st day of May, 2020, before me personally came Tina Smith, to me known, who, being me duly sworn, did depose and say that he/she resides at 118 Crosswinds Dr. Goldsboro, NC 27530, that he/she is the Member of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

_____
(Notary Public)

My Commission Expires: 11/28/20

## CORPORATE INDEMNITOR

Corporation Name: **JSC Enterprises, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Kevin Amory**
Title: **Manager and Treasurer**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Enterprises, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

## CORPORATE INDEMNITOR

Corporation Name: **JSC Holdings, LLC**
Corporation Address: **3733 N. US Highway 117**
**Goldsboro, NC 27530**
Signature:
Printed Name: **Kevin Amory**
Title: **Manager and Treasurer**

State of: **North Carolina**
County of: **Wayne**

On this 1st day of May, 2020, before me personally came Kevin Amory, to me known, who, being by me duly sworn, did depose and say that he/she resides at 209 Gator Dr, Goldsboro, NC 27530, that he/she is the Manager and Treasurer of JSC Holdings, LLC, the corporation which executed the attached Agreement of Indemnity, that he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name to the said Agreement of Indemnity by like order.

(Notary Public)
My Commission Expires: 11/28/20

## CORPORATE INDEMNITOR

Corporation Name: _____
Corporation Address: _____
_____
Signature: _____
Printed Name: _____
Title: _____

State of: _____
County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, who, being by me duly sworn, did depose and say that he/she resides at _____
_____, that he/she is the _____
of _____, the corporation which executed the attached Agreement of Indemnity, that
he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate
seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name
to the said Agreement of Indemnity by like order.

_____
(Notary Public)
My Commission Expires: _____

## CORPORATE INDEMNITOR

Corporation Name: _____
Corporation Address: _____
_____
Signature: _____
Printed Name: _____
Title: _____

State of: _____
County of: _____

On this _____ day of _____, 20_____, before me personally came _____,
to me known, who, being by me duly sworn, did depose and say that he/she resides at _____
_____, that he/she is the _____
of _____, the corporation which executed the attached Agreement of Indemnity, that
he/she knows the seal of the said corporation, that the seal affixed to the said Agreement of Indemnity is such corporate
seal, that it was so affixed by order of the Board of Directors of the said corporation, and that he/she signed his/her name
to the said Agreement of Indemnity by like order.

_____
(Notary Public)
My Commission Expires: _____

Case 5:24-cv-00202-FL   Document 1-1   Filed 04/02/24   Page 13 of 14

**INDIVIDUAL INDEMNITOR**

Individual Name:    **Jeremy Smith**
Individual Address:   **118 Crosswinds Dr.**
                        **Goldsboro, NC 27530**

Signature:

State of:    **North Carolina**
County of:   **Wayne**

On this <u>1st</u> day of <u>May</u>, 20<u>20</u>, before me personally came <u>Jeremy Smith</u>, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: _11/28/20_

**INDIVIDUAL INDEMNITOR**

Individual Name:    **Tina Smith**
Individual Address:   **118 Crosswinds Dr.**
                        **Goldsboro, NC 27530**

Signature:   *Tina Smith*

State of:    **North Carolina**
County of:   **Wayne**

On this <u>1st</u> day of <u>May</u>, 20<u>20</u>, before me personally came <u>Tina Smith</u>, to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he/she executed the same.

(Notary Public)

My Commission Expires: _11/28/20_

All Contracts      All Departments
Sorted By: Contract Number      Through Month: 03/23

| | WIP | | | | | | | | | | CASH | | | | | | | | | COMBINED | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bonded | Estimated at Completion | | | | To Date | | | | | | | | | | | | | | | | | | | | |
| | Revenue | Cost | Gross Profit | Percent Complete | Actual Cost | Earned Revenue | Earned Gross Profit | Billings | Cost in Excess of Billings | Billings in Excess of Cost | AR 3-30-23 | RR 3-30-23 | Total Receivables | AP 3-30-23 | RP 3-30-23 | Total Payables | Net Cash in Current Amounts | Net Cash in Retainage | Net Cash Total | Balance to Bill | Cost to Complete | 10% Overhead | Cost and Overhead to Complete | Cash in Backlog | Total Cash Remaining |
| **Open Contracts** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bonded 20.106 NCDOT Hwy 117 Widening | 15,567,680 | 16,894,101 | -8.52% | 88.70% | 14,985,403 | 13,658,982 | -9.71% | 13,461,444 | (197,538) | - | 0.00 | 0.00 | 0.00 | 352,043.01 | 45,280.31 | 397,323.32 | (352,043.01) | (45,280.31) | (397,323.32) | 2,106,236.00 | 1,908,698.00 | 190,869.80 | 2,099,567.80 | 6,668.20 | (390,655.12) |
| Bonded 20.114 West Millbrook Middle School | 10,474,253 | 10,134,194 | 3.25% | 97.62% | 9,892,846 | 10,224,798 | 3.25% | 10,201,330 | (23,468) | - | 71,857.50 | 255,033.23 | 326,890.73 | 366,038.43 | 74,788.36 | 440,826.79 | (294,180.93) | 180,244.87 | (113,936.06) | 272,923.00 | 241,348.00 | 24,134.80 | 265,482.80 | 7,440.20 | (106,495.86) |
| Bonded 21.100 Carolina Springs Pump Station | 4,405,846 | 5,235,307 | -18.83% | 98.24% | 5,143,023 | 4,313,561 | -19.23% | 4,491,770 | | 178,209 | | 112,294.26 | 112,294.26 | 133,557.52 | 47,211.56 | 180,769.08 | (133,557.52) | 65,082.70 | (68,474.82) | | 92,284.00 | 9,228.40 | 101,512.40 | (187,436.40) | (256,911.22) |
| Bonded 21.102 Magnolia MHP Sanitary Sewer | 882,535 | 984,314 | -11.53% | 96.09% | 945,830 | 844,051 | -12.06% | 925,243 | | 81,192 | 181,296.32 | 60.25 | 181,356.57 | 19,840.42 | 6,867.45 | 26,707.87 | 161,455.90 | (6,807.20) | 154,648.70 | (42,708.00) | 38,484.00 | 3,848.40 | 42,332.40 | (85,040.40) | 69,608.30 |
| Bonded 21.115 Town of Windsor Wastewater Repairs | 1,188,933 | 1,694,058 | -42.49% | 98.65% | 1,671,240 | 1,166,115 | -43.32% | 1,165,024 | (1,091) | | (6,921.41) | 29,125.62 | 22,204.21 | 35,186.17 | 13,618.46 | 48,804.63 | (42,107.58) | 15,507.16 | (26,600.42) | 23,909.00 | 22,818.00 | 2,281.80 | 25,099.80 | (1,190.80) | (27,791.22) |
| Bonded 21.117 EPA-RTP Entrance Gate Improvements | 822,725 | 1,031,531 | -25.38% | 75.74% | 781,282 | 632,551 | -36.47% | 632,551 | | 60,075 | 0.00 | 31,627.56 | 31,627.56 | 61,033.56 | 8,592.18 | 69,625.74 | (61,033.56) | 23,035.38 | (37,998.18) | 190,174.00 | 250,249.00 | 25,024.90 | 275,273.90 | (85,099.90) | (123,098.08) |
| Bonded 21.119 Apex Western Transmission | 1,428,476 | 1,731,788 | -21.23% | 98.68% | 1,709,009 | 1,405,697 | -21.58% | 1,321,409 | (84,288) | | | 33,035.25 | 33,035.25 | 68,867.88 | 5,729.89 | 74,597.77 | (68,867.88) | 27,305.36 | (41,562.52) | 107,067.00 | 22,779.00 | 2,277.90 | 25,056.90 | 82,010.10 | 40,447.58 |
| Bonded 21.123 Woods Creek - Site Work | 5,411,244 | 5,812,377 | -7.41% | 98.45% | 5,722,237 | 5,321,104 | -7.54% | 5,411,244 | | 90,140 | 235,792.66 | 135,281.07 | 371,073.73 | 458,178.93 | 77,089.14 | 535,268.07 | (222,386.27) | 58,191.93 | (164,194.34) | 0.00 | 90,140.00 | 9,014.00 | 99,154.00 | (99,154.00) | (263,348.34) |
| Bonded 21.125 Pleasant Grove Ch Rd Industrial Core II | 3,744,996 | 3,724,402 | 0.55% | 93.56% | 3,484,390 | 3,503,654 | 0.55% | 3,700,327 | | 196,673 | 165,670.97 | 185,016.35 | 350,687.32 | 236,840.82 | 96,796.97 | 333,639.79 | (71,169.85) | 88,217.38 | 17,047.53 | 44,669.00 | 240,012.00 | 24,001.20 | 264,013.20 | (219,344.20) | (202,296.67) |
| Bonded 21.126 On Site Utilities Wood's Creek | 1,815,973 | 1,877,871 | -3.41% | 100.00% | 1,877,871 | 1,815,973 | -3.41% | 1,815,973 | | | 31,668.34 | 45,399.32 | 77,067.66 | 91,111.80 | 49,189.23 | 140,301.03 | (59,443.46) | (3,789.91) | (63,233.37) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (63,233.37) |
| Bonded 21.127 Off Site Utilities Wood's Creek | 3,783,524 | 3,507,767 | 7.29% | 98.58% | 3,458,086 | 3,729,934 | 7.29% | 3,783,524 | | 53,590 | 187,140.13 | 94,588.11 | 281,728.24 | 262,320.10 | 60,778.48 | 323,098.58 | (75,179.97) | 33,809.63 | (41,370.34) | 0.00 | 49,681.00 | 4,968.10 | 54,649.10 | (54,649.10) | (96,019.44) |
| Bonded 21.128 Atlantic Ave Widening-Raleigh | 8,800,936 | 10,251,217 | -16.48% | 24.21% | 2,481,357 | 1,031,076 | -140.66% | 1,924,912 | | 893,836 | 322,757.25 | 96,245.42 | 419,002.67 | 191,445.48 | 12,822.60 | 204,268.08 | 131,311.77 | 83,422.82 | 214,734.59 | 6,876,024.00 | 7,769,860.00 | 776,986.00 | 8,546,846.00 | (1,670,822.00) | (1,456,087.41) |
| Bonded 21.132 Montlieu Ave Roadway & Utility | 6,283,309 | 5,491,983 | 12.59% | 95.36% | 5,237,333 | 5,991,964 | 12.59% | 5,613,370 | (378,594) | | 288,951.17 | 181,401.27 | 470,352.44 | 226,752.72 | 53,392.61 | 280,145.33 | 62,198.45 | 128,008.66 | 190,207.11 | 669,939.00 | 254,650.00 | 25,465.00 | 280,115.00 | 389,824.00 | 580,031.11 |
| Bonded 22.102 UPS Metaine - Sarret Corporation | 14,737,940 | 16,151,439 | -9.59% | 64.26% | 10,378,996 | 8,965,497 | -15.77% | 13,385,642 | | 4,420,145 | 3,477,220.51 | 668,532.13 | 4,145,752.64 | 1,504,111.13 | 320,109.64 | 1,824,220.77 | 1,973,109.38 | 348,422.49 | 2,321,531.87 | 1,352,298.00 | 5,772,443.00 | 577,244.30 | 6,349,687.30 | (4,997,369.30) | (2,675,857.43) |
| Bonded 22.103 Selma Burke Middle School Paving | 2,053,853 | 1,793,620 | 12.67% | 20.12% | 360,888 | 413,248 | 12.67% | 339,500 | (73,748) | | 16,975.00 | | 16,975.00 | 1,626.01 | 4,082.81 | 5,708.82 | (1,626.01) | 12,892.19 | 11,266.18 | 1,714,353.00 | 1,432,732.00 | 143,273.20 | 1,576,005.20 | 138,347.80 | 149,613.98 |
| Bonded 22.104 NCDOT Brunswick County | 4,830,587 | 5,109,653 | -5.78% | 58.92% | 3,010,720 | 2,731,654 | -10.22% | 3,006,878 | | 275,224 | 47,374.72 | | 47,374.72 | 471,751.24 | 18,890.91 | 490,642.15 | (424,376.52) | (18,890.91) | (443,267.43) | 1,823,709.00 | 2,098,933.00 | 209,893.30 | 2,308,826.30 | (485,117.30) | (928,384.73) |
| Bonded 22.105 NCDOT Pitt County C204075 | 16,161,594 | 16,999,631 | -5.19% | 33.10% | 5,627,075 | 4,789,037 | -17.50% | 4,178,958 | (610,079) | | 0.00 | | 0.00 | 1,147,723.32 | 18,130.88 | 1,165,854.20 | (1,147,723.32) | (18,130.88) | (1,165,854.20) | 11,982,636.00 | 11,372,556.00 | 1,137,255.60 | 12,509,811.60 | (527,175.60) | (1,693,029.80) |
| Bonded 22.106 Cumberland C204404 | 7,349,405 | 6,287,081 | 14.45% | 55.45% | 3,485,983 | 4,075,003 | 14.45% | 3,148,982 | (926,020) | | 0.00 | | 0.00 | 1,225,323.44 | 3,656.68 | 1,228,980.12 | (1,225,323.44) | (3,656.68) | (1,228,980.12) | 4,200,423.00 | 2,801,098.00 | 280,109.80 | 3,081,207.80 | 1,119,215.20 | (109,764.92) |
| **Total Open Contracts:** | 109,743,809 | 114,712,334 | -2.74% | 72.92% | 80,253,569 | 74,553,824 | -4.81% | 76,598,091 | (2,394,826) | 6,248,094 | | | 0.00 | 1,225,323.44 | | 1,228,980.12 | (1,850,943.82) | 967,584.68 | (883,359.14) | 31,235,728.00 | 34,458,765.00 | 3,445,876.50 | 37,904,641.50 | (6,668,913.50) | (7,552,272.64) |

Type: CRP
Recorded: 4/17/2023 11:25:40 AM
Fee Amt: $26.00 Page 1 of 3
Revenue Tax: $0.00
WAYNE COUNTY, NC
CONSTANCE B. CORAM REGISTER OF DEEDS

# BK 3813 PG 519 - 521

## NORTH CAROLINA GENERAL WARRANTY DEED

Excise Tax: $ _____ .00

PARCEL IDENTIFIER NO. 3611053950

VERIFIED BY Rowan COUNTY ON THE _____ DAY OF _____, 20 _____

THIS INSTRUMENT WAS PREPARED BY: 24 HOUR CLOSING (NO TITLE SEARCH WAS PREFORMED)

RETURN TO: 1320 MATTHEWS MINT HILL ROAD, MATTHEWS NC 28105

BRIEF DESCRIPTION FOR THE INDEX: Lot 65 Crosswinds

THIS DEED made this _____ day of April 2023 by and between

| GRANTOR | GRANTEE | |
|---|---|---|
| **Jeremy A. Smith, and** *wife*, **Tina L. Smith** | **Smith Holdings Land Trust** | |
| Mailing Address:<br>118 Crosswinds Drive<br>Goldsboro, NC 27530 | Property Address:<br>118 Crosswinds Drive<br>Goldsboro, NC 27530 | Mailing Address:<br>118 Crosswinds Drive<br>Goldsboro, NC 27530 |

**WITNESSETH:** That said Grantor has remained and released and by these presents do remise, release, convey and forever convey unto Grantee, their heirs, and/or successors and assigns, all right, title, claim and interest of the Grantor in and to a certain lot(s) or parcel of land situated in the Wayne County, State of North Carolina, and more particularly described as follows:

**See attached Exhibit A**

All or a portion of the property herein conveyed ( ___ ) includes or (X) does not include the primary residence of a Grantor. The initial trustee of this trust is Tina Wood Smith.

Submitted electronically by "Pinyan Law Office, PLLC d/b/a 24 Hour Closing"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Wayne County Register of Deeds.

The property hereinabove described was acquired by Grantor recorded in Book 2930, at Page 254.

**TO HAVE AND TO HOLD** the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against lawful claims of all persons whomsoever, other that the following exceptions:

All such valid and enforceable easements, restrictions and rights of way of record and the lien of ad valorem taxes for the current year which the grantee herein assumes and agrees to pay.

**IN WITNESS WHEREOF**, the Grantor has hereunto set their hand and seal the day and year first above written.

_____ (SEAL)
Jeremy A. Smith

_____ (SEAL)
Tina L. Smith

STATE OF <u>NORTH CAROLINA</u>            COUNTY OF Wayne _____

I certify that Jeremy A. Smith and Tina L. Smith, personally appeared before me this day, showing satisfactory evidence of identity, and acknowledged the due execution and authority to execute the foregoing instrument.

Date: 4/5/23

My Commission Expires: 6/12/2027

Signature of Notary: April R. Rhodes

Exhibit (A) – Legal Description

Being all of Lot No. 65 and Lot No. 66A of Crosswinds, Section 3 as appears on a map or plat entitled "Revision of Lots 63, 65 and 66, Crosswinds, Section Three, Stoney Creek Township, Wayne County, N. C.", dated June 28, 2005, prepared by Bobby Rex Kornegay, Registered Land Surveyor, recorded in Book 2435, Page 674 of the Wayne County Registry, which is incorporated herein by reference. And being the same property conveyed to Philip Jon Denlinger and wife, Deborah Carol Denlinger, by Deed dated August 7, 2007 and recorded in Book 2551, Page 651 of the Wayne County Registry.

This conveyance is made subject to those Restrictive and Protective Covenants for Crosswinds, Section 3, dated October 16, 1992, and recorded in Book 13 50, Page 112, Wayne County Registry.

This conveyance is also made subject to all easements appearing on the recorded map or plat and all easements appearing of record in the chain of title. This conveyance is also made subject to the 2012 Wayne County ad valorem taxes which shall be prorated between the parties.

Property Address: 118 Crosswinds Drive Goldsboro NC 27530
Parcel ID: 3611053950

FOR REGISTRATION REGISTER OF DEEDS
Karen S. Hardesty
Carteret County, NC
April 17, 2023 10:20:37 AM
DEED   # Pages: 2
Fee:$26.00        NC Revenue Stamp:$0.00
FILE #   1796373

*Karen S. Hardesty*

# NORTH CAROLINA GENERAL WARRANTY DEED

Excise Tax: $ __**0**__ .00

PARCEL IDENTIFIER NO. 637512974012000 and 637512973003000

VERIFIED BY _____ COUNTY ON THE _____ DAY OF _____, 20_____

THIS INSTRUMENT WAS PREPARED BY: 24 HOUR CLOSING (NO TITLE SEARCH WAS PREFORMED)

RETURN TO: 1320 MATTHEWS MINT HILL ROAD, MATTHEWS NC 28105

BRIEF DESCRIPTION FOR THE INDEX: Lot 31 and 32, Block A Beach Mobile Home Court

THIS DEED made this _____ day of April 2023 by and between

| GRANTOR | GRANTEE |
|---|---|
| **Jeremy A. Smith, and** *wife*, **Tina L. Smith** | **Smith Holdings Land Trust** |
| Mailing Address:<br>118 Crosswinds Drive<br>Goldsboro, NC 27530 | Property Address:<br>207 Smith Street,<br>Atlantic Beach NC 28512       Mailing Address:<br>118 Crosswinds Drive<br>Goldsboro, NC 27530 |

**WITNESSETH:** That said Grantor has remained and released and by these presents do remise, release, convey and forever convey unto Grantee, their heirs, and/or successors and assigns, all right, title, claim and interest of the Grantor in and to a certain lot(s) or parcel of land situated in the Carteret County, State of North Carolina, and more particularly described as follows:

**Being all of Lots Thirty- One (31) and Thirty-Two (32), Block A, as shown and designated on the map of "Beach Mobile HomeCourt," which said map was made June 13, 1968, by C.C. King, and duly recorded in Map Book 7, Page 43, Carteret County Registry, to which reference is hereby made for a more complete and accurate description.**

All or a portion of the property herein conveyed (___) includes or (X) does not include the primary residence of a Grantor. The initial trustee of this trust is Tina Wood Smith.

Submitted electronically by "Pinyan Law Office, PLLC d/b/a 24 Hour Closing"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Carteret County Register of Deeds.

The property hereinabove described was acquired by Grantor recorded in Instrument number 1702345.

**TO HAVE AND TO HOLD** the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against lawful claims of all persons whomsoever, other that the following exceptions:

All such valid and enforceable easements, restrictions and rights of way of record and the lien of ad valorem taxes for the current year which the grantee herein assumes and agrees to pay.

**IN WITNESS WHEREOF,** the Grantor has hereunto set their hand and seal the day and year first above written.

_____ (SEAL)
Jeremy A. Smith

_____ (SEAL)
Tina L. Smith

STATE OF <u>NORTH CAROLINA</u>          COUNTY OF Wayne _____

I certify that Jeremy A. Smith and Tina L. Smith, personally appeared before me this day, showing satisfactory evidence of identity, and acknowledged the due execution and authority to execute the foregoing instrument.

Date: 4/5/23 _____          My Commission Expires: 6/12/2027

Signature of Notary: April R Rhodes

APRIL L RHODES
NOTARY
EXPIRES
6-12-2027
PUBLIC
WAYNE COUNTY, NC

FOR REGISTRATION REGISTER OF DEEDS
Karen S. Hardesty
Carteret County, NC
May 3, 2023 12:06:23 PM
DEED  # Pages: 2
Fee:$26.00          NC Revenue Stamp:$0.00
FILE #  1798103

# NORTH CAROLINA NON-WARRANTY DEED

**Excise Tax: $0.00**

PARCEL IDENTIFIER NO. 63751294012000 and 637512973003000

VERIFIED BY _____ COUNTY ON THE _____ DAY OF _____, 20___

THIS INSTRUMENT WAS PREPARED BY: 24 HOUR CLOSING (NO TITLE SEARCH WAS PREFORMED)

RETURN TO: 1320 MATTHEWS MINT HILL ROAD, MATTHEWS NC 28105

BRIEF DESCRIPTION FOR THE INDEX: Lot 31 and 32 Block A Beach Mobile Home Court

THIS DEED made this _____ day of May 2023 by and between

| GRANTOR | GRANTEE |
|---|---|
| **Smith Holdings Land Trust** | **JSmith NC Destination Management LLC** |
| Mailing Address: 118 Crosswinds Drive Goldsboro NC 27530 | Property Address: 207 Smith Street, Atlantic Beach, NC 28512 — Mailing Address: 4030 Wake Forest Road Ste 349 Raleigh NC 27609 |

**WITNESSETH:** That said Grantor has remained and released and by these presents do remise, release, convey and forever convey unto Grantee, their heirs, and/or successors and assigns, all right, title, claim and interest of the Grantor in and to a certain lot(s) or parcel of land situated in the Carteret County, State of North Carolina, and more particularly described as follows:

**Being all of Lots Thirty-One (31) and Thirty-Two (32), Block A, as shown and designated on the map of "Beach Mobile Home Court," which said map was made June 13, 1968, by C. C. King, and duly recorded in Map Book 7, page 43, Carteret County Registry, to which reference is hereby made for a more complete and accurate description.**

**Property Address: 207 Smith Street, Atlantic Beach, NC 28512**
**Parcel ID: 63751294012000 and 637512973003000**

All or a portion of the property herein conveyed (____) includes or (X) does not include the primary residence of a Grantor.

Submitted electronically by "Pinyan Law Office, PLLC d/b/a 24 Hour Closing"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Carteret County Register of Deeds.

5-3-2023 12:06:23.0 page 1 of 2

The property hereinabove described was acquired by Grantor by instrument recorded in **Book 1796, at Page 373.**

**TO HAVE AND TO HOLD** the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

The Grantor makes no warranty, express or implied, as to title to the property hereinabove described.

**IN WITNESS WHEREOF,** the Grantor has hereunto set their hand and seal the day and year first above written.

Smith Holdings Land Trust

_____(SEAL)
Jeremy Smith

_____(SEAL)
Tina Smith

STATE OF <u>NORTH CAROLINA</u>          COUNTY OF Wayne

I certify that Jeremy Smith and Tina Smith, personally appeared before me this day, showing satisfactory evidence of identity, and acknowledged the due execution and authority to execute the foregoing instrumen on behalf of Smith Holdings Land Trust.

Date: 5/1/2023                    My Commission Expires: 6/12/2027

Signature of Notary: April L Rhodes

APRIL L RHODES
NOTARY
EXPIRES
6-12-2027
PUBLIC
WAYNE COUNTY, NC

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et ) | |
| al. ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Jeremy Smith
118 Crosswinds Drive
Goldsboro, NC 27530


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )        Civil Action No. |
| JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et al. | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  JSC ENTERPRISES, LLC f/k/a BPC ENTERPRISES, LLC
c/o Jeremy Smith - Registered Agent
118 Crosswinds Drive
Goldsboro, NC 27530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                 _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                        *Server's signature*

                                                 _____
                                                        *Printed name and title*


                                                 _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY | ) )  ) ) |
| *Plaintiff(s)* | ) ) |
| v. | )  Civil Action No. |
| JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et al. | ) ) ) |
| *Defendant(s)* | ) ) ) |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*  JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC
c/o Jeremy Smith - Registered Agent
118 Crosswinds Drive
Goldsboro, NC 27530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY<br><br><br>_____<br>*Plaintiff(s)*<br>v.<br>JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et al.<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    JSMITH NC DESTINATION MANAGEMENT, LLC
c/o Northwest Registered Agent Service, Inc. - Registered Agent
4030 Wake Forest Road, Suite 349
Raleigh, NC 27609-0010

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Jeffrey S. Price
    MANIER & HEROD
    1201 Demonbreun Street, Suite 900
    Nashville, Tennessee 37203
    Phone: (615) 244-0030
    JPrice@ManierHerod.com

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | )      Civil Action No. |
| JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et al. | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    SMITH HOLDINGS LAND TRUST
                                          c/oTina Smith - Trustee
                                          118 Crosswinds Drive
                                          Goldsboro, NC 27530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Jeffrey S. Price
                                              MANIER & HEROD
                                              1201 Demonbreun Street, Suite 900
                                              Nashville, Tennessee 37203
                                              Phone: (615) 244-0030
                                              JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                      _____

                                                            *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY ) | |
| ) | |
| ) | |
| ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et ) | |
| al. ) | |
| ) | |
| ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Tina Smith in her capacity as Trustee of Smith Holdings Land Trust
118 Crosswinds Drive
Goldsboro, NC 27530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____        _____
                                                *Server's signature*

                                         _____
                                                *Printed name and title*


                                         _____
                                                *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> JSC HOLDINGS, LLC f/k/a BPC HOLDINGS, LLC, et al. <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Tina Smith
118 Crosswinds Drive
Goldsboro, NC 27530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Jeffrey S. Price
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
JPrice@ManierHerod.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit F



April 3, 2023

**Via E-Mail and U.S. Mail**
City of Raleigh
222 W. Hargett Street
Raleigh, NC 27601

    Re:    Project:        Atlantic Avenue Improvement
                 Principal:     JSmith Civil, LLC
                 Surety:        Westfield Insurance Company
                 Bond No.:    164584X

Dear City of Raleigh:

       I am writing on behalf of JSmith Civil, LLC ("JSmith") in relation to the above referenced project (the "Project"). JSmith is cooperating with its surety, Westfield Insurance Company ("Surety"), to address sums owed to subcontractors and suppliers on the Project. In furtherance of the cooperation and efforts of JSmith and Surety, JSmith desires that all payments on the above referenced Project be paid to and administered by Surety. To that end, by this letter, JSmith hereby irrevocably directs that all payments now or hereafter due on account of, or with respect to, the above contract for the above-described Project be made to Surety as provided in this letter. These payments include all current pending change orders, retainage, claims, or extras. Please make payment per the following payment instructions:

Checks to be payable to Westfield Insurance Company and sent to:

Attn: Alex Mosyjowski, Surety Claims
Westfield Insurance Company
1 Park Circle
Westfield Center, OH 44251

Wire Instructions are attached.

       Surety and JSmith will cooperate and work together to assure that the contract funds are used for the intended purpose of satisfying obligations to subcontractors and suppliers and to complete the Project. No modification or change to these instructions is authorized or will be made except by writing, signed by a representative of Surety and delivered to you, authorizing and consenting to such modification or change. You are not authorized to accept any nonconforming modification or change, but are authorized to follow any payment instructions provided by Surety.



PO Box 857 | Goldsboro, NC 27533-0857
O: 919.330.1230| F: 919.330.0066
www.jscivil.com |NC GC License No. 77634

**Please contact Alex Mosyjowski (alexmosyjowski@westfieldgrp.com/(330)** 887-6518) or Matthew Burg (matthewburg@westfieldgrp.com/(330) 887-0477) with any questions and/or to coordinate payment.

Sincerely,

JSMITH CIVIL, LLC

By: _____

Jeremy Smith, President / CEO

cc: Alex Mosyjowski (via email)
Matthew G. Burg (via email)



# Exhibit G



**Raleigh**

August 16, 2023

*VIA EMAIL AND OVERNIGHT COURIER*

Jeremy Smith, President/CEO          And          Alex Mosyjowski, Surety Claims Counsel
JSmith Civil, LLC                                          Westfield Insurance Company
1202 Parkway Drive                                      1 Park Circle
Goldsboro, NC 27534                                    Westfield Center, OH 44251

| | |
|---|---|
| Project: | Atlantic Avenue Widening Project (the "Project") |
| Owner: | City of Raleigh (the "City") |
| Owner's Project No.: | ES-2021-02 |
| City Purchase Order No.: | 145800 (the "Contract") |
| Contract Effective Date: | December 21, 2021 |
| Principal/Contractor: | JSmith Civil, LLC ("JSmith Civil") |
| Surety: | Westfield Insurance Company ("Westfield") |
| Bond No.: | 164584X (the "Performance Bond") |

RE:     Declaration of Default and Termination of Contract for Cause

Dear Messrs. Smith and Mosyjowski:

As you know, on June 23, 2023, the City transmitted to you a letter constituting written notice under Section 16.02 of the General Conditions for the above-referenced Contract and under Section 3.1 of the above-referenced Performance Bond that the City was considering a declaration that JSmith Civil is in default and termination of the Contract for cause (the "June 23, 2023 Notice Letter"). The contents of the June 23, 2023 Notice Letter are incorporated herein by reference. More than 45 days have elapsed since the City's transmission of the June 23, 2023 Notice Letter, and during that time, JSmith Civil has not responded substantively to the contents of the letter, has not performed any Project work other than incidental site maintenance requested by the City, and has not provided any indication of an intention to complete the Project.

A conference under Section 3.1 of the Performance Bond was conducted on June 30, 2023, with Mr. Mosyjowski, outside counsel for Westfield, and various City representatives participating, but no representatives from JSmith Civil participating. During the Section 3.1 conference, the City was informed that Westfield: (a) didn't envision JSmith Civil moving forward

with the Project; (b) was in the process of making a transition to a different contractor; and (c) had reached out to certain potential replacement contractors in an effort to secure completion pricing. During a status update call with Westfield representatives on July 13, 2023, the City was informed that Westfield was awaiting completion pricing from several of the potential replacement contractors that Westfield had contacted.

Based on the facts and circumstances as described in the prior two paragraphs, and pursuant to Section 16.02.B of the General Conditions of the Contract and Section 3.2 of the Performance Bond, the City hereby declares JSmith Civil to be in default of the Contract and provides written notice to JSmith Civil and Westfield that the Contract is terminated for cause. Pursuant to Section 3.3 of the Performance Bond, the City hereby agrees to pay the balance of the Contract Price, in accordance with the terms of the Contract, to Westfield or to a contractor selected to complete the Contract.

Given what Westfield has previously represented to the City about Westfield's efforts to secure completion pricing for the Project, the City is presuming that Westfield will be able to complete its investigation and make its election under Section 5 of the Performance Bond swiftly. If Westfield requires any additional information from the City as Westfield completes its investigation and makes its bond election, the City will be pleased to provide same. In the interim, the City preserves all of its rights and remedies under the Contract, the Performance Bond, and applicable law.

Sincerely,

Michael R. Moore,
Assistant City Manager

cc:     Westfield Insurance Company
        P.O. Box 5001
        Westfield Center, OH 44251-5001
        (*via certified mail, return receipt requested*)

        Dan Pentecost (via email only – danielpentecost@westfieldgrp.com)
        Matthew G. Burg (via email only – matthewburg@westfieldgrp.com)
        Matt Hindt (via email only - mhindt@jscivil.com)
        Jarrod Stone (via email only – jstone@manierherod.com)

# Exhibit H

DocuSign Envelope ID: 8A8BB7CB-6171-4A1D-B164-88B9C2D9AD2C

# TENDER AND COMPLETION AGREEMENT

This Tender and Completion Agreement (this "Agreement") is made and entered into by and among Westfield Insurance Company, an Ohio insurance company authorized to issue performance and payment bonds in North Carolina ("Surety"); the City of Raleigh, North Carolina, a North Carolina municipal corporation ("Obligee"); and Carolina Sunrock LLC, a Delaware limited liability company ("Completion Contractor") (collectively, the "Parties").

## WITNESSETH

**WHEREAS,** JSmith Civil, LLC ("Principal") and Obligee entered into a Contract dated on or about September 21, 2021 (the foregoing, together with all of its incorporated documents including but not limited to, the original bid documents, plans, specifications, modifications, and amendments, shall be referred to in this Agreement as the "Bonded Contract") involving certain construction work in Raleigh, North Carolina known commonly and referred to as the Atlantic Avenue Widening Project, ES-2021-02 (the "Bonded Project");

**WHEREAS**, Surety issued Payment Bond No. 164584X (the "Payment Bond") and Performance Bond No. 164584X (the "Performance Bond"), each in the amount of $9,586,280, on behalf of Principal, and in favor of Obligee, in connection with the Bonded Contract (the Payment Bond and the Performance Bond, collectively, the "Bonds");

**WHEREAS,** Obligee has demanded that Surety perform under the Performance Bond and Surety has asserted certain defenses to performance under the Performance Bond;

**WHEREAS**, Completion Contractor has agreed to perform all remaining work and obligations under the Bonded Contract in accordance with and pursuant to the terms of the Bonded Contract and this Agreement, all of which are incorporated into and made part of this Agreement;

**WHEREAS**, with the consent of Obligee, Surety has elected to discharge its obligations under Performance Bond by tendering Completion Contractor to complete the Bonded Contract pursuant to the terms of the Bonded Contract and this Agreement;

**WHEREAS**, Obligee accepts Completion Contractor as the completing contractor in place of Principal and acknowledges that Surety's tendering of Completion Contractor and payment of the Surety Settlement Payment (defined below) discharges Surety's obligations under the Performance Bond.

**NOW THEREFORE**, in consideration of the premises and other good and valuable considerations, receipt and sufficiency of all of which are hereby acknowledged, the Parties hereto agree as follows:

1. **Examination of Bonded Contract, Subcontracts, and Bonded Project by Completion Contractor**. Completion Contractor has (a) examined the Bonded Contract and is familiar with all of the terms and conditions of the Bonded Contract, (b) examined the Bonded Project, and is familiar with jobsite conditions, including, without limitation, the materials

available but not yet incorporated into the Bonded Project, the nature and extent of work previously performed by Principal, and the work remaining to be performed, (c) satisfied itself as to the cost of completing the work encompassed by the Bonded Contract, together with all required overhead expenses and the payment of subcontractor, labor, and material expenses to hereafter be incurred under or in connection with the Bonded Contract or otherwise, and (d) fully informed itself with respect to those items required to complete the work encompassed by the Bonded Contract. Completion Contractor acknowledges and agrees that no representations, whether express or implied, have been made by Surety or Obligee or any of their respective employees, agents, consultants, or representatives with respect to the Bonded Contract or the Bonded Project, including the status of the remaining work, the availability of materials, or the ability of Principal's subcontractors or suppliers for the remaining work.

2. **Completion Contractor's Performance of Obligations of Bonded Contract**. In consideration of its receipt of the Completion Price (defined below), Completion Contractor agrees to perform all remaining work and fulfill all other obligations encompassed by the Bonded Contract, this Agreement, and/or the Bonds by serving as the completion contractor through tender and substitution, and Completion Contractor agrees that it is bound by, and shall abide by, all the terms, conditions, and provisions of the Bonded Contract and this Agreement. In accordance with the terms of the Bonded Contract, Completion Contractor agrees to furnish and pay for all of the labor, material, supplies, equipment, services, insurance, warranties, and all other items necessary to perform and fully complete the work and to satisfy all obligations encompassed by the Bonded Contract just as if Completion Contractor were Principal performing under the Bonded Contract. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, Completion Contractor shall not have any liability whatsoever to Obligee, Surety, Principal, subcontractor, materials provider, vendor, laborer, equipment lessor or provider, or other party who has furnished materials or labor to or for the benefit of Principal prior to the date hereof in connection with the Bonded Project with respect to Principal's failure to fully or timely pay any amount owed with respect to labor, work, materials, or equipment furnished to or for the benefit of Principal or any of its subcontractors in connection with the performance of the Bonded Contract or work on the Bonded Project prior to the date of this Agreement. All claims and damages arising from the failure of Completion Contractor to perform the work and other obligations encompassed by the Bonded Contract and/or this Agreement shall be the responsibility of Completion Contractor and/or its surety and not Surety.

3. **Bonded Contract Balance**. It is expressly acknowledged and agreed that no funds of any nature are due or to become due to Principal under the Bonded Contract as a result of its default and rejection of the Bonded Contract, and all such funds shall be disbursed pursuant to this Agreement. Obligee represents and warrants that a summary of the Balance of the Bonded Contract is as follows:

| a | Original Contract Price | $ | 9,586,280.00 | |
|---|---|---|---|---|
| b | Change Orders Approved | $ | 0.00 | |
| c | Adjusted Contract Price | $ | 9,586,280.00 | a+b |
| d | Paid to Date | ($ | 1,875,249.48) | |

| e | Bonded Contract Balance per Pay App. No. 12 (including retention) | $ | 7,711,030.52 | |
| f | Adjustment for Unused Contingency | ($ | 859,688.94) | |
| g | Adjustment for Sales Tax Paid | $ | 26,607.25 | |
| h | Adjustment for Unclassified Excavation Overpayment | $ | 85,289.00 | |
| i | Adjustment for Obligee's Legal Fees | ($ | 25,000.00) | |
| j | Revised Bonded Contract Balance (including retention) | $ | 6,938,237.83 | e-f+g+h-i |

The Parties agree that the funds available under the Bonded Contract for completion of the Bonded Contract and this Agreement are $6,938,237.83, subject to further increases or decreases after the date hereof pursuant to the terms of the Bonded Contract (the "Balance of the Bonded Contract"). The Parties agree that Obligee shall retain the Balance of the Bonded Contract to remit to Completion Contractor, without offset, pursuant to Section 5, below, of this Agreement.

4.   **Completion Price**. Completion Contractor has agreed to complete all work under the Bonded Contract in exchange for compensation based on those unit prices and schedule of values set forth on the attached Exhibit 1, which is incorporated herein by reference, for the price of $13,744,779.52 (which includes $68,569.85 for bond costs), subject to adjustments for unit quantities actually installed in the Bonded Project by Completion Contractor (the "Completion Price"). Completion Contractor shall comply with all requirements under the Bonded Contract, including, without limitation, insurance requirements. The Completion Price includes a credit of $476,250.01 for stored materials as set forth in the Stored Materials list included in Exhibit 1 (the "Stored Materials"). To the extent that any Stored Materials are missing, unable to be used on the Bonded Project for any reason, and/or have to be replaced by Completion Contractor (the "Rejected, Unavailable, or Unused Materials"), Surety shall pay Completion Contractor the value assigned to the specific items of the Rejected, Unavailable, or Unused Materials listed on Exhibit 1; provided, however, Completion Contractor will make a good faith effort to use as much of the available Stored Materials not rejected by Obligee as possible. Obligee agrees to assist and work with Completion Contractor in good faith to verify and document the Stored Materials actually installed and used for the Bonded Project as well as in determining and quantifying the Rejected, Unavailable, or Unused Materials. Surety agrees to reimburse Completion Contractor within thirty (30) days of request by Completion Contractor for payment of any Rejected, Unavailable, or Unused Materials.

5.   **Payment Requisitions and Payment of the Completion Price.**  All payment applications, requisitions, and other submissions required by the Bonded Contract for payment by Obligee shall be prepared and submitted by Completion Contractor. Completion Contractor shall be paid for its work pursuant to and subject to the terms of the Bonded Contract modified by the unit prices on Exhibit 1 of this Agreement. Completion Contractor and Obligee agree and acknowledge that the unit prices set forth in Exhibit 1 shall replace and supersede the unit

DocuSign Envelope ID: 8A8BB7CB-6171-4A1D-B164-88B9C2D9AD2C

prices in the Bonded Contract, and that all other terms and conditions of the Bonded Contract governing payment to the Principal to remain in full force and effect as to Completion Contractor. Obligee shall have the sole obligation to pay the Completion Price, and Surety's tender of the Surety Settlement Payment as set forth in Section 6, below, shall discharge Surety's obligations to Obligee and/or Completion Contractor.

6. **Surety Settlement Payment**.  Within thirty (30) days of the execution of this Agreement by the Parties, Surety shall pay to Obligee the sum of $6,806,541.69 (the "Surety Settlement Payment") as full and final settlement of Surety's obligations under the Performance Bond. The tendering of the Surety Settlement Payment and tendering of Completion Contractor by execution of this Agreement shall constitute full performance of Surety under the Performance Bond.

7. **Time for Completion.**  The prosecution of the work under the Bonded Contract shall commence upon the date that this Agreement has been executed by the Parties, and after Obligee issues a notice to proceed to Completion Contractor (the "Notice to Proceed"). Obligee shall not issue a Notice to Proceed until the Completion Bonds required pursuant to Section 8, below, and evidence of insurance have been provided to and approved by Obligee. Following the issuance of the Notice to Proceed, Completion Contractor agrees to diligently proceed with the work within ten (10) days.  Between receipt of Notice to Proceed and receipt of a subsequent written notice from Obligee that all private utilities along the Bonded Project corridor have been relocated (the "Utility Relocation Completion Notice"), Completion Contractor agrees to perform the work set forth in Exhibit 2 attached hereto and incorporated by reference herein. Completion Contractor agrees to complete all of the work of the Bonded Contract in accordance with the terms and conditions of the Bonded Contract and this Agreement within six hundred fourteen (614) days after receipt of the Utility Relocation Completion Notice (the "Extended Completion Date"), subject to any extensions thereof as provided under the terms of the Bonded Contract. In the event that Completion Contractor fails to complete the work prior to the Extended Completion Date, or any extension thereof, Completion Contractor shall be responsible for any and all liquidated damages specified in the Bonded Contract arising from such failure.  Obligee agrees to the Extended Completion Date, and further agrees not to assess liquidated damages against Completion Contractor arising from the failure to complete the Bonded Project prior to the Extended Completion Date, and will look to Completion Contractor and its surety for any liquidated damages assessed due to Completion Contractor's failure to complete the work by the Extended Completion Date.

8. **Completion Bonds**.   Completion Contractor shall provide a payment bond and a performance bond, each in the amount of the Completion Price and naming Obligee as obligee, assuring the performance by Completion Contractor of its obligations under the Bonded Contract and this Agreement, including payment by Completion Contractor of all parties providing labor or materials for completion of the Bonded Project (the "Completion Bonds"). The Completion Bonds shall be in the same form as the Bonds and approved by Obligee. Completion Contractor warrants that the cost of the Completion Bonds is included in and is part of the Completion Price.

4

9. **Obligee's Acceptance of Tender of Completion Contractor**. In consideration of Surety's payment of the Surety Settlement Payment and tender of Completion Contractor to complete the Bonded Contract for the Completion Price, Obligee accepts and approves of Completion Contractor as completing contractor relative to the Bonded Contract. Obligee shall be solely responsible for administration of the Bonded Project. Completion Contractor and its surety shall be substituted in and shall replace Surety with respect to the performance of the remaining obligations under the Bonded Project and the Performance Bond.

10. **Release and Indemnification of Surety and Obligee by Completion Contractor**. Completion Contractor (a) forever indemnifies Surety and Obligee and their respective directors, officers, agents, servants, employees, affiliates, and subsidiaries, and the respective predecessors, successors, and assigns of all of the foregoing, of and from any and all claims, rights, demands, or damages of whatsoever kind or nature as may arise from Completion Contractor's breach of the Bonded Contract or this Agreement and (b) acknowledges that the execution of this Agreement and the negotiation of any term hereof were (i) independent of any statement, representation, or analysis of Surety or Obligee or their respective consultants, agents, or representatives and (ii) made after an opportunity to consult with counsel. Notwithstanding any other provision to the contrary, Obligee acknowledges that Completion Contractor shall have all rights, remedies, and defenses under the Bonded Contract and applicable law (and any contractual dispute resolution and mediation processes established under the Bonded Contract shall remain available to Completion Contractor as if it had initially executed the Bonded Contract in place of Principal), and nothing contained herein shall obligate Completion Contractor to indemnify Obligee or Surety of, from, against, or for any claims, rights, demands, or damages arising from sums owed to Principal's subcontractors and suppliers for work performed or materials delivered prior to the date of this Agreement.

11. **Obligation of Surety Under Payment Bond**. Notwithstanding Obligee's release of Surety as set forth in Section 12, below, the Parties agree that the Payment Bond shall remain in full force and effect, subject to its express terms, conditions, and governing law; provided, however, that Surety shall have no obligation under the Payment Bond for any labor, materials, or services performed by or provided to Completion Contractor, or its subcontractors, suppliers, or vendors, during Completion Contractor's completion of the Bonded Contract pursuant to this Agreement.

12. **Release of Surety and the Performance Bond**. Upon Obligee's receipt of the Surety Settlement Payment, Obligee hereby releases and fully discharges Surety from its obligations under the Performance Bond and the Performance Bond shall be deemed cancelled and discharged; provided, however, that Obligee's indemnification rights as set forth in Section 13, below, are not released hereby, and are expressly reserved.

13. **Release of Obligee and Indemnification of Obligee by Surety**. Upon Obligee's receipt of the Surety Settlement Payment, at which time Obligee's release of Surety pursuant to Section 12, above, becomes effective, Surety hereby releases and fully discharges Obligee from any and all claims that Surety, for itself or as assignee or subrogee of Principal, has asserted or could have asserted against Obligee arising from or in any way related to the Bonded

Contract and/or the Bonded Project. Surety warrants and represents that it has full legal power and authority to settle and adjust any and all claims Principal may have against Obligee arising from or in any way related to the Bonded Contract and/or the Bonded Project. To the fullest extent permitted by law, Surety agrees to indemnify, defend, and hold harmless Obligee from and against any and all claims, rights, demands, causes of action, suits, adversary proceedings, and/or damages of whatsoever kind or nature arising from or in any way related to the Bonded Contract and/or the Bonded Project that may be asserted against Obligee by (a) Principal and/or (b) any other person or entity involved as a creditor, trustee, or administrator in any bankruptcy proceeding initiated by Principal to the extent that such other person or entity is proceeding or asserting to proceed by and through the rights and claims of Principal (collectively the "Principal Claims"). Surety disputes that Principal has any rights or retains any of the Principal Claims or that any party has any rights in relation thereto. If Principal agrees to execute a full release of the Principal Claims, Obligee will execute a full release of Principal from any claims under the Bonded Contract or related to the Bonded Project (the "Obligee Claims"); provided, however, that if approval of the bankruptcy court is required before Principal's release of the Principal Claims becomes effective, Obligee's release of the Obligee Claims shall not become effective until such approval from the bankruptcy court is obtained, and Obligee agrees to cooperate with Principal and its bankruptcy court counsel in obtaining such approval. If Surety is required to indemnify, defend and/or hold harmless Obligee pursuant to this Section 13 (the "Indemnification Obligation"), Obligee shall fully cooperate with Surety and allow Surety to assert the Obligee Claims against Principal and Surety shall have the right, in its sole and absolute discretion, to settle any and all of the Principal Claims and the Obligee Claims and Obligee will execute such documents and agreements required to facilitate such settlement. Notwithstanding any other terms of this Section 13 and/or this Agreement, Surety's Indemnification Obligation shall be capped at and shall not exceed $2,759,569.76, which sum is equal to the difference between the penal sum of the Performance Bond and the Surety Settlement Payment. Upon Surety's expenditure of the total sum of $2,759,569.76 in performance of the Indemnification Obligation, Surety shall be fully discharged and released of its obligations under this Section 13.

14. **Reservation of Rights against Principal**.  Nothing herein waives or modifies any right Obligee or Surety may have against Principal or any indemnitor. Obligee and Surety each expressly and fully reserve their respective rights, claims, and remedies against the Principal and any indemnitors related to the recovery of (a) the Surety Settlement Payment and (b) any other claims, costs, and expenses incurred by Obligee and/or Surety related to the Bonded Project and/or the Bonds.

15. **Completion Contractor Not an Agent of Surety or Obligee**. Completion Contractor is an independent contractor and is not an agent, servant, partner, or joint venturer of Surety or Obligee. The Parties agree that Completion Contractor, not Surety, shall be the contractor of record for completion of the Bonded Project.

16. **Surety Not Completion Contractor**.  Surety actions shall forever be construed and considered as those of a surety and not as a contractor.

17. **Third Parties**.  This Agreement is strictly for the benefit of the Parties, and the Parties expressly declare that they do not intend to confer any rights or benefits of whatsoever kind or nature upon any third party.

18. **Entire Agreement**.  This Agreement, along with the Bonded Contract, as amended by this Agreement, represents the entire agreement among the Parties, and shall be subject to Amendment only as provided in Section 23, below.

19. **Governing Law and Venue**.  This Agreement shall be interpreted according to the laws of the State of North Carolina, without regard to its choice of law provisions, and the proper, sole, and exclusive venue for any civil action arising out of or in any way related to this Agreement shall be the federal or state courts sitting in Wake County, North Carolina.

20. **Authority of Signatories**.  Each of the undersigned signatories of this Agreement on behalf of Surety, Obligee, and Completion Contractor, respectively, represents and warrants that (a) he or she is fully empowered and duly authorized by all necessary action of Surety, Obligee, and Completion Contractor, respectively, to execute and deliver this Agreement, (b) he or she has full capacity, power, and authority to enter into and carry out this Agreement, and (c) this Agreement is the legal, valid, and binding obligation of Surety, Obligee, and Completion Contractor, respectively.

21. **Representation of Signatories**.  The signatories of this Agreement represent, covenant, and warrant to each other that (a) they have carefully read the Agreement, (b) the Agreement is a negotiated document, (c) they understand its provisions and intend to be bound thereby, and (d) they have consulted with legal counsel regarding the terms and conditions of this Agreement.

22. **Severability**.  The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision herein, and the invalidity or unenforceability of any provision of this Agreement as to any person, entity, or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons, entities, or circumstances.

23. **Amendment**.   Notwithstanding anything to the contrary contained herein, this Agreement may not be amended, supplemented, or discharged except expressly by an instrument in writing signed by Surety, Obligee, and Completion Contractor; provided, however, that Obligee and Completion Contractor are free to enter into separate and additional agreements related to the Bonded Project (including change orders and modifications to the Bonded Contract) without the consent or written approval of Surety,  with the understanding that such agreements shall not modify, impact, or impair Surety's rights under this Agreement.

24. **Counterparts**.  This Agreement may be executed by the Parties independently in any number of counterparts, all of which together shall constitute but one and the same instrument, which instrument shall be valid and effective as if all Parties had executed the same counterpart.

25. **Section Headings**.  The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

26. **Non-Discrimination**.  To the extent permitted by North Carolina law, the Parties for themselves, their agents, officials, directors, officers, members, representatives, employees, and contractors agree not to discriminate in any manner or in any form based on actual or perceived age, mental or physical disability, sex, religion, creed, race, color, sexual orientation, gender identity or expression, familial or marital status, economic status, veteran status or national origin in connection with this Agreement or its performance.

   The Parties agree to conform with the provisions and intent of Raleigh City Code § 4-1004 in all matters related to this Agreement. This provision is incorporated into the Agreement for the benefit of the City of Raleigh and its residents and may be enforced by an action for specific performance, injunctive relief, or any other remedy available at law or equity.  This Section 26 shall be binding on the successors and assigns of all Parties with reference to the subject matter of the Agreement.

27. **Acknowledgement of City Brand and Tree Logo Ownership and Restrictions**. Obligee has developed proprietary branding (the "City Brand") centered around the Raleigh tree mark logo (the "Tree Logo"). Obligee's exclusive rights and ownership in and to the Tree Logo are protected under trademark and copyright, including U.S. Copyright Reg. No. VAu1-322-896, N.C. State Trademark Registration Reg. No. T-23070 and Federal Trademark Registration Reg. No. 5,629,347, as well as under other federal and state laws. Completion Contractor acknowledges and understands that Obligee is not conferring any license to Completion Contractor under this Agreement or the Bonded Contract to use or depict the Tree Logo or other aspects of the City Brand when performing work on the Bonded Project under this Agreement and the Bonded Contract.  Completion Contractor shall not make any use or depiction of the Tree Logo or other aspects of the City Brand without the prior express written approval of Obligee. In this regard, should any materials being produced by Completion Contractor for Obligee under this Agreement and the Bonded Contract contemplate use or depiction of the Tree Logo, including, but not limited to, printed materials, digital media, signage and/or display materials, Completion Contractor shall proceed under the auspices and direction of Obligee's Communications Department and shall comply with all guidelines and restrictions governing use or depiction of the Tree Logo.

28. **Communications**.  If communications to the public and/or Obligee employees are required as part of Completion Contractor's scope of work under this Agreement and the Bonded Contract, then Completion Contractor shall work with Obligee in the development of a communications plan ("Communications Plan") that must first be approved by Obligee in writing before any such communications are delivered to the public and/or Obligee employees.

   For purposes of this Section 28, such written approval by Obligee shall be provided by electronic mail by the applicable Obligee Communications Department employee who is responsible for reviewing and approving the Communications Plan, such electronic mail to

be sent to the electronic mail address listed in Section 32, below, as part of the contact information for Completion Contractor representative identified in Section 32, below.

Among other things, the Communications Plan must establish whether Obligee or Completion Contractor will be responsible for sending any such communications to the public and/or Obligee employees as required either by this Agreement and the Bonded Contract or the Communications Plan. The Communications Plan also shall include, but not be limited to, communications objectives, target audience, and deliverables (print, video, website, social, direct, or digital). Completion Contractor shall comply with the Communications Plan when communicating to the public and/or Obligee employees pursuant to this Agreement and the Bonded Contract and the Communications Plan. All such communications shall comply with Obligee's brand and communications guidelines, as the same may be amended or modified from time to time.

Obligee's current brand and communications guidelines are incorporated into this Agreement and Bonded Contract by reference and can be found on Obligee's website here: https://raleighnc.gov/doing-business/city-brand-guidance-vendors.

For purposes of this Section 28, "Communications" is defined as any public or Obligee employee facing information presented in channels such as, but not limited to, a website, mobile applications, social media, printed materials, vehicles, billboards, and videos.

28.1.   Communications Plan Approval:
Any materials, messaging or outreach from Completion Contractor related to marketing and communications of any service or effort under this Agreement and the Bonded Contract must first be reviewed and approved by Obligee's Communications Department. This is to ensure that the Communications Plan: (i) complies with Obligee's brand and communication guidelines; (ii) integrates with Obligee's other communications channels and digital strategy; (iii) meets accessibility guidelines; and (iv) conforms to communications best practices with respect to general user experience.

28.2.   Accessibility Requirements:
For web content that Completion Contractor is to make accessible to the public and/or Obligee employees as part of an approved Communications Plan that is included in Completion Contractor's scope of work under this Agreement and the Bonded Contract, all web materials including, but not limited to, tools, mobile applications, and websites, generated by, or on behalf of, Completion Contractor must meet at least the mid-range conformance level, AA compliance of the current Web Content Accessibility Guidelines, as the same may be amended from time to time.

Any such web content generated by, or on behalf of Completion Contractor, as part of a Communications Plan associated with this Agreement and the Bonded Contract shall meet all standards of good cognitive web accessibility, which include the following:

      28.2.1. Using proper headings and lists

      28.2.2. Using unique links

      28.2.3. Using alternative text and captions

      28.2.4. Using more white space

      28.2.5. Dividing content into more manageable pieces

      28.2.6. Making forms manageable by breaking them into multiple, sequential steps

      28.2.7. Providing a logical reading order

      28.2.8. Being consistent with fonts, colors and locations of page elements

      28.2.9. Offering keyboard access

      28.2.10. Offering content in multiple formats

      28.2.11. Understanding minimum contrast

28.3.   <u>Languages</u>:
Digital sites/ tools that are for public use/consumption, including for use by Obligee employees, under a Communications Plan associated with this Agreement and the Bonded Contract must have translation module (e.g., G-translate, Weglot) so that the service is available in all languages. At minimum, Spanish translation is required on all such digital sites/tools based on low English proficiency requirements:

      28.3.1. In most cases, entities that are recipients of federal financial assistance through the U.S. Department of Health and Human Services (HHS) must provide language assistance services in order to comply with their legal obligation to take reasonable steps to ensure meaningful access to their programs by persons with Limited English Proficiency (LEP).

28.4.   <u>Content</u>:
For any communications content that Completion Contractor is required to generate, or have generated, as part of its scope of work under this Agreement and the Bonded Contract, Completion Contractor shall send such content to Obligee Communications Department staff in raw, high-resolution format for inclusion in communications materials to be made accessible to the public and/or Obligee employees as set forth in the Communications Plan that arises from this Agreement and the Bonded Contract (i.e., websites, mobile applications, printed materials collateral, and social media). PDF attachments shall be used only as a last resort

and only after written approval by Obligee, with such written approval to be provided by Obligee in electronic mail format as described elsewhere in this Section 28.

28.4.1. Completion Contractor shall only provide to Obligee communications materials for which Obligee has rights to use, with written documentation of such use rights being provided to Obligee as requested from time to time by Obligee in its sole discretion.

28.4.2. All working files agreed upon for the specific Communications Plan shall be provided to Obligee Communications Department, i.e., text, graphics, charts and data, infographics, and original native files such as Illustrator, Excel, ArcGIS, etc. Following are the file format specifications:

28.4.2.1. Images: At least 300dpi for printing at actual size; 96dpi and at least 1920x1080px for digital/Web.

28.4.2.2. Video: Any video should be no less than Standard HD (1920x1080) but preferable 4k.

28.4.2.3. Text: Word document using accessibility best practices (heading structure, table of contents, and tables).

29. **E – Verify**. Completion Contractor, in performing the work under the Agreement and the Bonded Contract, shall comply with E-Verify, the federal E-Verify program operated by the United States Department of Homeland Security and other federal agencies, or any successor or equivalent program used to verify the work authorization of newly hired employees pursuant to federal law and as in accordance with N.C.G.S. §64-25 et seq.

30. **Iran Divestment Act Certification.** Completion Contractor certifies that, as of the date listed below, it is not on the Final Divestment List as created by the State Treasurer pursuant to N.C.G.S. § 147-86.55, et seq.

31. **Companies Boycotting Israel Divestment Act Certification.** Completion Contractor certifies that it has not been designated by the North Carolina State Treasurer as a company engaged in the boycott of Israel pursuant to N.C.G.S. 147-86.81.

32. **Notices Between Obligee and Completion Contractor**. Where the Bonded Contract or this Agreement requires one party to notify or give notice to another party, such notice shall be provided in writing and in accordance with Article 18.01 of the General Conditions of the Bonded Contract, as modified by SC-18.01.A.3 of the Supplemental Conditions of the Bonded Contract, to the Designated Representative of the party to whom the notice is addressed, as follows:

Obligee's Designated Representative:

Richard L. Kelly, P.E., Engineering Services Director

City of Raleigh
One Exchange Plaza, Suite 801
Raleigh, NC 27601
Telephone:  (919) 996-5575
E-mail:  richard.kelly@raleighnc.gov

With Copies to:

Byron Sanders, Jr., P.E., CPM, Asst. Engineering Services Director
City of Raleigh
One Exchange Plaza, Suite 801
Raleigh, NC 27601
Telephone: (919) 996-4011
E-mail:  byron.sanders@raleighnc.gov

A.  Sylvester Percival, P.E., Roadway Design and Construction Manager
City of Raleigh
222 W. Hargett Street, Suite 400
Raleigh, NC 27601
Telephone:  (919) 996-4053
E-mail:  sylvester.percival@raleighnc.gov

Dennis Trujillo, Sr. Project Manager
City of Raleigh
222 W. Hargett Street, Suite 400
Raleigh, NC 27601
Telephone:  (919) 996-4101
E-mail:  dennis.trujillo@raleighnc.gov

Completion Contractor's Designated Representative:

John Barrett, VP of Contracting
Carolina Sunrock LLC
200 Horizon Drive, Suite 100
Raleigh, NC 27615
Telephone:  (919) 730-1371E-mail:  jbarrett@thesunrockgroup.com

With Copies to:

Richard Howley, Project Manager
Carolina Sunrock LLC
200 Horizon Drive, Suite 100
Raleigh, NC 27615
Telephone:  (984) 789-2420
E-mail:  rhowley@thesunrockgroup.com

DocuSign Envelope ID: 8A8BB7CB-6171-4A1D-B164-88B9C2D9AD2C

Trey Clement, Construction Manager
Carolina Sunrock LLC
200 Horizon Drive, Suite 100
Raleigh, NC 27615
Telephone:  (919) 524-1147
E-mail:  tclement@thesunrockgroup.com

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by digital signature, under seal, on the respective dates below, and this Agreement shall be effective upon the date of the City's signature.

SURETY:

OBLIGEE:

Westfield Insurance Company, an Ohio insurance company

CITY OF RALEIGH
a North Carolina municipal corporation

By:

By:

_____ (SEAL)
Signature

_____
Signature

Daniel D. Pentecost
_____
Name

Michael Moore
_____
Name

Sr. Surety Claims Counsel and as Attorney-in-fact
_____
Title

Assistant City Manager
_____
Title

City Manager Office
_____
Department

December 21, 2023
_____
Date of Signature

December 22, 2023
_____
Date of Signature

COMPLETION CONTRACTOR:

ATTEST:

Carolina Sunrock LLC, a Delaware limited liability company

_____
Signature

_____ (SEAL)
City Clerk (or designee)

John Barrett
_____
Name

Vice President/General Manager – Contracting
_____
Title

This instrument has been pre-audited in the manner required by the Local Government Budget and Fiscal Control Act.

December 21, 2023
_____
Date of Signature

_____
Chief Financial Officer (or designee)

City of Raleigh Contract No. 0000004309

# Exhibit 1

**ITEMIZED PROPOSAL / SCHEDULE OF PRICES**
**ATLANTIC AVENUE IMPROVEMENTS**
**FROM HIGHWOODS BOULEVARD TO NEW HOPE CHURCH ROAD**
Roadway Improvements for .88 miles of Atlantic Avenue; Grading, Drainage, Paving,
Curb & Gutter, Multi-Use Path, Pavement Markings and Signals

| Item No. | Sect No. | Item Description | Unit | Original Quantity | Pay App #12 % Complete | REVISED BID Quantity | Unit Bid Price | Amount Bid |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | **REVISED BID** | |
| colspan | | **MOBILIZATION, CLEARING and EARTHWORK** | | | | | | |
| 1 | NCDOT 800 | Mobilization (Max = 5% of Bid) | LS | 1 | 100.0% | 1.00 | $ 702,423.00 | $ 702,423.00 |
| 2 | | Project Management Communications | YR | 2 | 50.0% | 2.00 | $ 2,161.00 | $ 4,322.00 |
| 3 | COR 03000 | Clearing and Grubbing | LS | 1 | 93.0% | 1.00 | $ 132,550.00 | $ 132,550.00 |
| 4 | COR 03000 | Supplementary Clearing & Grubbing | AC | 1 | 1.1% | 1.00 | $ 22,500.00 | $ 22,500.00 |
| 5 | COR 04000 | Unclassified Excavation | LS | 1 | 83.9% | 1.00 | $ 1,785,000.00 | $ 1,785,000.00 |
| 6 | COR 04000 | Borrow Excavation | CY | 4800 | 0.0% | 4800.00 | $ 55.00 | $ 264,000.00 |
| 7 | COR 04000 | Undercut Excavation | CY | 2570 | 2.0% | 2518.60 | $ 47.00 | $ 118,374.20 |
| 8 | NCDOT 815 | Subdrain Excavation | CY | 336 | 0.0% | 336.00 | $ 9.10 | $ 3,057.60 |
| 9 | COR 04000 | Fine Grading (21,070 SY) | LS | 21070 | 14.6% | 1.00 | $ 346,050.00 | $ 346,050.00 |
| 10 | COR 04000 | Drainage Ditch Excavation | CY | 156 | 100.0% | 1.00 | $ 45.00 | $ 45.00 |
| colspan | | **GEOTEXTILE FABRIC and STORM DRAINAGE** | | | | | | |
| 11 | COR 05000 | Geotextile for Soil Stabilization | SY | 8697 | 0.0% | 8697.00 | $ 2.40 | $ 20,872.80 |
| 12 | COR 05000 | Geotextile for Subsurface Drains | SY | 1000 | 51.8% | 482.00 | $ 8.30 | $ 4,000.60 |
| 13 | COR 06000 | 24" C.S. Pipe Culvert, .064" Thick | LF | 18 | 0.0% | 18.00 | $ 138.00 | $ 2,484.00 |
| 14 | COR 06000 | 15" R.C. Class V Pipe | LF | 40 | 22.6% | 40.00 | $ 139.00 | $ 5,560.00 |
| 15 | COR 06000 | 24" R.C. Class V Pipe | LF | 612 | 8.3% | 612.00 | $ 274.00 | $ 167,688.00 |
| 16 | COR 06000 | 15" R.C. Class III Pipe | LF | 5776 | 18.3% | 5776.00 | $ 125.00 | $ 722,000.00 |
| 17 | COR 06000 | 18" R.C. Class III Pipe | LF | 408 | 24.4% | 408.00 | $ 134.00 | $ 54,672.00 |
| 18 | COR 06000 | 24" R.C. Class III Pipe | LF | 552 | 0.0% | 552.00 | $ 242.00 | $ 133,584.00 |
| 19 | COR 06000 | 30" R.C. Class III Pipe | LF | 72 | 9.5% | 72.00 | $ 562.00 | $ 40,464.00 |
| 20 | COR 06000 | 42" R.C. Class III Pipe | LF | 336 | 44.4% | 200.00 | $ 660.00 | $ 132,000.00 |
| 21 | COR 06000 | 48" R.C. Class III Pipe | LF | 144 | 2.4% | 144.00 | $ 715.00 | $ 102,960.00 |
| 22 | COR 06000 | Pipe Removal | LF | 983 | 5.7% | 983.00 | $ 70.00 | $ 68,810.00 |
| 23 | COR 06000 | Endwalls | CY | 5.2 | 10.0% | 4.70 | $ 3,960.00 | $ 18,612.00 |
| 24 | COR 06000 | Temporary Steel Plate Covers for Masonry Drainage Structures (Contingency) | EA | 10 | 152.1% | 10.00 | $ 1,290.00 | $ 12,900.00 |
| 25 | COR 06000/ COR 19000/PSP | Flowable Fill | CY | 19 | 12.7% | 16.60 | $ 702.00 | $ 11,653.20 |
| 26 | COR 06000/ COR 19000/PSP | Masonry Drainage Structures (up to 5' depth) | EA | 107 | 32.4% | 107.00 | $ 4,745.00 | $ 507,715.00 |
| 27 | COR 06000/ COR 19000/PSP | Masonry Drainage Structure (Extra Depth) | LF | 17.6 | 0.0% | 17.60 | $ 904.00 | $ 15,910.40 |
| 28 | NCDOT 846 | Frame with Two Grates, NCDOT STD 840.24 | EA | 2 | 35.2% | 2.00 | $ 1,415.00 | $ 2,830.00 |
| 29 | NCDOT 846 | Frame with Two Grates, NCDOT STD 840.29 | EA | 3 | 0.0% | 3.00 | $ 1,435.00 | $ 4,305.00 |
| 30 | NCDOT 859 | Convert Structure to JB | EA | 3 | 0.0% | 3.00 | $ 3,975.00 | $ 11,925.00 |
| 31 | NCDOT 815 | 6" Perforated Subdrain Pipe | LF | 1000 | 0.0% | 1000.00 | $ 200.00 | $ 200,000.00 |
| 32 | NCDOT 815 | 6" Outlet Pipe | LF | 12 | 0.0% | 12.00 | $ 200.00 | $ 2,400.00 |
| 33 | NCDOT 815 | Subdrain Pipe Outlet | EA | 2 | 0.0% | 2.00 | $ 2,395.00 | $ 4,790.00 |
| 34 | NCDOT 840 | Frame, Grate, & Hood, 840.03 - Type E | EA | 15 | 39.9% | 15.00 | $ 1,665.00 | $ 24,975.00 |
| 35 | NCDOT 840 | Frame, Grate, & Hood, 840.03 - Type F | EA | 33 | 40.8% | 33.00 | $ 1,665.00 | $ 54,945.00 |
| 36 | NCDOT 840 | Frame, Grate, & Hood, 840.03 - Type G | EA | 45 | 37.2% | 45.00 | $ 1,665.00 | $ 74,925.00 |
| 37 | NCDOT 840 | D.I. Frame and Grates NCDOT STD. 840.16 | EA | 6 | 38.2% | 6.00 | $ 1,935.00 | $ 11,610.00 |
| 38 | NCDOT 840 | M.H. Frame and Cover NCDOT STD. 840.54 | EA | 4 | 0.0% | 4.00 | $ 1,535.00 | $ 6,140.00 |
| 39 | NCDOT 858 | Adjustment of Junction Box | EA | 1 | 0.0% | 1.00 | $ 2,165.00 | $ 2,165.00 |
| colspan | | **CONCRETE and PAVING** | | | | | | |
| 40 | COR 07000 | 8" x 12" Concrete Curb | LF | 520 | 0.0% | 520.00 | $ 65.50 | $ 34,060.00 |
| 41 | COR 07000 | 1'-6" Concrete Curb and Gutter | LF | 3910 | 0.0% | 3910.00 | $ 40.50 | $ 158,355.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 42 | COR 07000 | 2'-6" Concrete Curb and Gutter | LF | 9970 | | 0.0% | 9970.00 | $ | 54.50 | $ | 543,365.00 |
| 43 | COR 07000 | 4" Concrete Sidewalk | SY | 2440 | | 0.0% | 2440.00 | $ | 89.50 | $ | 218,380.00 |
| 44 | COR 07000 | 6" Concrete Sidewalk | SY | 280 | | 0.0% | 280.00 | $ | 101.00 | $ | 28,280.00 |
| 45 | COR 07000 | Concrete Curb Ramps | EA | 44 | | 0.0% | 44.00 | $ | 4,375.00 | $ | 192,500.00 |
| 46 | COR 07000 | Concrete Driveway Apron | SY | 360 | | 0.0% | 360.00 | $ | 135.00 | $ | 48,600.00 |
| 47 | COR 07000 | Concrete Driveways (6") | SY | 450 | | 0.0% | 450.00 | $ | 149.00 | $ | 67,050.00 |
| 48 | COR 07000/ NCDOT 852 | Concrete Transitional Section for Catch Basin | EA | 7 | | 0.0% | 7.00 | $ | 1,400.00 | $ | 9,800.00 |
| 49 | COR 07000/ NCDOT 852 | Concrete Transitional Section for Drop Inlet | EA | 4 | | 0.0% | 4.00 | $ | 2,655.00 | $ | 10,620.00 |
| 50 | COR 07000/ NCDOT 852 | 5" Monolithic Concrete Islands (Keyed In) | SY | 940 | | 0.0% | 940.00 | $ | 97.50 | $ | 91,650.00 |
| 51 | COR 19000/PSP | Wheel Stops | EA | 9 | | 0.0% | 9.00 | $ | 127.00 | $ | 1,143.00 |
| 52 | COR 07000 | 6" Concrete Transit Pad | SY | 160 | | 0.0% | 160.00 | $ | 150.00 | $ | 24,000.00 |
| 53 | COR 08000 | Aggregate Base Course - 6" Thick | SY | 5900 | | 0.0% | 5900.00 | $ | 16.50 | $ | 97,350.00 |
| 54 | COR 08000 | Aggregate Base Course - 8" Thick | SY | 2800 | | 100.0% | 100.00 | $ | 19.50 | $ | 1,950.00 |
| 55 | NCDOT 505 | Class IV Subgrade Stabilization | TON | 4185 | | 0.0% | 4185.00 | $ | 42.50 | $ | 177,862.50 |
| 56 | NCDOT 815 | Subdrain Coarse Aggregate | CY | 168 | | 0.0% | 168.00 | $ | 80.00 | $ | 13,440.00 |
| 57 | NCDOT 607 | Incidental Milling | SY | 1610 | | 0.0% | 1610.00 | $ | 7.50 | $ | 12,075.00 |
| 58 | COR 08000/ NCDOT 607 | 1.5" Milling | SY | 5900 | | 0.0% | 5900.00 | $ | 3.90 | $ | 23,010.00 |
| 59 | COR 08000 | Asphalt Concrete Base Course, Type B25.0C - 4" Thick | SY | 280 | | 0.0% | 280.00 | $ | 45.15 | $ | 12,642.00 |
| 60 | COR 08000 | Asphalt Concrete Base Course, Type B25.0C - 6" Thick | SY | 12670 | | 0.0% | 12670.00 | $ | 37.10 | $ | 470,057.00 |
| 61 | COR 08000 | Asphalt Concrete Intermediate Course, Type I19.0C - 4" Thick | SY | 12670 | | 0.0% | 12670.00 | $ | 18.95 | $ | 240,096.50 |
| 62 | COR 08000 | Asphalt Concrete Surface Course, Type S9.5A - 2" Thick | SY | 5000 | | 0.0% | 5000.00 | $ | 12.70 | $ | 63,500.00 |
| 63 | COR 08000 | Asphalt Concrete Surface Course, Type S9.5B - 1.5" Thick | SY | 3770 | | 0.0% | 3770.00 | $ | 7.40 | $ | 27,898.00 |
| 64 | COR 08000 | Asphalt Concrete Surface Course, Type S9.5B - 3" Thick | SY | 36120 | | 7.8% | 34000.00 | $ | 13.50 | $ | 459,000.00 |
| 65 | COR 08000 | Asphalt Wedging (Variable thickness, all Types) | TON | 4410 | | 0.0% | 4410.00 | $ | 83.00 | $ | 366,030.00 |
| 66 | COR 08000 | Asphalt Binder for Plant Mix | TON | 1055 | | 3.9% | 1055.00 | $ | 450.00 | $ | 474,750.00 |
| 67 | COR 08000 | Proof Rolling | HR | 20 | | 5.0% | 19.00 | $ | 255.00 | $ | 4,845.00 |
| 68 | COR 08000 | Removal of Existing Asphalt Pavement | SY | 11540 | | 0.0% | 11540.00 | $ | 23.00 | $ | 265,420.00 |
| | | **PUBLIC UTILITIES (ADJUSTMENTS and WATER DISTRIBUTION SYSTEM)** | | | | | | | | |
| 69 | COR 12000 | 8 inch DIP Sanitary Sewer Gravity Pipe Replacement | LF | 776 | | 24.1% | 588.98 | $ | 528.00 | $ | 310,981.44 |
| 70 | COR 12000 | 4' Dia. Precast Concrete Manhole | EA | 4 | | 99.2% | 4.00 | $ | 9,500.00 | $ | 38,000.00 |
| 71 | COR 12000 | 5' Dia. Precast Concrete Manhole | EA | 1 | | 22.7% | 1.00 | $ | 11,500.00 | $ | 11,500.00 |
| 72 | COR 08000 | Adjustment of Manhole | EA | 16 | | 0.0% | 16.00 | $ | 2,200.00 | $ | 35,200.00 |
| 73 | COR 11000 | 6 inch DIP Water Line | LF | 974 | | 43.0% | 600.00 | $ | 357.15 | $ | 214,290.00 |
| 74 | COR 11000 | 8 inch DIP Water Line | LF | 25 | | 72.0% | 10.00 | $ | 1,600.00 | $ | 16,000.00 |
| 75 | COR 11000 | 10 inch DIP Water Line | LF | 46 | | 100.0% | 1.00 | $ | 29,440.00 | $ | 29,440.00 |
| 76 | COR 11000 | 12 inch DIP Water Line | LF | 40 | | 38.9% | 30.00 | $ | 853.35 | $ | 25,600.50 |
| 77 | COR 11000 | 6" Valve | EA | 5 | | 101.7% | 1.00 | $ | 32,500.00 | $ | 32,500.00 |
| 78 | COR 11000 | 8"x6" Cut-in Tee | EA | 2 | | 120.0% | 1.00 | $ | 8,000.00 | $ | 8,000.00 |
| 79 | COR 11000 | Pipe Fittings | LBS | 950 | | 16.7% | 950.00 | $ | 25.00 | $ | 23,750.00 |
| 80 | COR 11000 | Adjustment Water Valve Boxes | EA | 37 | | 0.0% | 37.00 | $ | 750.00 | $ | 27,750.00 |
| 81 | COR 11000 | Fire Hydrant Assembly | EA | 6 | | 41.9% | 4.00 | $ | 24,000.00 | $ | 96,000.00 |
| 82 | COR 11000 | Blow Off Assembly | EA | 1 | | 30.3% | 1.00 | $ | 7,400.00 | $ | 7,400.00 |
| 83 | COR 11000 | Relocate 5/8" Water Meter | EA | 8 | | 54.1% | 8.00 | $ | 3,200.00 | $ | 25,600.00 |
| 84 | COR 11000 | Relocate 3/4" Water Meter | EA | 2 | | 27.2% | 2.00 | $ | 3,200.00 | $ | 6,400.00 |
| 85 | COR 11000 | Relocate 1" Water Meter | EA | 1 | | 138.1% | 1.00 | $ | 3,900.00 | $ | 3,900.00 |
| 86 | COR 11000 | Relocate 2" Water Meter | EA | 9 | | 52.3% | 9.00 | $ | 8,600.00 | $ | 77,400.00 |
| 87 | COR 11000 | Relocate Fire Hydrant | EA | 14 | | 124.6% | 7.00 | $ | 17,000.00 | $ | 119,000.00 |
| 88 | COR 19000/PSP | Concrete Cradle | EA | 1 | | 100.0% | 1.00 | $ | 2,500.00 | $ | 2,500.00 |
| 89 | COR 19000/PSP | Electrical Conduit for Street Lighting (2") | LF | 1602 | | 0.0% | 1602.00 | $ | 22.00 | $ | 35,244.00 |
| 90 | COR 11000 | 5/8" Water Service Connection | EA | 2 | | 50.0% | 1.00 | $ | 4,000.00 | $ | 4,000.00 |

| No. | Code | Description | Unit | Qty | % | Rev Qty | Unit Price | Total |
|---|---|---|---|---|---|---|---|---|
| 91 | COR 11000 | 3/4" Water Service Connection | EA | 2 | 0.0% | 2.00 | $ 2,000.00 | $ 4,000.00 |
| 92 | COR 11000 | 1" Water Service Connection | EA | 31 | 50.3% | 16.00 | $ 4,262.50 | $ 68,200.00 |
| 93 | COR 11000 | 2" Water Service Connection | EA | 7 | 48.4% | 4.00 | $ 6,125.00 | $ 24,500.00 |
| 94 | COR 11000 | 30" x 6" Tapping Sleeve and Valve Assembly | EA | 2 | 0.0% | 2.00 | $ 90,000.00 | $ 180,000.00 |
| 95 | COR 11000 | 12" x 6" Tapping Sleeve and Valve Assembly | EA | 6 | 15.7% | 5.00 | $ 14,400.00 | $ 72,000.00 |
| 96 | COR 11000 | 6" x 6" Tapping Sleeve and Valve Assembly | EA | 1 | 14.1% | 1.00 | $ 7,800.00 | $ 7,800.00 |
| 97 | COR 11000 | Relocate Backflow Prevention Assembly | EA | 1 | 18.1% | 1.00 | $ 7,100.00 | $ 7,100.00 |
| 98 | COR 11000 | Relocated Air Release Valve | EA | 2 | 78.1% | 2.00 | $ 11,000.00 | $ 22,000.00 |
| 99 | COR 11000 | Abandon Waterline | LF | 808 | 0.0% | 808.00 | $ 19.00 | $ 15,352.00 |
| 100 | COR 11000 | Waterline Vertical Adjustment | EA | 3 | 92.2% | 1.00 | $ 46,500.00 | $ 46,500.00 |
| | | **CONSTRUCTION TRAFFIC CONTROL, PAVEMENT MARKINGS, and RAISED PAVEMENT MARKERS** | | | | | | |
| 101 | COR 14000 | Stationary Work Zone Signs | SF | 250 | 117.6% | 250.00 | $ 7.90 | $ 1,975.00 |
| 102 | COR 14000 | Portable Work Zone Signs | SF | 110 | 189.1% | 110.00 | $ 13.00 | $ 1,430.00 |
| 103 | COR 14000/ NCDOT 1089 | Barricade Mounted Work Zone Signs | SF | 30 | 0.0% | 30.00 | $ 15.50 | $ 465.00 |
| 104 | COR 14000 | Flashing Arrow Board | EA | 2 | 50.0% | 2.00 | $ 3,180.00 | $ 6,360.00 |
| 105 | COR 14000 | Portable Changeable Message Sign | EA | 3 | 100.0% | 3.00 | $ 16,000.00 | $ 48,000.00 |
| 106 | COR 14000 | Drums | EA | 180 | 0.0% | 180.00 | $ 66.50 | $ 11,970.00 |
| 107 | COR 14000 | Barricades (Type III) | LF | 20 | 0.0% | 20.00 | $ 35.50 | $ 710.00 |
| 108 | COR 14000 | Truck Mounted Attenuator | EA | 2 | 0.0% | 2.00 | $ 19,780.00 | $ 39,560.00 |
| 109 | COR 14000 | Portable Concrete Barrier | LF | 1910 | 96.1% | 1910.00 | $ 42.15 | $ 80,506.50 |
| 110 | COR 14000 | Reset Portable Concrete Barrier | LF | 610 | 0.0% | 610.00 | $ 12.30 | $ 7,503.00 |
| 111 | COR/ 14000 NCDOT 1160 | Temporary Crash Cushion | EA | 4 | 100.0% | 4.00 | $ 11,250.00 | $ 45,000.00 |
| 112 | COR/ 14000 NCDOT 1160 | Reset Temporary Crash Cushion | EA | 1 | 0.0% | 1.00 | $ 2,950.00 | $ 2,950.00 |
| 113 | COR 14000/ NCDOT 1180 | Skinny Drums | EA | 50 | 300.0% | 50.00 | $ 52.00 | $ 2,600.00 |
| 114 | COR 14000/ NCDOT 1190 | Law Enforcement | HR | 24 | 0.0% | 24.00 | $ 100.00 | $ 2,400.00 |
| 115 | COR 14000 | Flagger (Hour) | HR | 960 | 3.3% | 930.00 | $ 49.00 | $ 45,570.00 |
| 116 | COR 15000 | Temporary Raised Pavement Markers | EA | 185 | 11.9% | 163.00 | $ 11.35 | $ 1,850.05 |
| 117 | COR 15000 | Paint (4") | LF | 47250 | 4.2% | 45266.00 | $ 0.60 | $ 27,159.60 |
| 118 | COR 15000 | Paint (24") | LF | 150 | 0.0% | 150.00 | $ 3.50 | $ 525.00 |
| 119 | COR 15000 | Paint Marking Symbols | EA | 104 | 0.0% | 104.00 | $ 55.00 | $ 5,720.00 |
| 120 | COR 15000 | Removal of Pavement Markings (4") | LF | 5200 | 1.2% | 5138.00 | $ 1.00 | $ 5,138.00 |
| 121 | COR 15000 | Permanent Raised Pavement Markers | EA | 140 | 0.0% | 140.00 | $ 10.00 | $ 1,400.00 |
| 122 | COR 15000 | 4" Thermoplastic Pavement Marking Lines | LF | 14550 | 0.0% | 14550.00 | $ 1.25 | $ 18,187.50 |
| 123 | COR 15000 | 8" Thermoplastic Pavement Marking Lines | LF | 3000 | 0.0% | 3000.00 | $ 3.75 | $ 11,250.00 |
| 124 | COR 15000 | 24" Thermoplastic Pavement Marking Lines | LF | 300 | 0.0% | 300.00 | $ 12.25 | $ 3,675.00 |
| 125 | COR 15000 | Thermoplastic Pavement Marking Symbols | EA | 36 | 0.0% | 36.00 | $ 277.00 | $ 9,972.00 |
| | | **SEDIMENTATION AND EROSION CONTROL, TEMPORARY AND PERMANENT GRASSES** | | | | | | |
| 126 | COR 16000 | Rip Rap, Class B | TON | 16 | 0.0% | 16.00 | $ 100.00 | $ 1,600.00 |
| 127 | COR 16000 | Rip Rap, Class I | TON | 5 | 0.0% | 5.00 | $ 100.00 | $ 500.00 |
| 128 | COR 16000, COR 19000/PSP | Temporary Silt Fence | LS | 2800 | 120.6% | 1.00 | $ 7,560.00 | $ 7,560.00 |
| 129 | COR 16000, COR 19000/PSP | Temporary Silt / Tree Protection Fence | LS | 2575 | 168.2% | 1.00 | $ 7,596.25 | $ 7,596.25 |
| 130 | COR 16000, COR 19000/PSP | Tree Protection Fence | LS | 4050 | 90.5% | 1.00 | $ 10,530.00 | $ 10,530.00 |
| 131 | COR 16000, COR 19000/PSP | Rock Pipe Inlet Protection | EA | 2 | 50.0% | 1.00 | $ 1,760.00 | $ 1,760.00 |
| 132 | COR 16000, COR 19000/PSP | Inlet Protection | EA | 165 | 0.0% | 165.00 | $ 329.00 | $ 54,285.00 |
| 133 | COR 16000, COR 19000/PSP | Wattles | EA | 15 | 40.0% | 9.00 | $ 158.00 | $ 1,422.00 |
| 134 | COR 16000, COR 19000/PSP | Check Dams | EA | 15 | 60.0% | 6.00 | $ 352.00 | $ 2,112.00 |
| 135 | COR 16000, COR 19000/PSP | Silt Fence Outlets | EA | 25 | 8.0% | 23.00 | $ 279.00 | $ 6,417.00 |
| 136 | COR 16000 | Silt Excavation | CY | 410 | 0.0% | 410.00 | $ 31.50 | $ 12,915.00 |
| 137 | COR 16000 | Straw Matting (Matting for Erosion Control) | SY | 7540 | 19.7% | 6055.00 | $ 2.50 | $ 15,137.50 |
| 138 | COR 17000 | Permanent Non-Lawn Seeding and Mulching | AC | 7.5 | 0.0% | 7.50 | $ 2,250.00 | $ 16,875.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 139 | COR 17000 | Temporary Seeding and Mulching | AC | 7.5 | 16.7% | 6.25 | $ | 1,850.00 | $ | 11,562.50 |
| 140 | COR 17000 | Mowing | AC | 4 | 0.0% | 4.00 | $ | 175.00 | $ | 700.00 |
| 141 | COR 17000 | Specialized Hand Mowing | HR | 10 | 0.0% | 10.00 | $ | 95.00 | $ | 950.00 |
| **PROJECT SPECIAL PROVISIONS - ROADWAY, PERMANENT SIGNAGE, UTILITIES (PUBLIC AND PRIVATE), and RETAINING WALL** | | | | | | | | | | |
| 142 | COR 19000/PSP | Incidental Stone Base (Contingency) | TON | 1000 | 0.0% | 100.00 | $ | 67.90 | $ | 6,790.00 |
| 143 | COR 19000/PSP | Steel Beam Guardrail | LF | 350 | 0.0% | 350.00 | $ | 32.50 | $ | 11,375.00 |
| 144 | COR 19000/PSP | Additional Guardrail Posts | EA | 5 | 0.0% | 5.00 | $ | 70.00 | $ | 350.00 |
| 145 | COR 19000/PSP | Guardrail End Units, CAT-1 | EA | 2 | 0.0% | 2.00 | $ | 1,450.00 | $ | 2,900.00 |
| 146 | COR 19000/PSP | Contractor Furnished, Type "D" Sign | SF | 10 | 0.0% | 10.00 | $ | 20.00 | $ | 200.00 |
| 147 | COR 19000/PSP | Contractor Furnished, Type "E" Sign | SF | 270 | 0.0% | 270.00 | $ | 19.75 | $ | 5,332.50 |
| 148 | COR 19000/PSP | Supports, 3 LB. Steel U-Channel | LF | 900 | 0.0% | 900.00 | $ | 6.10 | $ | 5,490.00 |
| 149 | COR 19000/PSP | Sign Erection, Type "D" | EA | 2 | 0.0% | 2.00 | $ | 275.00 | $ | 550.00 |
| 150 | COR 19000/PSP | Sign Erection, Type "E" | EA | 52 | 0.0% | 52.00 | $ | 225.00 | $ | 11,700.00 |
| 151 | COR 19000/PSP | Disposal of Sign System, U-Channel | EA | 50 | 0.0% | 50.00 | $ | 5.00 | $ | 250.00 |
| 152 | COR 19000/PSP | Handrail | LF | 791 | 0.0% | 791.00 | $ | 190.00 | $ | 150,290.00 |
| 153 | COR 19000/PSP | Hinged Bollard | EA | 18 | 0.0% | 18.00 | $ | 295.00 | $ | 5,310.00 |
| 154 | COR 19000/PSP | Modular Block Retaining Wall (110' L x 3.5' H) | SF | 385 | 0.0% | 385.00 | $ | 76.00 | $ | 29,260.00 |
| 155 | COR 19000/PSP | Soldier Pile Retaining Wall (348' L x 5' H) | SF | 1740 | 0.0% | 1740.00 | $ | 299.98 | $ | 521,965.20 |
| 156 | COR 19000/PSP | Soldier Pile Retaining Wall (335' L x 8.5' H) | SF | 2847.5 | 0.0% | 2847.50 | $ | 299.93 | $ | 854,050.68 |
| 157 | COR 19000/PSP | Modular Block Retaining Wall (19'L x 2' H) | SF | 38 | 0.0% | 38.00 | $ | 331.77 | $ | 12,607.26 |
| **PROJECT SPECIAL PROVISIONS - TRAFFIC SIGNALS** | | | | | | | | | | |
| 158 | COR 20000/PSP | Pedestrian Signal Head (12", 1 Section) | EA | 8 | 0.0% | 8.00 | $ | 895.00 | $ | 7,160.00 |
| 159 | COR 20000/PSP | Pedestrian Signal Head (16", 1 Section with Countdown) | EA | 12 | 60.7% | 12.00 | $ | 895.00 | $ | 10,740.00 |
| 160 | COR 20000/PSP | Signal Cable | LF | 7550 | 13.5% | 6531.00 | $ | 3.00 | $ | 19,593.00 |
| 161 | COR 20000/PSP | Vehicle Signal Head (12", 3 Section) | EA | 29 | 0.0% | 29.00 | $ | 875.00 | $ | 25,375.00 |
| 162 | COR 20000/PSP | Vehicle Signal Head (12", 4 Section) | EA | 5 | 42.9% | 3.00 | $ | 1,110.00 | $ | 3,330.00 |
| 163 | COR 20000/PSP | Vehicle Signal Head (12", 5 Section) | EA | 3 | 47.2% | 2.00 | $ | 1,430.00 | $ | 2,860.00 |
| 164 | COR 20000/PSP | Messenger Cable (1/4") | LF | 110 | 0.0% | 110.00 | $ | 3.50 | $ | 385.00 |
| 165 | COR 20000/PSP | Messenger Cable (3/8") | LF | 1180 | 0.0% | 1180.00 | $ | 3.50 | $ | 4,130.00 |
| 166 | COR 20000/PSP | Tracer Wire | LF | 1710 | 0.0% | 1710.00 | $ | 1.25 | $ | 2,137.50 |
| 167 | COR 20000/PSP | Unpaved Trenching (1,2") | LF | 1230 | 0.0% | 1230.00 | $ | 12.00 | $ | 14,760.00 |
| 168 | COR 20000/PSP | Unpaved Trenching (2,2") | LF | 2210 | 0.0% | 2210.00 | $ | 16.00 | $ | 35,360.00 |
| 169 | COR 20000/PSP | Unpaved Trenching (3,2") | LF | 60 | 0.0% | 60.00 | $ | 20.00 | $ | 1,200.00 |
| 170 | COR 20000/PSP | Directional Drill (2,2") | LF | 430 | 0.0% | 430.00 | $ | 31.25 | $ | 13,437.50 |
| 171 | COR 20000/PSP | Junction Box (Standard Size) | EA | 16 | 45.8% | 9.00 | $ | 550.00 | $ | 4,950.00 |
| 172 | COR 20000/PSP | Junction Box (Over-sized, Heavy Duty) | EA | 14 | 68.9% | 6.00 | $ | 895.00 | $ | 5,370.00 |
| 173 | COR 20000/PSP | Wood Pole | EA | 5 | 31.5% | 4.00 | $ | 1,500.00 | $ | 6,000.00 |
| 174 | COR 20000/PSP | Guy Assembly | EA | 20 | 0.0% | 20.00 | $ | 750.00 | $ | 15,000.00 |
| 175 | COR 20000/PSP | 1/2" Riser with Weatherhead | EA | 4 | 0.0% | 4.00 | $ | 550.00 | $ | 2,200.00 |
| 176 | COR 20000/PSP | 1" Riser with Weatherhead | EA | 2 | 0.0% | 2.00 | $ | 600.00 | $ | 1,200.00 |
| 177 | COR 20000/PSP | 2" Riser with Weatherhead | EA | 10 | 0.0% | 10.00 | $ | 700.00 | $ | 7,000.00 |
| 178 | COR 20000/PSP | 2" Riser with Heat Shrink Tubing | EA | 1 | 0.0% | 1.00 | $ | 845.00 | $ | 845.00 |
| 179 | COR 20000/PSP | Inductive Loop Sawcut | LF | 3120 | 0.0% | 3120.00 | $ | 7.00 | $ | 21,840.00 |
| 180 | COR 20000/PSP | Lead-In Cable | LF | 10620 | 21.6% | 8327.00 | $ | 2.00 | $ | 16,654.00 |
| 181 | COR 20000/PSP | Communications Cable (12 Fiber) | LF | 1940 | 0.0% | 1940.00 | $ | 3.75 | $ | 7,275.00 |
| 182 | COR 20000/PSP | Splice Enclosure | EA | 2 | 0.0% | 2.00 | $ | 2,000.00 | $ | 4,000.00 |
| 183 | COR 20000/PSP | Interconnect Center | EA | 2 | 0.0% | 2.00 | $ | 2,000.00 | $ | 4,000.00 |
| 184 | COR 20000/PSP | Delineator Marker | EA | 3 | 0.0% | 3.00 | $ | 130.00 | $ | 390.00 |
| 185 | COR 20000/PSP | New Electrical Service | EA | 1 | 0.0% | 1.00 | $ | 2,500.00 | $ | 2,500.00 |
| 186 | COR 20000/PSP | Metal Strain Signal Pole | EA | 2 | 0.0% | 2.00 | $ | 14,250.00 | $ | 28,500.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 187 | COR 20000/PSP | Soil Test | EA | 2 | 100.0% | 1.00 | $ | 450.00 | $ | 450.00 |
| 188 | COR 20000/PSP | Drilled Pier Foundation | CY | 16 | 0.0% | 16.00 | $ | 1,600.00 | $ | 25,600.00 |
| 189 | COR 20000/PSP | Sign for Signals | EA | 5 | 0.0% | 5.00 | $ | 355.00 | $ | 1,775.00 |
| 190 | COR 20000/PSP | Type I Post with Foundation | EA | 5 | 40.4% | 3.00 | $ | 1,925.00 | $ | 5,775.00 |
| 191 | COR 20000/PSP | Type II Pedestal with Foundation | EA | 6 | 43.4% | 4.00 | $ | 3,250.00 | $ | 13,000.00 |
| 192 | COR 20000/PSP | Relocate Existing Sign | EA | 11 | 0.0% | 11.00 | $ | 175.00 | $ | 1,925.00 |
| 193 | COR 20000/PSP | Signal Cabinet Foundation | EA | 3 | 12.0% | 3.00 | $ | 1,200.00 | $ | 3,600.00 |
| 194 | COR 20000/PSP | Controllers with Cabinet (Type 2070E, Base Mounted) | EA | 3 | 29.6% | 3.00 | $ | 20,795.00 | $ | 62,385.00 |
| 195 | COR 20000/PSP | Detector Card (Type 170) | EA | 23 | 65.9% | 23.00 | $ | 250.00 | $ | 5,750.00 |
| 196 | COR 20000/PSP | Cabinet Base Extender | EA | 2 | 36.8% | 2.00 | $ | 550.00 | $ | 1,100.00 |
| 197 | COR 20000/PSP | Traffic Signal Removal (Overhead Flasher at Ingram Drive) | LS | 1 | 0.0% | 1.00 | $ | 2,500.00 | $ | 2,500.00 |
| 198 | COR 20000/PSP | 2018ECL Conflict Monitor | EA | 1 | 0.0% | 1.00 | $ | 1,630.00 | $ | 1,630.00 |
| 199 | COR 20000/PSP | Auxiliary File | EA | 1 | 0.0% | 1.00 | $ | 1,510.00 | $ | 1,510.00 |
| 200 | COR 20000/PSP | Ethernet Edge Switch | EA | 2 | 0.0% | 2.00 | $ | 2,500.00 | $ | 5,000.00 |
| 201 | COR 20000/PSP | Junction Box Marker | EA | 7 | 0.0% | 7.00 | $ | 75.00 | $ | 525.00 |
| 202 | COR 20000/PSP | Back Pull Fiber Optic Cable | LF | 150 | 0.0% | 150.00 | $ | 6.00 | $ | 900.00 |
| 203 | COR 20000/PSP | 6-Fiber Pre-terminated Fiber-optic Drop Cable Assembly | LF | 385 | 0.0% | 385.00 | $ | 5.25 | $ | 2,021.25 |
| | **PROJECT SPECIAL PROVISIONS - BIORETENTION SCMS** | | | | | | | | | |
| 204 | COR 21000/PSP | Bioretention Soil Media | CY | 35 | 0.0% | 35.00 | $ | 84.00 | $ | 2,940.00 |
| 205 | COR 21000/PSP | Drainage Stone (#57 Stone) | TN | 20 | 0.0% | 20.00 | $ | 112.50 | $ | 2,250.00 |
| 206 | COR 21000/PSP | Concrete Sand (ASTM C-33) | TN | 4 | 0.0% | 4.00 | $ | 114.00 | $ | 456.00 |
| 207 | COR 21000/PSP | Choking Stone (#8 Stone) | TN | 4 | 0.0% | 4.00 | $ | 114.00 | $ | 456.00 |
| 208 | COR 21000/PSP | River Rock | TON | 1 | 0.0% | 1.00 | $ | 1,570.00 | $ | 1,570.00 |
| 209 | COR 21000/PSP | Geotextile for Bioretention Energy Dissipators | SY | 26 | 0.0% | 26.00 | $ | 75.00 | $ | 1,950.00 |
| 210 | COR 21000/PSP | HDPE Impermeable Liner | SY | 90 | 192.6% | 10.00 | $ | 1,323.00 | $ | 13,230.00 |
| 211 | COR 21000/PSP | 6" PVC Underdrain | LF | 60 | 15.9% | 50.00 | $ | 75.00 | $ | 3,750.00 |
| 212 | COR 21000/PSP | Underdrain Clean-Outs | EA | 2 | 49.0% | 1.00 | $ | 1,064.00 | $ | 1,064.00 |
| 213 | COR 21000/PSP | Concrete L-Wall Curb | LF | 75 | 0.0% | 75.00 | $ | 260.00 | $ | 19,500.00 |
| 214 | COR 21000/PSP | Concrete Divider and End Wall | LF | 30 | 0.0% | 30.00 | $ | 260.00 | $ | 7,800.00 |
| 215 | COR 21000/PSP | Concrete Curb Extender | LF | 50 | 0.0% | 50.00 | $ | 48.00 | $ | 2,400.00 |
| 216 | COR 16000 | Riprap, Class A | TN | 6 | 659.8% | 1.00 | $ | 500.00 | $ | 500.00 |
| 217 | COR 21000/PSP | Grass Sod | SY | 40 | 0.0% | 40.00 | $ | 19.50 | $ | 780.00 |
| 218 | COR 21000/PSP | Water | Kgal | 2 | 0.0% | 2.00 | $ | 347.00 | $ | 694.00 |
| | **PROJECT SPECIAL PROVISIONS - LANDSCAPING** | | | | | | | | | |
| 219 | COR 22000/PSP | Cercis canadensis (Red Bud) 1.5" cal. | EA | 7 | 0.0% | 7.00 | $ | 547.00 | $ | 3,829.00 |
| 220 | COR 22000/PSP | Halesia tetraptera (Silverbell) 1.5" cal. | EA | 10 | 0.0% | 10.00 | $ | 541.00 | $ | 5,410.00 |
| 221 | COR 22000/PSP | Juniperus viginiana (Eastern Red Cedar) 1.5" cal. | EA | 4 | 0.0% | 4.00 | $ | 561.00 | $ | 2,244.00 |
| 222 | COR 22000/PSP | Lagerstroemia india (Crape Myrtle) 1.5" cal. | EA | 34 | 0.0% | 34.00 | $ | 532.00 | $ | 18,088.00 |
| 223 | COR 22000/PSP | Nyssa Sylvatica (Black Gum) 1.5" cal. | EA | 19 | 0.0% | 19.00 | $ | 535.00 | $ | 10,165.00 |
| 224 | COR 22000/PSP | Ulmus Americana (American Elm) 1.5" cal. | EA | 7 | 0.0% | 7.00 | $ | 547.00 | $ | 3,829.00 |
| 225 | COR 22000/PSP | Viburnum obovatum (Mrs. Schiller's Delight) 1 gal. | EA | 62 | 0.0% | 62.00 | $ | 28.75 | $ | 1,782.50 |
| 226 | COR 22000/PSP | Iris versicolor (Blue Flag Iris) 3.25" Liner | EA | 215 | 0.0% | 215.00 | $ | 12.50 | $ | 2,687.50 |
| 227 | COR 22000/PSP | Juncus effusus (Soft Rush) 3.25" Liner | EA | 80 | 0.0% | 80.00 | $ | 13.75 | $ | 1,100.00 |
| 228 | COR 22000/PSP | Organic Mulch (Labor Only, material supplied by City) | CY | 31 | 0.0% | 31.00 | $ | 33.00 | $ | 1,023.00 |
| 229 | COR 22000/PSP | Soil Amendments (Organic, Inorganic, Fertilizer) | CY | 31 | 0.0% | 31.00 | $ | 69.00 | $ | 2,139.00 |
| 230 | COR 22000/PSP | 2-Year Warranty & Maintenance Services | LS | 1 | 0.0% | 1.00 | $ | 16,680.00 | $ | 16,680.00 |
| | | | | | | | | | $ | 14,221,029.53 |
| 231 | | Credit for Material Inventory (On-Site & Off-Site) | LS | 1 | 0.0% | 1.00 | $ | (476,250.01) | $ | (476,250.01) |
| | | | **Total Bid Amount** | | | **Total Bid Amount** | | | $ | 13,744,779.52 |

| | | |
|---|---|---|
| **Total Re-Bid:** | $ | 14,221,029.53 |
| **Total Re-Bid + Material Credit:** | $ | 13,744,779.52 |

Stored Material Credit Breakdown

| Bid Item No. | Description | Unit | Contract Quantity | Quantity Stored Materials Paid | Unit Price | Sunrock Credit |
|---|---|---|---|---|---|---|
| 13 | 24" C.S. Pipe Culvert, .064" Thick | LF | 18.00 | 18 | $ 54.40 | $ 979.15 |
| 15 | 24" R.C. Class V Pipe | LF | 612.00 | 64 | $ 39.90 | $ 2,553.60 |
| 16 | 15" R.C. Class III Pipe | LF | 5,776.00 | 1,087 | $ 14.58 | $ 15,851.18 |
| 17 | 18" R.C. Class III Pipe | LF | 408.00 | 616 | $ 19.00 | $ 11,704.00 |
| 18 | 24" R.C. Class III Pipe | LF | 552.00 | 552 | $ 28.50 | $ 15,732.00 |
| 19 | 30" R.C. Class III Pipe | LF | 72.00 | 72 | $ 41.80 | $ 3,009.60 |
| 20 | 42" R.C. Class III Pipe | LF | 336.00 | 176 | $ 80.75 | $ 14,212.00 |
| 21 | 48" R.C. Class III Pipe | LF | 144.00 | 80 | $ 104.50 | $ 8,360.00 |
| 23 | Endwalls | CY | 5.20 | 1 | $ 610.71 | $ 855.00 |
| 26 | Masonry Drainage Structures (up to 5' depth) | EA | 107.00 | 50 | $ 682.10 | $ 34,105.00 |
| 27 | Masonry Drainage Structures (extra depth) | LF | 17.60 | 6 | $ 679.25 | $ 4,075.50 |
| 29 | Frame with Two Grates, NCDOT STD 840.29 | EA | 3.00 | 3 | $ 305.91 | $ 917.73 |
| 34 | Frame , Grate & Hood, 840.03 - Type E | EA | 15.00 | 15 | $ 407.27 | $ 6,108.98 |
| 35 | Frame , Grate & Hood, 840.03 - Type F | EA | 33.00 | 33 | $ 430.78 | $ 14,215.66 |
| 36 | Frame , Grate & Hood, 840.03 - Type G | EA | 45.00 | 41 | $ 430.78 | $ 17,661.88 |
| 37 | D.I. Frame and Grates NCDOT STD 840.16 | EA | 6.00 | 6 | $ 365.84 | $ 2,195.01 |
| 69 | 8 Inch DIP Sanitary Sewer Gravity Pipe Replacement | LF | 776.00 | 815 | $ 22.67 | $ 18,474.69 |
| 70 | 4' Diameter Precast Concrete Manhole | EA | 4.00 | 4 | $ 5,549.41 | $ 22,197.62 |
| 71 | 5' Diameter Precast Concrete Manhole | EA | 1.00 | 1 | $ 2,270.50 | $ 2,270.50 |
| 73 | 6 Inch DIP Water Line | LF | 974.00 | 600 | $ 52.74 | $ 31,644.12 |
| 74 | 8 Inch DIP Water Line | LF | 25.00 | 25 | $ 38.15 | $ 953.80 |
| 76 | 12 Inch DIP Water Line | LF | 40.00 | 40 | $ 36.55 | $ 1,461.86 |
| 77 | 6" Valve | EA | 5.00 | 2 | $ 5,615.06 | $ 11,230.11 |
| 78 | 8" x 6" Cut-in Tee | EA | 2.00 | 2 | $ 858.10 | $ 1,716.19 |
| 79 | PIPE FITTINGS FROM OUR PROPOSAL | | | | | $ 953.80 |
| 81 | Fire Hydrant Assembly | EA | 6.00 | 6 | $ 3,818.80 | $ 22,912.80 |
| 82 | Blow Off Assembly | EA | 1.00 | 1 | $ 1,784.00 | $ 1,784.00 |
| 83 | Relocate 5/8" Water Meter | EA | 8.00 | 8 | $ 307.72 | $ 2,461.75 |
| 84 | Relocate 3/4" Water Meter | EA | 2.00 | 2 | $ 255.21 | $ 510.42 |
| 85 | Relocate 1" Water Meter | EA | 1.00 | 1 | $ 557.46 | $ 557.46 |
| 86 | Relocate 2" Water Meter | EA | 9.00 | 9 | $ 1,434.50 | $ 12,910.52 |
| 87 | Relocate Fire Hydrant | EA | 14.00 | 15 | $ 2,492.67 | $ 37,390.08 |
| 92 | 1" Water Service Connection | EA | 31.00 | 31 | $ 880.51 | $ 27,295.87 |
| 93 | 2" Water Service Connection | EA | 7.00 | 7 | $ 1,832.93 | $ 12,830.53 |
| 95 | 12" x 6" Tapping Sleeve and Valve Assembly | EA | 6.00 | 6 | $ 921.68 | $ 5,530.08 |
| 96 | 6" x 6" Tapping Sleeve and Valve Assembly | EA | 1.00 | 1 | $ 637.38 | $ 637.38 |
| 97 | Relocate Backflow Prevention Assembly | EA | 1.00 | 1 | $ 2,172.67 | $ 2,172.67 |
| 98 | Relocate Air Release Valve | EA | 2.00 | 2 | $ 2,687.27 | $ 5,374.53 |
| 100 | Waterline Vertical Adjustment | EA | 3.00 | 3 | $ 3,058.94 | $ 9,176.83 |
| 159 | Pedestrian Signal Head (16", 1 Section with Countdown) | EA | 12.00 | 16 | $ 470.21 | $ 7,523.35 |
| 160 | Signal Cable | LF | 7,550.00 | 5,000 | $ 0.61 | $ 3,046.43 |
| 162 | Vehicle Signal Head (12", 4 Section) | EA | 5.00 | 5 | $ 579.81 | $ 2,899.03 |
| 163 | Vehicle Signal Head (12", 5 Section) | EA | 3.00 | 3 | $ 834.10 | $ 2,502.29 |
| 171 | Junction Box (Standard Size) | EA | 16.00 | 16 | $ 218.20 | $ 3,491.19 |
| 172 | Junction Box (Over-sized, Heavy Duty) | EA | 14.00 | 14 | $ 514.37 | $ 7,201.24 |
| 173 | Wood Pole | EA | 5.00 | 5 | $ 513.15 | $ 2,565.74 |
| 180 | Lead-In Cable | LF | 10,620.00 | 10,000 | $ 0.46 | $ 4,584.86 |
| 190 | Type I Post with Foundation | EA | 5.00 | 5 | $ 878.41 | $ 4,392.07 |
| 191 | Type II Pedestal with Foundation | EA | 6.00 | 6 | $ 1,297.79 | $ 7,786.72 |
| 193 | Signal Cabinet Foundation | EA | 3.00 | 2 | $ 439.45 | $ 878.90 |
| 194 | Controllers with Cabinet (Type 2070E, Base Mounted) | EA | 3.00 | 2 | $ 9,523.31 | $ 19,046.61 |
| 195 | Detector Card (Type 170) | EA | 23.00 | 23 | $ 156.75 | $ 3,605.33 |
| 196 | Cabinet Base Extender | EA | 2.00 | 2 | $ 249.63 | $ 499.25 |
| 211 | 6" PVC Underdrain | LF | 60.00 | 60 | $ 8.45 | $ 506.73 |
| 212 | Underdrain Clean-Outs | EA | 2.00 | 2 | $ 283.91 | $ 567.82 |
| 160* | Signal Cables (Pre-Payment #2) | LF | N/A | 2,464 | $ 0.61 | $ 1,506.28 |
| 186* | Metal Strain Poles (Pre-Payment #2) | EA | 2.00 | 2 | $ 9,331.14 | $ 18,662.27 |

Total Credit $ 476,250.01

*Black - Straightforward, Blue - Subcomponents and/or further explaination in additional tabs , Red - Extended price from a noted invoice total during Pay App 1. No record of actual per unit cost .

| A Bid Tab Line Item | B Stored Material Credit Extended | C Quantity of Paid Material Stored | D Price Per Material Unit | E Extended Price | F 95% of Extended Price | G Difference Between Column F and B |
|---|---|---|---|---|---|---|
| 13 | $ 979.15 | 18 | $ 57.26 | $ 1,030.68 | $ 979.15 | $ - |
| 15 | $ 2,553.60 | 64 | $ 42.00 | $ 2,688.00 | $ 2,553.60 | $ - |
| 16 | $ 15,851.18 | 1087 | $ 15.35 | $ 16,685.45 | $ 15,851.18 | $ - |
| 17 | $ 11,704.00 | 616 | $ 20.00 | $ 12,320.00 | $ 11,704.00 | $ - |
| 18 | $ 15,732.00 | 552 | $ 30.00 | $ 16,560.00 | $ 15,732.00 | $ - |
| 19 | $ 3,009.60 | 72 | $ 44.00 | $ 3,168.00 | $ 3,009.60 | $ - |
| 20 | $ 14,212.00 | 176 | $ 85.00 | $ 14,960.00 | $ 14,212.00 | $ - |
| 21 | $ 8,360.00 | 80 | $ 110.00 | $ 8,800.00 | $ 8,360.00 | $ - |
| 23 | $ 855.00 | 1.4 | $ 642.86 | $ 900.00 | $ 855.00 | $ - |
| 26 | $ 34,105.00 | 50 | | $ 35,900.00 | $ 34,105.00 | $ - |
| 26 | | 33 | $ 515.00 | $ 17,510.00 | $ 16,634.50 | 16,634.50 |
| 26 | | 1 | $ 725.00 | $ 725.00 | $ 688.75 | 688.75 |
| 26 | | 4 | $ 750.00 | $ 3,000.00 | $ 2,850.00 | 2,850.00 |
| 26 | | 3 | $ 865.00 | $ 2,595.00 | $ 2,465.25 | 2,465.25 |
| 26 | | 2 | $ 2,775.00 | $ 5,325.00 | $ 5,058.75 | 5,058.75 |
| 26 | | 2 | $ 2,590.00 | $ 5,180.00 | $ 4,921.00 | 4,921.00 |
| 26 | | 1 | $ 1,050.00 | $ 1,050.00 | $ 997.50 | 997.50 |
| 26 | | 1 | $ 515.00 | $ 515.00 | $ 489.25 | 489.25 |
| 27 | $ 4,075.50 | 6 | $ 715.00 | $ 4,290.00 | $ 4,075.50 | $ - |
| 29 | $ 917.73 | 3 | $ 322.01 | $ 966.03 | $ 917.73 | $ - |
| 34 | $ 6,108.98 | 15 | $ 428.70 | $ 6,430.50 | $ 6,108.98 | $ - |
| 35 | $ 14,215.66 | 33 | $ 453.45 | $ 14,963.85 | $ 14,215.66 | $ - |
| 37 | $ 17,661.88 | 41 | $ 453.45 | $ 18,591.45 | $ 17,661.88 | $ - |
| 37 | $ 2,195.01 | 6 | $ 385.09 | $ 2,310.54 | $ 2,195.01 | $ - |
| 69 | $ 18,474.69 | 815 | | $ 19,447.04 | $ 18,474.69 | 0.00 |
| 69 | | 4 | $ 26.52 | $ 106.08 | $ 100.78 | 100.78 |
| 69 | | 4 | $ 58.24 | $ 232.96 | $ 221.31 | 221.31 |
| 69 | | 1 | $ 32.00 | $ 32.00 | $ 30.40 | 30.40 |
| 69 | | 815 | N/A | $ 19,076.00 | $ 18,122.20 | 18,122.20 |
| 70 S | $ 22,197.62 | 4 | | $ 23,365.92 | $ 22,197.62 | 0.00 |
| 70 | | 4 | $ 266.48 | $ 985.92 | $ 936.62 | 889.79 |
| 70 | | 4 | $ 5,595.00 | $ 22,380.00 | $ 21,261.00 | 20,197.95 |
| 71 | $ 2,270.50 | 1 | $ 2,390.00 | $ 2,390.00 | $ 2,270.50 | $ - |
| 73 | $ 31,644.12 | 600 | N/A | $ 33,309.60 | $ 31,644.12 | $ - |
| 74 | $ 953.80 | 25 | N/A | $ 1,004.00 | $ 953.80 | $ - |
| 74 | $ 1,461.86 | 40 | N/A | $ 1,538.80 | $ 1,461.86 | $ - |
| 77 | $ 11,230.11 | 2 | *See tab 77 | $ 11,821.17 | $ 11,230.11 | $ - |
| 78 | $ 1,716.19 | 2 | *See tab 78 | $ 1,806.52 | $ 1,716.19 | $ - |
| 79 | $ 953.80 N/A | 4 | *See tab 79 | $ 1,006.00 | $ 953.80 | $ - |
| 81 | $ 22,912.80 | 4 | N/A | $ 24,118.74 | $ 22,912.80 | $ - |
| 81 | | 1 | *See tab 81 | $ 2,289.60 | $ 2,375.12 | 2,375.12 |
| 81 | | 1 | *See tab 81 | $ 21,829.14 | $ 20,737.68 | 20,737.68 |
| 82 | $ 1,784.00 | 1 | *See tab 82 | $ 1,877.89 | $ 1,784.00 | $ - |
| 83 | $ 2,461.75 | 8 | *See tab 83 | $ 2,591.32 | $ 2,461.75 | $ - |
| 84 | $ 510.42 | 2 | *See tab 84 | $ 537.28 | $ 510.42 | $ - |
| 85 | $ 557.46 | 1 | *See tab 85 | $ 586.80 | $ 557.46 | $ - |
| 86 | $ 12,910.52 | 9 | *See tab 86 | $ 13,590.02 | $ 12,910.52 | $ - |
| 87 | $ 37,390.08 | 15 | *See tab 87,92,93,95-98,100 | $ 39,357.98 | $ 37,390.08 | $ - |
| 93 | $ 27,295.87 | 31 | *See tab 87,92,93,95-98,100 | $ 28,732.50 | $ 27,295.87 | $ - |
| 93 | $ 12,830.53 | 3 | *See tab 87,92,93,95-98,100 | $ 13,505.82 | $ 12,830.53 | $ - |
| 95 | $ 5,530.08 | 6 | *See tab 87,92,93,95-98,100 | $ 5,821.14 | $ 5,530.08 | $ - |
| 96 | $ 637.38 | 1 | *See tab 87,92,93,95-98,100 | $ 670.93 | $ 637.38 | $ - |
| 97 | $ 2,172.67 | 8 | *See tab 87,92,93,95-98,100 | $ 2,287.02 | $ 2,172.67 | $ - |
| 98 | $ 5,374.53 | 2 | *See tab 87,92,93,95-98,100 | $ 5,657.40 | $ 5,374.53 | $ - |
| 100 | $ 9,176.83 | 3 | *See tab 87,92,93,95-98,100 | $ 9,659.82 | $ 9,176.83 | $ - |
| 159 | $ 7,523.35 | 16 | *See tab 159-196 | $ 7,919.31 | $ 7,523.35 | $ - |
| 160 | $ 3,046.43 | 5000 | *See tab 159-196 | $ 3,206.77 | $ 3,046.43 | $ - |
| 162 | $ 2,899.03 | 1 | *See tab 159-196 | $ 3,051.61 | $ 2,899.03 | $ - |
| 163 | $ 2,502.29 | 1 | *See tab 159-196 | $ 2,633.99 | $ 2,502.29 | $ - |
| 171 | $ 3,491.19 | 14 | *See tab 159-196 | $ 3,674.93 | $ 3,491.19 | $ - |
| 172 | $ 7,201.24 | 14 | *See tab 159-196 | $ 7,580.25 | $ 7,201.24 | $ - |
| 173 | $ 2,565.74 | 2 | *See tab 159-196 | $ 2,700.78 | $ 2,565.74 | $ - |
| 180 | $ 4,584.86 | 10000 | *See tab 159-196 | $ 4,823.24 | $ 4,584.86 | $ - |
| 190 | $ 4,392.07 | 5 | *See tab 159-196 | $ 4,623.24 | $ 4,392.07 | $ - |
| 191 | $ 7,786.72 | 6 | *See tab 159-196 | $ 8,196.54 | $ 7,786.72 | $ - |
| 193 | $ 878.90 | 2 | *See tab 159-196 | $ 925.16 | $ 878.90 | $ - |
| 194 | $ 19,046.61 | 2 | *See tab 159-196 | $ 20,049.06 | $ 19,046.61 | $ - |
| 195 | $ 3,605.33 | 23 | *See tab 159-196 | $ 3,795.08 | $ 3,605.33 | $ - |
| 196 | $ 499.25 | 2 | *See tab 159-196 | $ 525.53 | $ 499.25 | $ - |
| 211 | $ 506.73 | 60 | $ 8.89 | $ 533.40 | $ 506.73 | $ - |
| 212 | $ 567.82 | 2 | *See tab 212 | $ 597.70 | $ 567.82 | $ - |
| | $ 456,081.46 | | | | | |

| H Notes |
|---|
| Pay App 4 |
| Pay App 12 |
| Pay App 11 (Quantity =375) and 12 (Quantity = 712) |
| Pay App 11 (Quantity=408( and 12 (Quantity=208) |
| Pay App 11 |
| Pay App 12 |
| Pay App 12 |
| Pay App 12 |
| Pay App 11 |
| Total Quantity reflects subcomponents that have different unit prices. |
| Pay App 11 |
| Pay App 11 |
| Pay App 11 |
| Pay App 11 |
| Pay App 11 |
| Pay App 11 |
| Pay App 12 |
| Pay App 11 |
| Pay App 5 |
| Pay App 5 |
| Pay App 5 |
| Pay App 5 |
| Material Stored Price consists of some subcomponents |
| Pay App 4 (sub components) |
| Pay App 4 |
| Pay App 1 - Reference bill of lading For Up to 840 LF delivered to /Smith Civil site (583 and 601 Church of God Rd, Goldsboro) |
| Material Stored Price consists of some subcomponents |
| Pay App 4 |
| Pay App 11 |
| Pay App 1 - Based on Total Invoice amount noted by inspector, unit price not provided, bill of lading for 600 LF delivered to /Smith Civil site (583 and 601 Church of God Rd, Goldsboro) |
| Pay App 1 - Based on Total Invoice amount noted by inspector, unit price not provided, likely part of bill of lading of 840LF pipe from line item 69 (part of  delivered to /Smith Civil site (583 and 601 Church of God Rd, Goldsboro) |
| Pay App 1 - Reference Bill of Lading For Up to 40 LF delivered to /Smith Civil site (583 and 601 Church of God Rd, Goldsboro) |
| Conisists of several subcomponents.  Part of Pay App 4. Subcomponent breakdown on next sheet |
| Pay App 1 |
| Pay App 1 and 4. Contains subcomponents |
| Pay App 1 |
| Pay App 1 and 4. Contains subcomponents |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Part is a subcomponent. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 4. Contains subcomponents. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11. LMI reference. |
| Pay App 11 |
| Pay App 11. Contains subcomponents. |

Item 77

| Line It | Description | Quantity | UOM | Unit Price | | Total Price | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 77 | 6 F6100 MJ RW GV OL ON CLO | 2 | EA | $ | 632.08 | $ | 1,264.16 | | $ | - |
| 77 | RAL Valve Box - Water Lid | 2 | EA | $ | 180.24 | $ | 360.48 | | $ | - |
| 77 | 6 F6114 MJ RW TAP VLV OL W | 9 | EA | $ | 882.71 | $ | 7,944.39 | | $ | - |
| 77 | RAL Valve Box - Water Lid | 9 | EA | $ | 180.24 | $ | 1,622.16 | | $ | - |
| 77 | 6 Megalug 1106DEC 316SS W, | 4 | EA | $ | 48.46 | $ | 193.84 | | $ | - |
| 77 | 6 Megalug 1106DEC 316SS W, | 9 | EA | $ | 48.46 | $ | 436.14 | $ 11,821.17 | $ | 11,230.11 |

95% **per COR specs, 95% is paid out for stored materials**

Item 78

| Line It | Description | Quantity | UOM | Unit Price | | Total Price | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 78 | 8x6 MJ Tee C153 USA | 2 | EA | $ | 258.22 | $ | 516.44 | | $ | - | |
| 78 | 8 MJ L/P SLV C153 USA | 2 | EA | $ | 163.37 | $ | 326.74 | | $ | - | |
| 78 | 8 EBA Megalug W/Acc 1108D | 8 | EA | $ | 101.43 | $ | 811.44 | | $ | - | |
| 78 | 6 EBA Megalug W/Acc 1106D | 2 | EA | $ | 75.95 | $ | 151.90 | $ | 1,806.52 | $ | 1,716.19 |

95% per COR specs, 95% is paid out for stored materials

Item 81

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | 95% per COR specs, 95% is paid out for stored materials |
| 81 | 6 F6100 MJ RW FV OL ON CLC | 6 | EA | $ 632.08 | $ 3,792.48 | $ - | |
| 81 | RAL Valve Box - Water Lid | 6 | EA | $ 180.24 | $ 1,081.44 | $ - | |
| 81 | S-1/4VO MED HYD 5'0"B W/S | 6 | EA | $ 2,598.02 | $ 15,588.12 | $ - | |
| 81 | 6 EBAA Megalug W/Acc 1106G | 18 | EA | $ 75.95 | $ 1,367.10 | $ 21,829.14 | $ 20,737.68 |

Item 82

| Line It | Description | Quantity | UOM | Unit Price | | Total Price | | | | | 95% per COR specs, 95% is paid out for stored materials |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 82 | 3/4x4-1/2 90 Offset Eyebolt 3 | 8 | EA | $ | 3.57 | $ | 28.56 | | $ | - | |
| 82 | 3/4 Hot Dipped Galv Hex Nut | 8 | EA | $ | 0.62 | $ | 4.96 | | $ | - | |
| 82 | 3/4 Hot Dipped Galv Flat Was | 8 | EA | $ | 0.64 | $ | 5.12 | | $ | - | |
| 82 | 6 EBAA Megalug MJ DI 1106 R | 1 | EA | $ | 41.42 | $ | 41.42 | | $ | - | |
| 82 | 6 F6100 MJ RW FV OL ON CLO | 1 | EA | $ | 632.08 | $ | 632.08 | | $ | - | |
| 82 | RAL Valve Box - Water Lid | 1 | EA | $ | 180.24 | $ | 180.24 | | $ | - | |
| 82 | 6 MJ 90 C153 USA | 1 | EA | $ | 143.17 | $ | 143.17 | | $ | - | |
| 82 | 6x2 TAPT Blind FLG DI USA | 1 | EA | $ | 230.16 | $ | 230.16 | | $ | - | |
| 82 | 2 Brass Cored Plug No Lead US | 1 | EA | $ | 32.47 | $ | 32.47 | | $ | - | |
| 82 | USF 669 Ring Only | 1 | EA | $ | 131.84 | $ | 131.84 | | $ | - | |
| 82 | USF KP Water Cover Only 1-H | 1 | EA | $ | 98.09 | $ | 98.09 | | $ | - | |
| 82 | 6x1/8 FLG ACC RR FF | 1 | EA | $ | 18.34 | $ | 18.34 | | $ | - | |
| 82 | 3/4 Hot DIP Galv All Thrd Rod | 40 | LF | $ | 3.44 | $ | 137.60 | | $ | - | |
| 82 | 6 Megalug 1106DEC 316SS W | 4 | EA | $ | 48.46 | $ | 193.84 | $ | 1,877.89 | $ | 1,784.00 |

Item 83

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | |
|---|---|---|---|---|---|---|---|
| 83 | C44-33GNL 3/4 GJCTS CPLG G | 8 | EA | $ 23.77 | $ 190.16 | | $ - |
| 83 | 3/4 Soft K Copper Tube 60' | 300 | LF | $ 7.37 | $ 2,211.00 | | $ - |
| 83 | C44-33GNL 3/4 GJCTS CPLG G | 8 | EA | $ 23.77 | $ 190.16 | $ 2,591.32 | $ 2,461.75 |

95% per COR specs, 95% is paid out for stored materials

Item 84

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 84 | C44-33GNL 3/4 GJCTS CPLG G | 2 | EA | $ 23.77 | $ 47.54 | | $ - | | |
| 84 | 3/4 Soft K Copper Tube 60' | 60 | LF | $ 7.37 | $ 442.20 | | $ - | | |
| 84 | C44-33GNL 3/4 GJCTS CPLG G | 2 | EA | $ 23.77 | $ 47.54 | $ 537.28 | $ 510.42 | | |

95% per COR specs, 95% is paid out for stored materials

Item 85

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | |
|---|---|---|---|---|---|---|---|
| 85 | 1 Soft K Copper Tube 60' | 60 | LF | $ 9.78 | $ 586.80 | $ 586.80 | $ 557.46 |

95% per COR specs, 95% is paid out for stored materials

Item 86

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | | 95% per COR specs, 95% is paid out for stored materials |
|---|---|---|---|---|---|---|---|---|
| 86 | C44-77-G-NL 2 GJCTS CPLG Gr | 8 | EA | $ 122.85 | $ 982.80 | | $ - | |
| 86 | 2 Soft K Copper Tube 60' | 300 | LF | $ 24.26 | $ 7,278.00 | | $ - | |
| 86 | C44-77-G-NL 2 GJCTS CPLG Gr | 8 | EA | $ 122.85 | $ 982.80 | | $ - | |
| 86 | 202B-750-CC7 6x2 CC BRS SAD | 1 | EA | $ 170.91 | $ 170.91 | | $ - | |
| 86 | FB1000-7GNL 2 Ballcorp CCXC | 1 | EA | $ 298.68 | $ 298.68 | | $ - | |
| 86 | 2 Ball Curb | 1 | EA | $ 431.77 | $ 431.77 | | $ - | |
| 86 | RAL Valve Box - Water Lid | 1 | EA | $ 180.24 | $ 180.24 | | $ - | |
| 86 | C84-77-G-NL 2 CPLG MIPXGCT | 2 | EA | $ 92.28 | $ 184.56 | | $ - | |
| 86 | 2 Soft K Copper Tube 40' | 40 | LF | $ 24.26 | $ 970.40 | | $ - | |
| 86 | C84-77-G-NL 2 CPLG MIPXGCT | 2 | EA | $ 92.28 | $ 184.56 | | $ - | |
| 86 | 2" Brass 90 No Lead | 2 | EA | $ 64.57 | $ 129.14 | | $ - | |
| 86 | 2x36 Brass Nipple USA No Lea | 2 | EA | $ 101.51 | $ 203.02 | | $ - | |
| 86 | C84-77-G-NL 2 CPLG MIPXGCT | 4 | EA | $ 92.28 | $ 369.12 | | $ - | |
| 86 | 2 Ball Curb | 2 | EA | $ 431.77 | $ 863.54 | | $ - | |
| 86 | RAL Valve Box - Water Lid | 2 | EA | $ 180.24 | $ 360.48 | $ 13,590.02 | $ 12,910.52 | |

Item 87.92.93.95-98.100

95% per COR specs, 95% is paid out for stored materials

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | |
|---|---|---|---|---|---|---|---|
| 87 | 5-1/4VO MED HYD 5'0"B W/S | 14 | EA | $ 2,598.02 | $ 36,372.28 | $ | - |
| 87 | 5-1/4VO MED HYD 5'0"B W/S | 1 | EA | $ 2,598.02 | $ 2,598.02 | $ | - |
| 87 | 6 Megalug 1106DEC 316SS W | 8 | EA | $ 48.46 | $ 387.68 | $ 39,357.98 | $ 37,390.08 |
| 90 | ROD-18 18" Curb Box Rod W/ | 18 | EA | $ 20.29 | $ 365.22 | $ | - |
| 90 | EA2-30-50 3' Curb Box | 18 | EA | $ 50.67 | $ 912.06 | $ | - |
| 90 | B44-333WGNL 3/4 Ball Curb G | 18 | EA | $ 87.54 | $ 1,575.72 | $ | - |
| 90 | VHH71-12W-4433GNL 5/8 MT | 18 | EA | $ 204.91 | $ 3,688.38 | $ | - |
| 90 | 18" Raleigh Meter Box - T/R R | 18 | EA | $ 342.20 | $ 6,159.60 | $ | - |
| 90 | 3/4 Soft K Copper Tube 60' | 540 | LF | $ 7.37 | $ 3,979.80 | $ 16,680.78 | $ 15,846.74 |
| 91 | ROD-18 18" Curb Box Rod W/ | 16 | EA | $ 20.29 | $ 324.64 | $ | - |
| 91 | EA2-30-50 3' Curb Box | 16 | EA | $ 50.67 | $ 810.72 | $ | - |
| 91 | B44-333WGNL 3/4 Ball Curb G | 16 | EA | $ 87.54 | $ 1,400.64 | $ | - |
| 91 | VHH71-12W-4433GNL 5/8 MT | 16 | EA | $ 204.91 | $ 3,278.56 | $ | - |
| 91 | 18" Raleigh Meter Box - T/R R | 16 | EA | $ 342.20 | $ 5,475.20 | $ | - |
| 91 | 3/4 Soft K Copper Tube 60' | 480 | LF | $ 7.37 | $ 3,537.60 | $ 14,827.36 | $ 14,085.99 |
| 92 | ROD-18 18" Curb Box Rod W/ | 31 | EA | $ 20.29 | $ 628.99 | $ | - |
| 92 | EA2-30-50 3' Curb Box | 31 | EA | $ 50.67 | $ 1,570.77 | $ | - |
| 92 | FB1000-4GNL 1 Ballcorp CCXG | 31 | EA | $ 80.58 | $ 2,497.98 | $ | - |
| 92 | B44-444WGNL 1 Ball Curb Gil | 31 | EA | $ 130.25 | $ 4,037.75 | $ | - |
| 92 | 18" Raleigh Meter Box - T/R R | 31 | EA | $ 342.20 | $ 10,608.20 | $ | - |
| 92 | 1 Soft K Copper Tube 60' | 960 | LF | $ 9.78 | $ 9,388.80 | $ 28,732.49 | $ 27,295.87 |
| 93 | 2 Soft K Copper Tube 40' | 40 | LF | $ 24.26 | $ 970.40 | $ | - |
| 93 | 202B-962-CC7 8x2 CC BRS SAI | 1 | EA | $ 192.98 | $ 192.98 | $ | - |
| 93 | 202B-750-CC7 6x2 CC BRS SAI | 1 | EA | $ 170.91 | $ 170.91 | $ | - |
| 93 | FB1000-7GNL 2 Ballcorp CCXG | 6 | EA | $ 298.68 | $ 1,792.08 | $ | - |
| 93 | 2 Ball Curb | 6 | EA | $ 431.77 | $ 2,590.62 | $ | - |
| 93 | RAL Valve Box - Water Lid | 6 | EA | $ 180.24 | $ 1,081.44 | $ | - |
| 93 | 2 Soft K Copper Tube 40' | 200 | LF | $ 24.26 | $ 4,852.00 | $ | - |
| 93 | 202B-962-CC7 8x2 CC BR5 SAI | 1 | EA | $ 192.98 | $ 192.98 | $ | - |
| 93 | FB1000-7GNL 2 Ballcorp CCXG | 1 | EA | $ 298.68 | $ 298.68 | $ | - |
| 93 | 2 Ball Curb | 1 | EA | $ 431.77 | $ 431.77 | $ | - |
| 93 | RAL Valve Box - Water Lid | 1 | EA | $ 180.24 | $ 180.24 | $ | - |
| 93 | T444-774GNL 2x2x1 TEE CT5 I | 1 | EA | $ 164.92 | $ 164.92 | $ | - |
| 93 | 1 Soft K Copper Tube 60' | 60 | LF | $ 9.78 | $ 586.80 | $ 13,505.82 | $ 12,830.53 |
| 95 | 432-1320-6 12x6 SS TAP SLV J | 6 | EA | $ 970.19 | $ 5,821.14 | $ 5,821.14 | $ 5,530.08 |
| 96 | 432-0690-6 6x6 SS TAP SLV JC | 1 | EA | $ 670.93 | $ 670.93 | $ 670.93 | $ 637.38 |
| 97 | 3/4x4-1/2 90 Offset Eyebolt 3 | 16 | EA | $ 3.57 | $ 57.12 | $ | - |
| 97 | 3/4 Hot Dipped Galv Hex Nut | 16 | EA | $ 0.62 | $ 9.92 | $ | - |
| 97 | 3/4 Hot Dipped Galv Flat Was | 16 | EA | $ 0.64 | $ 10.24 | $ | - |
| 97 | 6 MJ 90 C153 USA | 2 | EA | $ 143.17 | $ 286.34 | $ | - |
| 97 | 6 Megalug 1106DEC 316SS W | 2 | EA | $ 48.46 | $ 96.92 | $ | - |
| 97 | 6 FLG 90 C110 USA | 2 | EA | $ 267.15 | $ 534.30 | $ | - |
| 97 | 6x1/8 FLG ACC RR FF | 4 | EA | $ 18.34 | $ 73.36 | $ | - |
| 97 | 3/4 Hot Dipp Galv All Thrd Rod | 80 | LF | $ 3.44 | $ 275.20 | $ | - |
| 97 | 6 F6100 MJ RW FV OL ON CLC | 1 | EA | $ 632.08 | $ 632.08 | $ | - |
| 97 | RAL Valve Box - Water Lid | 1 | EA | $ 180.24 | $ 180.24 | $ | - |
| 97 | 6 Megalug 1106DEC 316SS W | 1 | EA | $ 48.46 | $ 48.46 | $ | - |
| 97 | 6 EBAA Megalug MJ DI 1106 R | 2 | EA | $ 41.42 | $ 82.84 | $ 2,287.02 | $ 2,172.67 |
| 98 | 2" PL20-V5 Air Release With V | 2 | EA | $ 716.03 | $ 1,432.06 | $ | - |
| 98 | C44-77-G-NL 2 GJCTS CPLG Gr | 2 | EA | $ 122.85 | $ 245.70 | $ | - |
| 98 | C84-77-G-NL 2 CPLG MIPXGCT | 2 | EA | $ 92.28 | $ 184.56 | $ | - |
| 98 | 2 Soft K Copper Tube 20' | 40 | LF | $ 28.85 | $ 1,154.00 | $ | - |
| 98 | 2 F6103 THRD RW GV OL ON C | 2 | EA | $ 302.28 | $ 604.56 | $ | - |
| 98 | RAL Valve Box - Water Lid | 2 | EA | $ 180.24 | $ 360.48 | $ | - |
| 98 | B41-777WGNL 2 Ball Curb GJ) | 2 | EA | $ 349.13 | $ 698.26 | $ | - |
| 98 | 2x3 Brass Nipple USA No Lead | 4 | EA | $ 12.32 | $ 49.28 | $ | - |
| 98 | 2 Brass Tee No Lead USA | 2 | EA | $ 81.95 | $ 163.90 | $ | - |
| 98 | 2x36 Brass Nipple USA No Lea | 2 | EA | $ 101.51 | $ 203.02 | $ | - |
| 98 | 2 Brass Cap No Lead USA | 2 | EA | $ 50.86 | $ 101.72 | $ | - |
| 98 | USF 669 Ring Only | 2 | EA | $ 131.84 | $ 263.68 | $ | - |
| 98 | USF KP Water Cover Only 1-H | 2 | EA | $ 98.09 | $ 196.18 | $ 5,657.40 | $ 5,374.53 |
| 100 | 12 MJ 45 C153 USA | 4 | EA | $ 417.20 | $ 1,668.80 | $ | - |
| 100 | 12 MJ 45 C153 USA | 4 | EA | $ 417.20 | $ 1,668.80 | $ | - |
| 100 | 3/4x4-1/2 90 Offset Eyebolt 3 | 64 | EA | $ 3.57 | $ 228.48 | $ | - |
| 100 | 3/4 Hot Dipped Galv Hex Nut | 64 | EA | $ 0.62 | $ 39.68 | $ | - |
| 100 | 3/4 Hot Dipped Galv Flat Was | 64 | EA | $ 0.64 | $ 40.96 | $ | - |
| 100 | 12 EBAA Megalug W/Acc 111 | 1 | EA | $ 191.48 | $ 191.48 | $ | - |
| 100 | 12 EBAA Megalug MJ DI 1112 | 2 | EA | $ 136.12 | $ 272.24 | $ | - |
| 100 | 3/4 Hot DIP Galv All Thrd Rod | 200 | LF | $ 3.44 | $ 688.00 | $ | - |
| 100 | 10 MJ 45 C153 USA | 2 | EA | $ 240.66 | $ 481.32 | $ | - |
| 100 | 10 EBAA Megalug W/Acc 111 | 4 | EA | $ 144.88 | $ 579.52 | $ | - |
| 100 | 10 EBAA Megalug MJ DI 1110 | 2 | EA | $ 93.55 | $ 187.10 | $ | - |
| 100 | 3/4 Hot DIP Galv All Thrd Rod | 120 | LF | $ 3.44 | $ 412.80 | $ | - |
| 100 | 12 MJ 45 C153 USA | 4 | EA | $ 417.20 | $ 1,668.80 | $ | - |
| 100 | 12 EBAA Megalug W/Acc 111 | 8 | EA | $ 191.48 | $ 1,531.84 | $ 9,659.82 | $ 9,176.83 |

Item 158-196

## Material Pre-Payment

| | Line # | Description | Quantity Requested for Material Prepay | Price per Each | Invoice Amount | 6.75 % Tax | Total | 95% Repayment Request |
|---|---|---|---|---|---|---|---|---|
| ✓ | 159 | Pedestrian signal head 16" | 16 | $463.6600 | $7,418.56 | $500.75 | $7,919.3128 | $7,523.35 |
| ✓ | 160 | Signal Cable | 5000 | $0.6008 | $3,004.00 | $202.77 | $3,206.7700 | $3,046.43 |
| ✓ | 162 | Vehicle Signal Head 4sec | 5 | $571.7300 | $2,858.65 | $192.96 | $3,051.6089 | $2,899.03 |
| ✓ | 163 | Vehicle Signal Head 5sec | 3 | $822.4800 | $2,467.44 | $166.55 | $2,633.9922 | $2,502.29 |
| ✓ | 171 | Junction Box standard | 16 | $215.1600 | $3,442.56 | $232.37 | $3,674.9328 | $3,491.19 |
| ✓ | 172 | Junction Box oversized | 14 | $507.2100 | $7,100.94 | $479.31 | $7,580.2535 | $7,201.24 |
| ✓ | 180 | Lead in cable | 10000 | $0.4521 | $4,521.00 | $305.17 | $4,826.1675 | $4,584.86 |
| ✓ | 190 | type i post w/foundation | 5 | $866.1800 | $4,330.90 | $292.34 | $4,623.2358 | $4,392.07 |
| ✓ | 191 | type ii pedestal w/foundation | 6 | $1,279.7100 | $7,678.26 | $518.28 | $8,196.5426 | $7,786.72 |
| ✓ | 193 | Signal Cabinet Foundation | 2 | $433.3300 | $866.66 | $58.50 | $925.1596 | $878.90 |
| ✓ | 194 | Controller w/Cabinet | 2 | $9,390.6600 | $18,781.32 | $1,267.74 | $20,049.0591 | $19,046.61 |
| ✓ | 195 | Detector cards | 23 | $154.5700 | $3,555.11 | $239.97 | $3,795.0799 | $3,605.33 |
| ✓ | 196 | Cabinet Base Extender | 2 | $246.1500 | $492.30 | $33.23 | $525.5303 | $499.25 |
| ✓ | 173 | Wood Pole | 5 | $506.0000 | $2,530.00 | $170.78 | $2,700.7750 | $2,565.74 |
| | | | | | | **Total (95% of Sum)** | | **$70,023.00** |

Item 212

95% per COR specs, 95% is paid out for stored materials

| Line It | Description | Quantity | UOM | Unit Price | Total Price | | | |
|---|---|---|---|---|---|---|---|---|
| 212 | 4 PVC SCH40 Pipe SW8 20' | 20 | LF | $ 6.58 | $ 131.60 | | $ - | |
| 212 | 6x4 PVC SCH40 DWV WYE HX | 2 | EA | $ 55.94 | $ 111.88 | | $ - | |
| 212 | 4 PVC SCH40 DWV 45 HXSP | 2 | EA | $ 6.90 | $ 13.80 | | $ - | |
| 212 | 4 SCH40 DWV Female ADPT H | 2 | EA | $ 6.34 | $ 12.68 | | $ - | |
| 212 | 4 Brass Cored Plug No Lead U | 2 | EA | $ 163.87 | $ 327.74 | $ 1,131.10 | $ 1,074.55 | <===not approved and included in stored materials |

597.7   567.815

# Exhibit 2

The following is a list of available Bonded Project work activities to be prosecuted by Completion Contractor after issuance of the Notice to Proceed but before its receipt of the Utility Relocation Completion Notice.  In addition to the following, Completion Contractor accepts the obligations set forth in the Bonded Contract to coordinate the private utility relocation work associated with the Bonded Project.  Based on the unique circumstances of the Bonded Project, including the willingness of the private utility companies to arrange for their own relocations subsequent to Principal's termination from the Bonded Project and prior to Completion Contractor's mobilization to the Bonded Project, it is anticipated that Completion Contractor's utility relocation coordination role under the Bonded Contract will be limited.

## Water & Sewer
1. Wake Med RPZ(reduce pressure)(Backflow preventer)(Coordination COR, Wake Med, Sun Rock)
2. Vertical Water Main Adjustment @ STA 61+40.
3. Install Remaining FH (2).
4. WM Relocations.
5. Opportunity for Sewer Main Replacement and SSMH Installations 1-5. (Ingram)

## Storm Water
1. Continue RCP and Structure Installations.
2. Wedging and plating required to install RCP.

## Grading of multi-use path

## Retaining Walls
1. Modular Block.
2. Wake Med wall (art wall and grading), and Carolina Ballet(grading), Comfort court wall.
3. Soldier Pile (Submittal)

## Erosion Control
1. Temporary Seeding.
2. Repair TTP and TSF.
3. Vegetation control

## Mellow Field Drive Sidewalk
1. Tree protection fence (process/inspected)
2. Fiber Utility box adjustment (adjusted not relocated) (private utility coordination);  it is the City's understanding that the private utility owner's fiber line doesn't need relocation, but the handhole does require relocation.

## Take over traffic control Maintenance

## General Clean Up
- Various Areas Throughout Corridor Needing Debris Removal from Site



Carolina Sunrock (Contracting Division)
P.O. Box 509
Butner, NC 27509
Phone: (919) 575-3894
Fax: (919) 575-4401

# Minority Participation Detail Report

| | | | |
|---|---|---|---|
| **Project Name:** | Atlantic Avenue Widening, Re-Bid Final | **Customer:** | The Vertex Companies, LLC |
| **Job Number:** | | **Billing Address:** | 400 Libbey Parkway |
| **Bid As:** | Prime | | Weymouth, MA 02189 |
| **Estimator:** | Randy Talley | **Phone:** | 919-371-2041 |
| **Project Address:** | Atlantic Avenue From Highwoods Blvd To New Hope Church Rd, Raleigh, NC | **Contact:** | Sam Reed, AIA, CCCA |
| **Completion Date:** | | | |

## Minority Summary

| Minority Type | Required $ | Required % | Current $ | Current % | Difference $ | Difference % |
|---|---|---|---|---|---|---|
| DBE | $2,133,154.38 | 15.00% | $2,341,889.49 | 16.47% | $208,735.11 | 1.47% |
| **Target Bid Price** | | | | | | **$14,221,029.21** |

## Disadvantaged Business Enterprise (DBE)

| Description | Assigned | Amount $ | Participation % |
|---|---|---|---|
| **Total Subcontractor Quotes** | | **$2,341,889.49** | **16.47%** |
| Arborex Tree Services, Knightdale, NC | DBE | $22,500.00 | 0.16% |
| Browe Construction Company, Inc., Selma, NC | DBE | $27,750.00 | 0.20% |
| LMJ Pavement Marking, LLC, Willow Spring, NC | WBE | $403,638.25 | 2.84% |
| Moffat Pipe, Inc., Wake Forest, NC | DBE | $1,705,100.24 | 11.99% |
| NPS Solutions LLC, Raleigh, NC | DBE | $84,362.00 | 0.59% |
| Southern Garden, Inc., Apex, NC | DBE | $98,539.00 | 0.69% |
| **Total Subcontractor RFQ Adjustments** | | **$180,169.67** | **1.27%** |
| Bond | DBE, WBE | $60,669.67 | 0.43% |
| MOBILIZATION | WBE | $19,500.00 | 0.14% |
| Mobilization | DBE | $100,000.00 | 0.70% |
| **Total DBE Participation:** | | **$2,522,059.16 †** | **17.73%** |
| **Required vs. Current:** | | **$388,904.78** | **2.73%** |

Legend: † Section total does not take into account the distribution of RFQ Adjustments

# Exhibit I

Matthew W. Buckmiller
Blake Y. Boyette†
Joseph Z. Frost



## Buckmiller Boyette & Frost

*Attorneys at Law*

4700 Six Forks Road
Suite 150
Raleigh, North Carolina 27609

Post Office Box 99023
Raleigh, North Carolina 27624

Telephone: (919) 296-5040
Telefax:    (919) 890-0356
Website:    www.bbflawfirm.com

†Licensed in North Carolina and Virginia

**April 5, 2024**

*VIA CERTIFIED MAIL AND EMAIL*

City of Raleigh
222 W. Hargett Street
Raleigh, NC 27601

Re:     JSmith Civil, LLC: Atlantic Avenue Widening Project.

To Whom It May Concern,

This law firm represents JSmith Civil, LLC ("JSmith") with respect to its dispute with the City of Raleigh related to the Atlantic Avenue Widening Project. On or about December 21, 2021, JSmith and the City entered into a written agreement ("Contract") pursuant to which JSmith was to perform roadway improvements for .88 miles of Atlantic Avenue from Highwood Blvd to New Hope Church Road, Project #ES 2021-02. On August 16, 2023, the City terminated the Contract with JSmith. JSmith contends that the City breached several provisions (express and implied) of the Contract.

The Contract contains a mediation requirement. Accordingly, pursuant to the Rules Implementing Mediated Settlement Conferences in North Carolina Public Construction Projects ("Mediation Rules"), and specifically Rule 1, this letter serves as a written request to the City of Raleigh for mediation of the dispute.

Rule 2 of the Mediation Rules further provides that JSmith and the City may select a mediation within ten (10) days from the date of this letter. Please contact me immediately so we can attempt to agree on a mediator.

Sincerely,

Matt Buckmiller

cc: bbuskirk@poynerspruill.com; mbouchard@poynerspruill.com; Dennis.Trujillo@raleighnc.gov; Bradford.Williams@raleighnc.gov; Sylvester.Percival@raleighnc.gov; jsmith@jscivil.com