IN RE:

**JSMITH CIVIL, LLC,**                                **CASE NO. 23-02734-5-JNC**
                                                      **CHAPTER 11**

     **DEBTOR.**

---

| | |
|---|---|
| **JSMITH CIVIL, LLC,** | |
| *Plaintiff,* | |
| vs. | **AP NO. 25-_____-5-JNC** |
| **BARNHILL CONTRACTING COMPANY** | |
| *Defendant.* | |

---

**COMPLAINT**
**[JURY TRIAL DEMANDED]**

---

**NOW COMES** Plaintiff JSMITH CIVIL, LLC ("Plaintiff" or "JSmith"), by and through undersigned counsel of record, and complaining of Defendant BARNHILL CONTRACTING COMPANY ("Barnhill" or "Defendant"), alleges and states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff JSmith is a North Carolina limited liability company which maintains its principal office in Wayne County, North Carolina.

2.      Defendant Barnhill Contracting Company is a North Carolina limited liability company which maintains its principal office in Nash County, North Carolina.

3.      This adversary proceeding relates to the above-captioned bankruptcy proceeding that was commenced by Plaintiff on September 19, 2023 (the "Petition Date"), through the filing

of a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court"), BK Case No. 23-2734-5-JNC (the "Bankruptcy Case").

4.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334, as it arises in and concerns matters affecting the administration of the bankruptcy estate, see § 157(b)(2)(A), involves the adjustment of a debtor-creditor relationship, see § 157(b)(2)(O), and concerns rights duty established in the above-captioned bankruptcy proceeding and under the Bankruptcy Code and applicable North Carolina law, and—as a result— the relief requested herein, is a "core proceeding" as defined under 28 U.S.C. § 157(b)(2). The Bankruptcy Court's jurisdiction controls over any arbitration agreements entered into between the parties.

5.      The Court, has jurisdiction to enter a final and dispositive Order granting the relief requested herein, Budget Service Co. v. Better Homes of Va., 804 F.2d 289 (4th Cir. 1986); however, and to the extent any claim for relief asserted herein is determined to be a non-core proceeding, JSmith consents to entry of a final Order in this matter in accordance with 28 U.S.C. § 157(c)(2).

6.      This Court, likewise, has authority to hear this matter pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391, 1408 and 1409, as all of the actions complained of and giving rise to the claims alleged herein arose in this judicial district, within which Plaintiff and Defendants reside and/or regularly conduct their respective business operations and affairs.

8.    The contract between Plaintiff and Defendant states that most disputes between the parties are required to be arbitrated.

9.    However, Section #28 provides in pertinent part the following: "It is agreed that the following claims shall not be arbitrable: any claim requesting punitive damages… and any claim based upon an alleged deceptive trade practice – consumer protection act."

10.    In this Adversary Proceeding, Claimant is asserting a claim under the North Carolina Unfair and Deceptive Trade Practices Act and/or a request for relief for punitive damages based on fraud and/or willful and wanton conduct. Similarly, Claimant is only asserting claims for pre-contract conduct of the Defendant.

## SUMMARY

11.    This action arises from Barnhill Contracting Company's pre-contract intentional misrepresentations and concealments, and deceptive business practices associated with the 400H Project. Confronted by substantial budgeting pressures and stringent environmental compliance requirements that threatened the project's viability, Barnhill strategically shifted undisclosed compliance costs and environmental risks onto Plaintiff JSmith Civil. Barnhill concealed essential regulatory constraints, withheld material facts about soil disposal obligations, and knowingly misrepresented the true scope of environmental hazards, consequently exposing Plaintiff to significant financial harm, business disruption, and increased environmental liabilities. Defendants' intentional and reckless actions, detailed herein, not only inflicted severe economic damage upon Plaintiff but also created substantial risk to public safety and environmental integrity.

## GENERAL ALLEGATIONS

12.    Upon information and belief. or about December 2017, Barnhill Contracting was awarded a project known as 400H.

13.     Barnhill subsequently spent approximately three years and seven months attempting to commence construction, experiencing significant budgetary challenges.

14.     Prior to releasing any bid documents to bidders for the September 29, 2020 bid, Barnhill was fully aware of the specific scope of work required to comply with Brownfields regulations on the 400H project, as demonstrated by an internal email from Wes Weaver (Barnhill Project Executive) email dated May 13, 2020.

15.     On or about September 18, 2020, Barnhill issued Addendum #1 to all bidders on the 400H project, including JSmith

16.     On or about September 24, 2020, Barnhill issued Addendum #2 to all bidders on the 400H project, including JSmith.

17.     Addendum 1 and 2 both included an RFI Log that clarified the "**potential quantity and nature**" of the hazardous spoils on the 400H project by explicitly instructing bidders to include "200 cubic yards of hazardous soil disposal" creating the illusion that minimal landfill disposal costs would be required.

18.     Defendant intentionally concealed its knowledge of the true scope of the actual environmental requirements in both Addendums #1 and #2, thereby misleading prospective bidders.

19.     On May 13, 2020, Jerry Ricciardi (Trammell Crow, Owners Representative) forwarded an email to Barnhill from Joselyn Harriger of the North Carolina Department of Quality ("NCDEQ"), explicitly stating that "sites with this much export are challenging, we have all been thrown a curve ball! " He goes on to say that "none of the soil can be given a blanket beneficial fill approval."

20.     This email confirmed NCDEQ stated clearly position that beneficial fill approval would require identifying specific receiving site, performing additional sampling and testing at that receiving location, and demonstrating that arsenic levels at the receiving site closely matched those of the soils to be exported.

21.     On May 13, 2020, Barnhill Project Executive Wes Weaver responded to this email and acknowledged to Jerry Ricciardi and Barnhill Management, including Mike Lutz, Tim Miller, Victor Stephenson, Brandon Harper, and David Wiest, that beneficial fill disposal was effectively impossible and described pursuing beneficial fill as a "likely dead end."

22.     Defendant Barnhill (through Project Executive Wes Weaver) in the same May 13, 2020 email identified the necessity of proactively identifying potential receiving locations, performing the necessary testing well in advance, and then engaging the lengthy stated approval process.

23.     Barnhill never disclosed to the Plaintiff or other bidders that either Barnhill (a) had pursued beneficial fill approval and could not obtain it, or (b) determined beneficial soil approval to be impractical and therefore did not pursue it.

24.     Regardless, Defendant deliberately withheld this critical information to avoid revealing the true environmental compliance costs and the complexity involved.

25.     By intentionally concealing the known impossibility of beneficial fill reuse, Barnhill misled subcontractors into submitting significantly lower bids than they otherwise would have if they had been truthfully informed of these critical project realities.

26.     On or about September 29, 2020, Barnhill accepted Subcontractor bids for the 400H project.

27.     Plaintiff submitted the lowest bid totaling $1,894,235.00 for the Turnkey Sitework package.

28.     The next lowest competing bidder, Carolina Civilworks, submitted a substantially higher bid of $2,363,625.00, approximately $469,000 more than the Plaintiff.

29.     Despite Plaintiff already having submitted the lowest bid by a substantial margin, Barnhill, driven by budget constraints and internal pressures to proceed with the Project, engaged Plaintiff in further negotiations aimed at cutting cost by removing scope items and seeking further concessions.

30.     Throughout these negotiations, Barnhill intentionally continued to withhold critical information from Plaintiff.

31.     Specially, Plaintiff's original bid was already approximately $469,000 lower than the next closest competitor. Defendant deliberately withheld this information to prevent JSmith from reconsidering its participation in the project or resisting further negotiations aimed at reducing the price.

32.     On October 12, 2020, in an email from Jerry Ricciardi (Trammel Crow, Owner's Representative) to the Defendant regarding the bids received for the 400H project, Jerry attached a bid summary previously provided by Barnhill, which included notes. On page three of that attachment, under "Qualifying and Clarifications" of the bids, Barnhill stated, "We have included unregulated spoils removal from site. See alternates for if mass excavation soils are required to be disposed of at a certified landfill (red rock)." Jerry explicitly noted that mass excavation of soils are in fact "not included in Alternates."

33.     Further, on page seven of the same attachment, Jerry Ricciardi specifically noted "[m]issing spoil disposal at certified landfill (Red Rock) stated in qualifications".

34. Subsequently, on November 13, 2020, Jerry Ricciardi sent an email to Katie Lippard (Senior Project Manager, Mid Atlantic) and Wes Weaver, concluding the email by requesting Wes Weaver to confirm that the disposal site for excavated material from onsite would be Red Rock, stating in bold letters, "**Wes I don't see any way around this.**"

35. Upon information and belief, the Defendant was required to cut substantial costs from the Project, approximately $15 million, to enable the Project to proceed.

36. On or about August 4, 2021, after more than three and a half years of design and budget issues, Barnhill and the Owner entered into a contract ("Prime Contract") under which the owner agreed to pay Barnhill a "(GMP)" or gross maximum price.

37. In furtherance of Barnhill's Prime Contract, On September 23, 2021, Barnhill transmitted the final Subcontract documents to Plaintiff via DocuSign, reflecting a total reduced contract value of $1,615,598.00 while deliberately failing to disclose to JSmith Civil the true scope and magnitude of environmental compliance obligations required by the Project.

38. The Subcontract, executed by Plaintiff on September 27, 2021, explicitly included disposal of 150 cubic yards of auger cast spoils, with compensation for any additional spoils to be paid at a unit rate.

39. However, Barnhill knew at the time of execution that this stated quantity was grossly understated, further shifting substantial undisclosed cost and risk onto Plaintiff.

40. Barnhill's internal pre-subcontract communications are telling.

41. In an internal email from Ken Powell (Barnhill Project Superintendent) to Barnhill Management, including Brian Rose (Senior Project Manager), Ryan Weaver, Kenny Hinkle, Miles Mitchell, Nathan Henson, and David Wiest, dated September 10, 2021, at 12:44 PM, confirmed

Barnhill's understanding and knowledge of the actual quantity of yards that was withheld from JSmith. Specifically, Mr. Powell stated;

**"150 yards of spoils removal is way light! Remember that the grout itself is pumped at a minimum waste factor of somewhere around 20%...Haven't done a pile count but if it's 350 need to figure 1,000 yards"**

42. The Subcontract sent to the Plaintiff via DocuSign on Sept 23, 2021, explicitly stated in Attachment C Supplemental Price Schedule, the Prime Contract Earthwork Division Thirty-One Qualifications, and Addendum 1 and 2 that only 200 cubic yards of contaminated soil (also referred to interchangeably as "hazardous spoils" or "contaminated spoils" within the project documents and related correspondence) required disposal at a certified landfill.

43. This representation was intentionally misleading and a continuation of Barnhill's pattern of misrepresentation and concealment.

44. The Subcontract sent to JSmith Civil for execution on September 23, 2021 explicitly represented that hazardous spoils could remain on-site, stating specifically: "hazardous spoils will either remain on site or be hauled to a certified landfill."

45. At the time Barnhill made this representation, it was fully aware that this was false. Barnhill knew from internal investigations conducted over a year earlier that the reuse of hazardous or contaminated soils on-site would require extensive additional testing and a lengthy regulatory approval process, which Barnhill itself had explicitly concluded was a "dead end," as documented by Wes Weaver's email dated May 13, 2020.

46. Furthermore, the Defendant included an Environmental Management Plan ("EMP") as part of the Subcontract documents it provided to JSmith Civil for execution. Specifically, with the EMP, under "Part 1.C. Exported Soil," Question 2 explicitly ask: "To what

type of facility will the export Brownfields soil be sent?" The box indicating "Use as Beneficial Fill off-site at a non- Brownfields Property" was affirmatively checked.

47.     However, when Defendant included the EMP as part of the contract documents for execution, it intentionally failed to disclose to Plaintiff that the beneficial fill option listed in the EMP was, in reality, unattainable, an issue explicitly acknowledged by Wes Weaver in his email dated May 13, 2020.

48.     ECS Southeast, LLC, Barnhill's expert in the arbitration, independently confirmed on March 31, 2025, that all soils onsite could have been approved as unrestricted Beneficial reuse if proper approval were obtained in accordance with the EMP. ECS further confirmed there was no evidence that the Defendant obtained such approvals.  Consequentially, without obtaining these necessary approvals, JSmith was compelled to transport and dispose of soils at approved landfarms or other certified treatment facilities, incurring significant additional cost; a fact known by Barnhill prior to execution of the Subcontract but not disclosed to JSmith.

49.     Defendant was fully aware of the conditions and constraints independently verified by ECS Southeast well in advance of bidding and executing the Subcontract.

50.     Barnhill deliberately chose either to not pursue beneficial fill approval or, as explicitly stated by Greg Sandreuter in his email dated May 13, 2020, "to waive the white flag" conceding that beneficial reuse approvals were unattainable. Regardless of the reason, Defendant intentionally concealed this materially significant environmental compliance issue from bidders, including the Plaintiff, thereby misleading Plaintiff into entering into the Subcontract under false pretenses.

51.     Had Plaintiff been aware that Barnhill either never pursued or was unable to obtain the required approvals for beneficial fill, Plaintiff would not have pursued the Project and certainly would not have entered into the Subcontract with the Defendant.

52.     At all relevant times, prior to the entering into the Subcontract with the Plaintiff, the Defendant was extensively informed regarding Plaintiff's financial condition and vulnerabilities.

53.     Specifically, from 2016 through 2021, Plaintiff provided Barnhill with at least (19) comprehensive prequalification packages, explicitly containing detailed Profit and Loss statements and Balance Sheets. These Financial disclosures included

> A.  Two Profit and Loss statements and Balance Sheets for 2016;
> B.  One Profit and Loss statement and Balance Sheet for early 2017;
> C.  Three Midyear Financial Statements for 2017;
> D.  Three Year End Financial Statements for 2018;
> E.  Three Year End Financial Statements for 2019;
> F.  Two Year End Financial Statements for 2020; and
> G.  One Year End Financial Statements for 2021.

54.     Through these extensive and regular disclosures, Barnhill possessed intimate knowledge of Plaintiff's financial standing including vulnerabilities and operational capacity.

55.     Just three days before Barnhill transmitted the Subcontract documents via DocuSign for execution, and only seven days before JSmith executed the Subcontract, Barnhill had explicit knowledge of serious concerns regarding JSmith's financial stability.

56.     Specifically, on September 20, 2021, Ryan Weaver, a Barnhill representative, internally acknowledged significant financial concerns and identified multiple "red flags" regarding JSmith's stability, explicitly noting that United Rentals had refused to rent equipment to JSmith due to payment issues.

57.     Despite the Defendants' explicit knowledge of Plaintiff's precarious financial condition, Barnhill proceeded to execute the Subcontract with JSmith, intentionally withholding critical information regarding significant undisclosed project costs.

58.     Additionally, the Prime Contract incorporated into the Subcontract documents sent to Plaintiff for execution on September 23, 2021, explicitly excluded exporting of soils to a certified landfill beyond the stated allowance of 200 cubic yards as detailed in the Earthwork Section, Division Thirty One.

59.     This exclusion was materially misleading because Barnhill internally knew that substantially greater quantities of soil would require certified landfill disposal due to regulatory constraints and site conditions, critical information intentionally concealed from JSmith, as documented in Wes Weavers email dated May 13, 2020.

60.      Plaintiff JSmith Civil, LLC ("JSmith") entered into a Subcontract("Subcontract") with Defendant Barnhill Contracting Company ("Barnhill") on September 27, 2021, via DocuSign, related to the 400H project at Hillsborough Square, a Brownfields site in Raleigh, North Carolina.

61.     Plaintiff commenced soil export on October 18, 2021 and expedited this process at Defendant's request, as the project had already experienced substantial delays due to prior budgetary issues.

62.     As set forth previously, Barnhill knew that pursuing the beneficial soil approval would have significantly delayed the project further.

63.     Upon information and belief, any additional cost incurred as a result of delays associated with pursuing the beneficial soil reuse approvals would have been Barnhill's responsibility, potentially amounting to hundreds of thousands, if not millions, of dollars. These

costs would have included overhead, payroll, liquidated damages, material escalation, and other delay-related expenses.

64.     Moreover, given the significant budgetary constraints Barnhill faced and the known impracticability of obtaining beneficial soils' approval, Barnhill found itself between a rock and a hard place. Defendant lacked the budgetary capacity to absorb these additional expenses, creating a powerful incentive for Barnhill to conceal and improperly shift these compliance costs onto Plaintiff.

65.     In furtherance of Defendants' scheme to circumvent these environmental costs, as well as to avoid additional delays and substantial expenses it could not afford, Barnhill deliberately withheld from Plaintiff the eventual requirement that all exported soils had to be disposed of at certified landfills until after execution of the Subcontract, despite possessing prior knowledge of this requirement. An email dated November 4, 2021, explicitly confirms that soils leaving the project site had been, and would continue to be hauled exclusively to one of four certified landfills.

66.     The Defendant intentionally concealed the true extent of environmental compliance in the bid documents, Subcontract agreements, during project construction and throughout the subsequent litigation, deliberately obstructing the significant transfer of associated cost onto JSmith.

67.     Barnhill's environmental omissions and misrepresentations regarding hazardous and contaminated soils significantly increased the risk of improper handling and inadequate management of these materials, heightening the likelihood of environmental contamination, long-term ecological harm, and substantial risk to public health.

68.     Environmental Compliance significantly impacts project timelines, budgeting, and overall feasibility.

69.     By withholding critical information, Barnhill unfairly shifted hidden cost, compliance burdens, and regulatory risks onto JSmith, resulting in unforeseen financial stress and operational disruption.

70.     By withholding critical environmental facts, Barnhill artificially lowered project costs, unfairly winning work by misleading Subcontractors into underestimating project expenses.

71.     Barnhill had an incentive not to be forthwith with JSmith. Had Barnhill accurately disclosed the true scope and magnitude of the soil disposal requirements, it would have significantly jeopardized the financial and operational viability of the entire 400H project, a project they had been working on for nearly four years.

72.     Moreover, any additional monies owed JSmith from hauling off spoils would have cut into Barnhill's profits since Barnhill entered into a Gross Maximum Cost ("GMC") Contract with the owner.

73.     Had Barnhill accurately disclosed the true soil disposal requirements, it would have severely jeopardized the viability of the entire project.

74.     Therefore, Barnhill intentionally withheld that information from bidders and the Plaintiff to get the Project within budget.

75.     Upon information and belief, Barnhill's project teams are compensated based on the profitability of the Project.

76.     At no point in the pre-contract communications did Barnhill disclose to JSmith that: (i) the actual quantity of auger spoils requiring removal would be nearly ten times greater than the quantity explicitly represented by Barnhill in Plaintiff's Subcontract scope of work; (ii) that spoils generated from onsite excavation could not be reused as beneficial fill onsite; (iii) that JSmith would bear full financial responsibility and liability for the contaminated soils and (iv) Barnhill

had pursued beneficial soils approval but was either unable to obtain it or determined that obtaining regulatory approval for beneficial fill was impossible, leading the Defendant not to pursue such approval further.

77.     Without Barnhill's exclusive and critical knowledge of these undisclosed realities, JSmith entered into the Subcontract ("Subcontract"), committing itself to perform sitework for the Project based solely on Barnhill's materially misleading misrepresentations.

78.     Through these deliberate misrepresentations, omissions, and exploitative tactics, and intimate knowledge of Plaintiff's financial vulnerabilities, Barnhill knowingly caused the Plaintiff to enter into a financially untenable Subcontract, which inevitably and foreseeably resulted in the Plaintiff's severe financial injury, operational harm, and ultimate bankruptcy.

79.     JSmith would never have executed the Subcontract if Barnhill had truthfully disclosed the true scope, risks, liabilities, and substantial financial implications related to soil contamination and environmental compliance.

80.     From the outset of the 400H project, Barnhill faced severe budgeting and design challenges. To overcome these financial pressures and keep the project feasible, Barnhill reduced its own direct cost by transferring substantial undisclosed financial risk and liabilities on its subcontractors, namely JSmith.

81.     Barnhill's later internal communications explicitly recognized how Plaintiff's financial distress and the subsequent involvement of Plaintiff's bond company would directly benefit Barnhill, by enabling it to offload substantial environmental compliance costs and liabilities that Barnhill had initially concealed and intentionally misrepresented to Plaintiff.

82.     These communications, particularly the email dated April 19, 2023, explicitly reveal the true nature and underlying intent of Barnhill's broader scheme. Senior Barnhill

executives, including Vice Presidents Randy Fichera, John W. Smith, and Barry Harden, internally acknowledged internally that JSmith's impending insolvency along with the involvement of its bonding company, created an opportunity for Barnhill to resolve its significant financial and environmental compliance liabilities associated with the 400H project. Specifically, John W. Smith stated, in direct refence to JSmith's insolvency: "Coming full circle and I am guessing this will help us resolve the 400H issue," explicitly recognizing the strategic financial benefit Barnhill would derive from JSmith's financial collapse. Randy Fichera confirmed this strategy succinctly, replying to John W. Smith and copying Barry Harden, stating simply, "Yes it will." This internal acknowledgment demonstrates Barnhill's intent to drive JSmith toward insolvency by not paying JSmith what was owed and conceal Barnhill's undisclosed liabilities on the Project.

83.     Had Plaintiff not successfully reorganized through Chapter 11 bankruptcy, Barnhill's deliberate strategy explicitly recognized by its executives would have fully succeeded.

### General Allegations of Defendant's Pattern of Conduct

84.     Defendant Barnhill's deceptive and unethical conduct in the present matter is reflective of its broader and consistent business practices.

85.     Internal communications among senior executives demonstrate a deliberate and coercive approach toward subcontractors and suppliers.

86.     Specifically, in the email dated March 20, 2023, Wes Weaver, Barnhill's Director of Operations, explicitly admitted to "strong-arming" a specific subcontractor into performing work related to the 400H project.

87.     Moreover, the same email exchange further demonstrates Barnhill's inadequate management and communication regarding significant project cost implications. Wes Weaver disclosed that approximately $600,000 worth of metal panel column wraps, and elevator front

wraps were mistakenly excluded from procurement packages, resulting in unanticipated substantial financial impacts. Barry Harden, Barnhill's Vice President of Operations, responded with confusion and surprise, stating 'OK, but I thought we had carried in our projection a big amount of money to cover this??' These internal emails underscore Barnhill's routine practice of mismanaging project scope, costs, and risk, subsequently transferring those burdens onto subcontractors like JSmith Civil through deceptive practices and intentional concealment.

88.     Additionally, another internal email communication dated February 8, 2023, highlights Barnhill's explicit strategy to obscure project cost. Wes Weaver directed the project team on another project as follows , "Our strategy needs to be burying as much cost as possible in Subcontractor costs…" This statement clearly evidences Barnhill's systematic practice of deliberately shifting undisclosed financial liabilities onto subcontractors.

89.     Furthermore, in an email dated October 27, 2021, just days after JSmith Civil commenced work on the 400H project, Barnhill Project Superintendent Ken Powell explicitly instructed his team to conceal negative project conditions from the owner by suggesting two methods for managing problematic photos internally: either marking them individually as private or creating a dedicated private album accessible only internally. Powell explicitly stated, "We do not need to keep plenty of photos of the 'bad stuff,' but with the owner having full access to Procore, we need to find an alternative to store these photos internally." This directive clearly illustrates Barnhill's broader and consistent practice of intentional concealment and misrepresentation of critical project conditions from stakeholders, thereby reinforcing the deceptive business conduct asserted herein.

90.     This documented conduct further substantiates Plaintiff's claims that Barnhill knowingly engaged in systematic deceptive trade practices designed to shift financial burdens and

risks onto subcontractors unfairly and deceptively, directly aligning with the allegations set forth herein.

### FIRST CLAIM FOR RELIEF
**(Unfair and Deceptive Trade Practices)**

91.     The Plaintiff incorporates herein by reference all the allegations contained in the Complaint as if fully set forth.

92.     The actions and conduct of Defendant Barnhill, delineated above, constitute unfair or deceptive acts or practices, in or affecting commerce, in violation of N.C. Gen. Stat. §75-1.1.

93.     Plaintiff's claims for unfair and deceptive trade practices against Defendant includes but is not limited to:

   a. Its fraud and/or deceptive conduct, detailed above and below, which includes the intentional misrepresentation and concealment of material facts;
   b. To the extent not fraudulent or deceptive, the Defendant's reckless, unfair, and careless conduct with it being totally irrelevant whether the Defendant's made such representations to Plaintiff in good faith, in ignorance of its falsity, and/or without intent to mislead;
   c. Its actions detailed above and below offends established public policy,  are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

94.     Plaintiff further alleges that Defendant's unfair and deceptive conduct directly resulted in additional harm.

95.     Plaintiff seeks all appropriate and remedies available under law, including remedies and damages not fully addressed, available, or awarded within the arbitration.

96.     As a direct and proximate result of the conduct of Defendant, the Plaintiff is entitled to recover from Defendant an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), to recover treble damages pursuant to N.C. Gen. Stat.  §75-16, and to recover reasonable attorney's fees, as provided in N.C. Gen. Stat.  §75-16.1.

## SECOND CLAIM FOR RELIEF
### (Fraud)

97.     The Plaintiff incorporates herein by reference all the allegations contained in the Complaint as if fully set forth.[1]

98.     The misrepresentation made by Defendant, by and through its duly authorized agents/employees including but not limited to Wes Weaver (Project Executive), Brian Rose (Senior Project Manager), and Barry Harden (Vice President Building Group Operations) to Plaintiff consisted of the following:

**Pre- Contract Misrepresentation and Concealment of the "Nature and Quantity" of 'hazardous material'**

    a.  Time: September 18, 2020 and September 24, 2020
    b.  Place: Addendum 1 and Addendum 2, Barnhill Scope of Work Pre-Bid RFI Log
    c.  Content: A subcontractor explicitly notified Barnhill that there was no information regarding the quantity and nature of hazardous material on site. Barnhill responded merely instructed, without further elaboration or disclosure, to "include 200 CY of hazardous spoil disposal," thereby misrepresenting the true and substantially known quantity and nature of hazardous or contaminated spoils present at the project.
    d.  Identity of Person Making the Statement: Carie Lamson of Barnhill at the request of Grant Thomas and/or Brandon Walker of Barnhill.
    e.  What Defendant Obtained Thereby: Barnhill fraudulently induced JSmith Civil into entering into the Subcontract.

**Pre Contract Original Earthwork Scope of Work Misrepresentation of Brownfields Site Requirements**

    a.  Time: September 15, 2020
    b.  Place: Included Earthwork Scope of Work within the bid documents downloaded from Barnhill Contracting Companies online Planroom.
    c.  Content: Defendant represented in the Earthwork pre bid scope of work that hazardous spoils "shall remain onsite or be disposed of at a certified landfill."
    d.  Identity of Person Making the Statement: Carie Lamson of Barnhill at the request of Brandon Harper of Barnhill.
    e.  What the Defendant Obtained Thereby: Barnhill fraudulently induced JSmith to enter into the Subcontract under significantly underestimated

---

[1] This claim is alleged simply as a predicate to obtain punitive damages.

project cost, enabling Barnhill to artificially maintain project viability within budget constraints.

**Misrepresentation of Auger Spoils Removal**

    a. Time: September 27, 2021 at 8:30:26 PM
    b. Place: DocuSign Subcontract executed by JSmith Civil
    c. Content: Barnhill explicitly represented that the scope of work "includes haul off of 150 cubic yards of spoils" from the auger cast pile operations, characterizing this quantity as sufficient for the project's needs, with any additional removal covered at the unit rate. Defendant fraudulently withheld internal knowledge and communications that ten times would actually be required.
    d. Identity of Person Making the Statement: The Subcontract was signed by Barry Harden, VP of Operations of Barnhill and created by Brian Rose of Barnhill
    e. What Defendant Obtained Thereby: Barnhill fraudulently induced JSmith Civil into entering into the Subcontract under conditions that artificially lowered costs, thus enabling Barnhill to fit the project within budget constraints.

**Misrepresentation of Hazardous and Contaminated Spoils Removal Scope and Magnitude in Contract Documents**

    a. Time: September 27, 2021, at 8:30:26 PM
    b. Place: Subcontract, Prime Contract, and Addendum 1 & 2
    c. Content: Defendant explicitly instructed Plaintiff JSmith to include only 200 cubic yards of hazardous spoils and or contaminated soils removal.
    d. Identity of Person Making the Statement: The Subcontract was signed by Barry Harden, VP of Operations of Barnhill and created by Brian Rose of Barnhill
    e. What Defendant Obtained Thereby: Barnhill fraudulently induced JSmith Civil into entering into the Subcontract under conditions that artificially lowered costs, thus enabling Barnhill to fit the project within budget constraints.

**Misrepresentation and Concealment of Certified Landfill Disposal Requirements**

    a. Time: September 27, 2021 at 8:30:26
    b. Place: DocuSign Subcontract executed by JSmith Civil, incorporating the Prime Contract
    c. Content: Defendant explicitly stated by incorporating the Prime contract into the Plaintiff's scope of work that disposal at a certified landfill beyond the specified 200 cubic yard was excluded implying remaining spoils could be disposed of as beneficial fill as significantly lower cost.

    d. Identity of Person Making the Statement: The Subcontract was signed by Barry Harden, VP of Operations of Barnhill and created by Brian Rose of Barnhill

    e. What Defendant Obtained Thereby: Barnhill fraudulently induced JSmith Civil into entering into the Subcontract under conditions that artificially lowered costs, thus enabling Barnhill to fit the project within budget constraints.

**Misrepresentation Regarding Brownfields Spoils Disposal**

    a. Time: September 27, 2021 at 8:30:26 PM

    b. Place: DocuSign Subcontract executed by JSmith Civil

    c. Content: Defendant represented in the subcontract scope of work that hazardous spoils "shall remain onsite or be disposed of at a certified landfill," implying onsite recuse was a viable option.

    d. Identity of Person Making the Statement: The Subcontract was signed by Barry Harden, VP of Operations of Barnhill and created by Brian Rose of Barnhill

    e. What Defendant Obtained Thereby: Defendant's concealed internal knowledge, documented as early as May 13, 2020 that regulatory approval was impractical or impossible, thus artificially reducing project cost.

**Misrepresentation and Concealment of Impossibility of Beneficial Fill Option**

    a. Time: September 27, 2021 (Date of Subcontract Execution)

    b. Place: Environmental Management Plan (EMP), part of the Contract Documents, and DocuSign Subcontract executed by JSmith Civil

    c. Content: Barnhill represented within the Environmental Management Plan (EMP) that excavated soils could be disposed of as beneficial fill off-site at a non-Bronfields property, significantly reducing anticipated disposal costs. The EMP explicitly has the option checked for beneficial fill reuse, falsely indicating it as viable and practical despite internally knowing since May 13,2020, that obtaining regulatory approval for beneficial reuse was impractical and effectively impossible.

    d. Identity of Person Making the Statement: The Subcontract was signed by Barry Harden, VP of Operations of Barnhill and created by Brian Rose of Barnhill

    e. What Defendant Obtained Thereby: Through deliberate concealment and materially false representation, Barnhill fraudulently induced JSmith to enter into the Subcontract under significantly underestimated project cost, enabling Barnhill to artificially maintain project viability within budget constraints.

    99.    The above agents/employees at the time that said representations were made and at all times relevant, were agents/employees of Defendant and had actual and/or apparent authority

to bind Defendant, since they had actual authority in all respects related to matters related to the Project.

100. In addition to the affirmative misrepresentations, Defendant failed to disclose material information which, by reason of its superior knowledge and as a matter of law it had a duty to disclose to the Plaintiff's by virtue of it making a partial or incomplete representation to the Plaintiff.

101. Accordingly, Defendant had a duty to disclose all facts material to the Plaintiff, known or reasonably ascertainable by it, since it had a duty imposed by law.

102. Defendant concealed material facts from the Plaintiff's, including but not limited to the following:

a. That all of their statements discussed above were not true;
b. That they didn't know whether their statements were true and accurate or not;
c. That JSmith would have to haul all spoils to a certified landfill;
d. That the auger cast spoils removal alone would exceed, by a multiple of ten, the allotted cubic yards of spoils.

103. These misrepresentations and failures to disclose induced Plaintiff to enter into the Subcontract.

104. Plaintiff could not discover that Defendant's intent or that its representations were untruthful through the exercise of reasonable diligence.

105. Accordingly, Defendant knowingly or recklessly made false and material representations, and otherwise failed to disclose material information, on which the Plaintiff's relied upon in entering into a Subcontract for the Project.

106. At the time that the false representations and/or concealments were made to the Plaintiff by Defendant, Defendant knew the statements were false or incomplete, or should have reasonably known that the statements were false or incomplete.

107. The false representations and/or concealments made by Defendant were calculated to deceive, and were made and done with the intent to deceive; and Plaintiff was, in fact, deceived by the false representations and/or concealments.

108. The false representations and/or concealments were made by Defendant with the intention that the Plaintiff rely on the same, and Plaintiff did rely on the same, to its detriment, and its reliance on the representations and/or concealments by Defendant was reasonable, under the circumstances.

109. Had Defendant disclosed the aforementioned material facts to the Plaintiff; Plaintiff would never have entered into the Subcontract with Defendant

110. As a direct and proximate cause of Defendant's fraudulent misrepresentations and/or concealments of material facts, the Plaintiff has been damaged, and is entitled to recover from Defendant an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

111. Upon information and belief, the conduct, acts and omissions of Defendant alleged herein constitute fraud and willful and wanton conduct in reckless disregard and indifference to the well-being of Plaintiff, and the officers, directors, and/or managers of Defendant participated in or condoned Defendant's conduct. Therefore, Plaintiff is entitled to recover punitive damages from Defendant in an amount to be determined at the trial of this matter.

**WHEREFORE**, the Plaintiff pray the Court as follows:

1. That Plaintiff have and recover compensatory damages from the Defendant in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus interest as allowed by law.

2. That Plaintiff recover punitive damages from the Defendant in an amount in excess of Seventy-Five Dollars ($75,000.00) and to be determined at the trial of this matter.

3.     That the costs of this action, including reasonable attorney's fees in accordance with N.C. Gen. Stat. §75-16.1, be taxed by the Court against the Defendant.

4.     That any damages awarded the Plaintiff be trebled pursuant to provisions of N.C. Gen. Stat. §75-16.

5.     For a trial by jury on all issues so triable.

6.     For such other and further relief as to the Court deems just and proper.


This the 23rd day of April, 2025.

<div style="margin-left: 40%;">

**BUCKMILLER & FROST, PLLC**
BY:  s/Matthew W. Buckmiller
MATTHEW W. BUCKMILLER, NCSB No. 35194
mbuckmiller@bbflawfirm.com
4700 Six Forks Road, Suite 150
Raleigh, North Carolina 27609
TEL:   (919) 296-5040
FAX:   (919) 977-7101
*Attorneys for Plaintiff*

</div>